# EXHIBIT A

AMENDED AND RESTATED
EMPLOYMENT AGREEMENT

AMENDED AND RESTATED EMPLOYMENT AGREEMENT, entered into as of the 24 day of March, 2008, by and between Aladdin Capital Holdings LLC, a Delaware limited liability company, with its principal place of business at Six Landmark Square, Stamford, CT 06901 (the "Company"), and Harumi Aoto, aka Harumi Aoto Donoyan, residing at 65 The Neck, Manhasset, NY 11030 (the "Employee").

WITNESSETH:

WHEREAS, the Company wishes to continue to employ the Employee upon the terms and conditions contained herein; and

WHEREAS, the Employee wishes to remain in the employment of the Company upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the parties hereto hereby agree as follows:

1. Employment

The Company hereby employs the Employee and the Employee hereby accepts employment upon the terms and conditions set forth herein. Defined terms used herein and not otherwise defined shall bear the meanings ascribed to them in the Limited Liability Company Agreement of the Company dated December 17, 2003, as the same may be amended from time to time (the "Operating Agreement").

2. Term

The term of this Agreement shall commence concurrently with, and commencement shall be subject to, the closing of the purchase transaction whereby MC acquires an ownership interest in the Company (the "Transaction"), and shall continue for two (2) years from the date of the Transaction, subject to the termination provisions of Sections 6 and 10 and the other provisions of this Agreement. The term shall be extended automatically for additional one-year periods on each anniversary of the commencement date ("Automatic Renewal Date"), unless terminated by the Company or the Employee, in its or her sole discretion, in the manner set forth in Section 10 hereof. For the avoidance of doubt, this Agreement shall not take effect, and any executed version hereof shall be null and void, in the event the Transaction shall not occur substantially on the terms contemplated under a Letter of Intent dated December 27, 2007, as modified by letters dated January 11, January 17 and February 1, 2008, between MC and the Company.

-1-

3. Services To Be Rendered

(a) During the term of this Agreement, Employee shall serve the Company in the capacity of Senior Managing Director, Japan Sales and Marketing and shall perform such duties as are consistent with such office, as and to the extent more fully defined in the Operating Agreement, and such other duties as shall be designated from time to time by the Supervisory Committee, the Chairman and Chief Executive Officer or the President of the Company. Unless prevented by death, disability or illness, the Employee shall devote her full business time, allowing for vacations and national holidays, as set forth in Sections 5(d) and (e) hereof, exclusively to the business and affairs of the Company, and shall use her best efforts, skill and abilities to promote the Company's interests. Employee may only be engaged in other businesses and activities and may only accept directorships outside of the Company if the Employee receives the express prior written consent of the Supervisory Committee.

(b) As a Company Officer of the Company, Employee shall be entitled to all rights of indemnification as may be provided to officers under the Operating Agreement and applicable Delaware law. Nothing herein shall be construed as requiring the Company or any other person or entity to cause the appointment or election of Employee to serve in any other capacity for or within the Company.

4. Compensation

For the services rendered hereunder, the Company shall pay and the Employee shall accept the following compensation:

(a) Employee shall receive base annual compensation of $225,000, payable bi-weekly.

(b) Employee shall be entitled to such bonus, incentive or other compensation as the Supervisory Committee, consistent with any incentive plans or pools established for such purpose, may determine from time to time.

(c) Employee's compensation shall be payable subject to such deductions as are then required by law and such further deductions as may be agreed to by the Employee, in accordance with the Company's prevailing compensation practices.

5. Benefits and Expenses

(a) Employee shall be entitled to participate in the standard health and dental insurance coverage made available to all employees of the Company.

(b) In the event that the Employee's employment by the Company is terminated for any reason, Employee shall have the right to purchase from the Company any insurance policies on her life owned by the Company for a price equal to the cash surrender value of the policies at the date of such termination, plus prepaid premiums, and to acquire any

-2-

disability income insurance policies maintained for her as provided in such policies. The right to purchase shall be exercised by the Employee by written notice to the Company not less than thirty (30) days after the date of such termination, and the purchase price for such policies shall be paid by the Employee to the Company.

(c) During the term of this Agreement, the Company shall, upon presentation of proper vouchers, reimburse Employee for all reasonable expenses incurred by her directly in connection with her performance of services as an Officer of the Company.

(d) Employee shall be entitled to 28 days of paid vacation per calendar year. Vacation entitlements are non-cumulative and if Employee fails to use any or all of Employee's vacation allotment during a particular calendar year, such vacation shall be deemed forfeited forever.

(e) Employee shall receive as paid days off all national holidays, sick days, and personal days that the Company, pursuant to established policy, recognizes and observes.

6. Disability and Death

(a) In the event of the permanent disability (as hereinafter defined) of the Employee, the Company shall have the right thereafter to terminate this Agreement with the Employee by sending written notice of such termination to the Employee, and thereupon this Agreement shall terminate. For purposes hereof, "permanent disability" shall mean the inability of the Employee to perform her duties hereunder due to physical or mental illness, including drug abuse and alcoholism, for a continuous period of three (3) months or for six (6) months in any period of twelve (12) consecutive months. In addition, the "permanent disability" of the Employee shall also have been deemed to have occurred if the Employee shall have had appointed a guardian or conservator for her or such appointment shall have been made by a court of competent jurisdiction.

(b) The parties hereto hereby agree that if a disagreement arises as to whether a condition of disability exists hereunder, Employee shall submit to a physical examination by a physician of her own choice and by a physician of the Company's choice. If the physicians so chosen do not agree as to the determination of disability, the two physicians shall mutually select a third qualified physician, whose determination shall be conclusive upon all parties. Each party shall bear the expense of the physician selected by such party and the expense of the third physician shall be borne equally by the Employee and the Company. The Employee hereby consents to the examination provided for herein and waives, if applicable, any privilege which exists between any physician and the Employee as a result of such examination.

(c) This Agreement shall also terminate upon and as of the date of death of the Employee at any time during the term of this Agreement.

(d) Notwithstanding anything contained herein to the contrary, the Employee shall be paid her base compensation as set forth in this Agreement, through the date of

-3-

termination of this Agreement due to permanent disability or death, provided, however, in the event of permanent disability any such compensation shall be reduced by any amounts payable to Employee from or in respect of disability insurance plans for which the Company has paid any premiums (in proportion to the amount of premiums paid) and which payments are received by the Employee for the period of such incapacity or illness.

7. Covenants and Restrictions

(a) Employee hereby covenants and agrees that Employee will not at any time subsequent to the date hereof, reveal, divulge, or make known to any Person any Confidential Information (as hereinafter defined) made known to Employee or of which Employee has become aware, regardless of whether developed, prepared, devised or otherwise created in whole or in part by the efforts of the Employee and except to the extent so authorized in writing by the Company in order to carry out the terms of this Agreement or except as required by law. For purposes of this Agreement, the term "Confidential Information" shall mean (i) any significant technical, scientific or engineering information relating to the Company's products and/or services, (ii) information relating to any customer of the Company, including without limitation, the names, addresses, telephone numbers and sales records of, or pertaining to any such customer, and (iii) price lists, methods of operation and other information pertaining to the Company and which the Company, in its sole discretion, regards as confidential or in the nature of trade secrets. Notwithstanding anything contained herein to the contrary, Confidential Information as used herein shall not include that which (i) was in the public domain prior to receipt hereunder in the same context as the disclosure made hereunder, (ii) subsequently becomes known to the Employee as a result of disclosure by third parties not in the course of this Agreement and as a matter of right and without restriction on disclosure, or (iii) subsequently comes into the public domain in the same context as the disclosure by the Company through no fault of the Employee.

(b) The Employee further covenants and agrees that the Employee will retain all of such Confidential Information in trust for the sole benefit of the Company, and will not divulge or deliver or show any of such Confidential Information to any unauthorized person and will not make use of or in any manner seek to turn to account any of such Confidential Information in an independent business however unrelated to the business of the Company. The Employee further agrees that upon the termination of this Agreement or upon the request of the Company, the Employee will either return to the Company or destroy, in accordance with the Company's request, all Confidential Information in the Employee's possession, including, without limitation, all account lists, records and data related to all customers of the Company.

(c) Employee covenants that, should Employee terminate her employment hereunder in any manner other than pursuant to notice of non-renewal of the term of this Agreement, or should Employee's employment be terminated by the Company for cause, Employee shall not accept employment or start or engage in any business or practice that is the same or substantially similar to the business of the Company, or which otherwise competes with

-4-

the business of the Company in the United States for a period of one year from the date of termination of employment. In the event that Employee's employment is terminated by Company at any time without cause and Employee continues to receive compensation from the Company, Employee covenants that Employee shall not accept employment or start or engage in any business or practice that is the same or substantially similar to the business of the Company, or which otherwise competes with the business of the Company anywhere in the United States for the period during which Employee continues to receive compensation from the Company. The Employee otherwise acknowledges and re-affirms her agreement, as a Member, to the terms of Section 11.14 of the Operating Agreement (Non-Competition; Non-Solicitation).

(d) The Employee acknowledges that her breach or threatened violation of any of the restrictive covenants contained in this Section 7 may cause irreparable damage to the Company for which remedies at law would be inadequate. The Employee further acknowledges that the restrictive covenants set forth herein are essential terms and conditions of this Agreement. The Employee therefore agrees that the Company shall be entitled to a decree or order by any court of competent jurisdiction enjoining such threatened or actual violation of any of such covenants. Such decree or order, to the extent appropriate, shall specifically enforce the full performance of any such covenant by the Employee and the Employee hereby consents to the jurisdiction of any such court of competent jurisdiction. This remedy shall be in addition to all other remedies available to the Company at law or equity. If any portion of this Section 7 is adjudicated to be invalid or unenforceable, this Section 7 shall be deemed amended to delete therefrom the portion so adjudicated, such deletion to apply only with respect to the operation of this Section 7 in the jurisdiction in which such adjudication is made.

8. Proprietary Property

(a) The parties hereto hereby agree that Proprietary Property (as hereinafter defined) shall be the sole and exclusive property of the Company, except as provided below. For purposes hereof, Proprietary Property shall mean inventions, discoveries, improvements and ideas, whether patentable or not, made solely by the Employee or jointly with others, which relate to the Company's business, including any of its products, services, processes, technology, research, product development, marketing programs, manufacturing operations, or engineering activities.

(b) The Employee shall promptly disclose to the Company in writing all Proprietary Property, including those in the formative stages, created during the term hereof, irrespective of whether created during normal business hours. In addition, the Employee hereby agrees to promptly disclose to the Company all Proprietary Property created subsequent to the date of termination hereof, irrespective of the reasons for termination hereof, which relate to or constitute an improvement on Proprietary Property or Confidential Information, as defined herein.

(c) The Employee hereby agrees and acknowledges that the Employee shall have no right, title or interest in or with respect to any Proprietary Property, except as described below, and will during the term hereof or at any time subsequent to the termination hereof, at the

-5-

Company's request and expense, execute any and all patent applications and assignments to the Company and take any all action as required by the Company to perfect and maintain the Company's rights and interests in and with respect to the Proprietary Property.

(d) The Employee hereby agrees to maintain written records concerning the Proprietary Property and agrees to make those records available to the Company at all times.

(e) Notwithstanding anything contained herein to the contrary, Proprietary Property shall not include inventions or discoveries with respect to which all of the following conditions apply:

(i) no equipment, supplies, facilities or Confidential Information of the Company was used in its development;

(ii) it does not relate the Company's business and/or any proposed or planned products or services of the Company, including any research and development activities; and

(iii) it does not result from any work performed by the Employee for the Company.

(f) During or subsequent to the Employee's employment by Company, the Employee will not, directly or indirectly, lecture upon, publish articles concerning, use, disseminate, disclose, sell or offer for sale any Proprietary Property without the Company's prior written permission.

9. Prior Agreements

The Employee represents that she is not now under any written agreement, nor has she previously at any time entered into any written agreement with any person, firm or corporation which would or could in any manner preclude or prevent her from giving freely and the Company receiving the exclusive benefit of her services.

10. Termination Provisions

(a) Either the Company or the Employee may terminate this Agreement for any reason whatsoever or for no reason by providing the other party with notice of such termination no later than thirty (30) days prior to the Automatic Renewal Date provided for under Section 2 hereof. If such notice is given pursuant to this Section 10(a), then the Agreement will not renew and shall terminate at the end of its then-current term.

(b) In addition to, and not in lieu of, the termination provisions set forth in Section 6 and Section 10 (a) of this Agreement, the employment of the Employee hereunder may be terminated by the Company in the event that the Employee (i) breaches this Agreement in any material respect; (ii) engages in any act of dishonesty with respect to the Company, including

any act of willful misfeasance; or (iii) fails to follow instructions provided in accordance with Section 3(a) of this Agreement or fails to perform her duties in a reasonable and professional manner (the foregoing reasons for termination set forth under clauses (i), (ii) and (iii) are sometimes referred to hereinafter as termination for "Cause"). Such termination of the Employee's employment hereunder shall be effective immediately upon delivery of written notice to the Employee setting forth the reason or reasons for such termination. Upon the termination of this Agreement in accordance with this Section 10(b), the Company shall not be obligated to make any further payments hereunder to the Employee.

(c) Notwithstanding any provisions in this Agreement to the contrary, the Company may terminate the employment of the Employee hereunder at any time without Cause, but in such event, the Company shall be obligated (subject to the conditions set forth herein) to pay the Employee's base compensation in bi-weekly installments through the end of the then-current term of this Agreement (such period being referred to herein as the "Remainder Term"), and the Company shall also continue for the Remainder Term to permit the Employee to receive or participate in all fringe benefits available to her pursuant to Section 5(a) above. Employee shall be required to execute and deliver to the Company a General Release and Waiver of all Claims in a form satisfactory to the Company in order to receive base compensation during the Remainder Term and, from time to time during the Remainder Term, the Employee shall be required to provide such service to the Company as it shall reasonably request relating to the duties of the Employee during the term of this Agreement. Employee shall not be entitled to any bonus or incentive compensation for the year in which the termination occurs or during the Remainder Term, unless the Supervisory Committee, in its sole discretion, authorizes such a bonus or incentive compensation.

(d) In the event of a "change of control" (as hereinafter defined) of the Company during the term of the Employee's employment hereunder, the Employee may terminate her employment with the Company by giving thirty (30) days' notice thereof within six months after the occurrence of such change of control. If the Employee terminates her employment under this Section 10(d) or is terminated without cause within six (6) months after a change of control, the Company shall pay Employee in an amount equal to any base compensation that would be due to her under a Remainder Term. Employee shall have the option to have such payment made in a lump sum payable on the date of termination or in bi-weekly installments payable over the Remainder Term. The Company shall also continue to permit the Employee to receive or participate in all fringe benefits available to her pursuant to Section 5(a) above for the period of the Remainder Term. A "change of control" shall be deemed to occur when any Person or group of Persons directly or indirectly (through a subsidiary or otherwise), (A) acquires or is granted the right to acquire, directly or through a merger or similar transaction, a majority of Company's outstanding voting securities, or (B) acquires all or substantially all of the Company's assets.

11. Employee's Status as Member

In the event that Employee's employment is terminated by either party pursuant to the terms of this Agreement, Employee shall be required to sell to Company, and the Company

-7-

shall be required to purchase, Employee's Interest in the Company. For purposes of such sale and purchase, the Company shall pay to Employee pursuant to the installment schedule set forth below, a portion of the Company's Fair Market Value as of the Appraisal Date equal to Employee's percentage interest in the Company, determined within a period of ninety (90) days after the termination date in accordance with the terms of the Operating Agreement. Payment to Employee for her Interest shall be made within five (5) years of the date of termination of Employee's employment with the Company, without reference to any Remainder Term, provided that Employee has been terminated by Company without cause. Such payment shall be made in three (3) equal annual installments, commencing on the third anniversary of the Employee's termination date. Notwithstanding the foregoing, in the case of a termination of employment for Cause or the voluntary termination of employment by Employee, the Company shall be obligated to purchase, and the Employee shall be required to sell, Employee's Interests in the Company in the manner set forth above; provided, however, that payment for such Interest shall be made by the Company in five (5) equal annual installments, commencing on the fifth anniversary of the Employee's termination date. The Company may, in its discretion, make any or all installment payments in advance of their due date without penalty, and in the case of a change of control of the Company, payment in full for Interests of the terminated Employed shall be accelerated to the date of closing of the transaction by which the change of control occurs. Employee hereby grants to Company a right of offset against any such amounts due for damages to the Company caused by acts of Employee, as finally determined by a court of law with competent jurisdiction or in any formal arbitration proceeding to which the parties may submit, or as agreed finally agreed between the parties in writing through settlement or otherwise.

12. Miscellaneous

(a) This Agreement shall inure to the benefit of and be binding upon the Company, its successors and assigns, and upon the Employee, her heirs, executors, administrators, legatees and legal representatives.

(b) Should any part of this Agreement, for any reason whatsoever, be declared invalid, illegal, or incapable of being enforced in whole or in part, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated, and it is hereby declared the intention of the parties hereto that they would have executed the remaining portion of this Agreement without including therein any portion which may for any reason be declared invalid.

(c) This Agreement shall be construed and enforced in accordance with the laws of the State of Connecticut applicable to agreements made and to be performed in such State without application of the principles of conflicts of laws of such State.

(d) This Agreement and all rights hereunder are personal to the Employee and shall not be assignable, and any purported assignment in violation thereof shall be null and void. Any person, firm or corporation succeeding to the business of the Company by merger, consolidation, purchase of assets or otherwise, shall assume by contract or operation of

-8-

law the obligations of the Company hereunder; provided, however, that the Company shall, notwithstanding such assumption and/or assignment, remain liable and responsible for the fulfillment of the terms and conditions of the Agreement on the part of the Company.

(e) This Agreement constitutes the entire agreement between the parties hereto with respect to the terms and conditions of the Employee's employment by the Company, as distinguished from any other contractual arrangements between the parties pertaining to or arising out of their relationship, and this Agreement supersedes and renders null and void any and all other prior oral or written agreements, understandings, or commitments pertaining to the Employee's employment by the Company. This Agreement may only be amended upon the written agreement of both parties hereto.

(f) Any notice, statement, report, request or demand required or permitted to be given by this Agreement shall be in writing, and shall be sufficient if delivered in person or if addressed and sent by certified mail, return receipt requested, postage prepaid, to the parties at the addresses set forth above, or at such other place that either party may designate by notice in the foregoing manner to the other. If mailed as aforesaid, any such notice shall be deemed given three (3) days after being so mailed.

(g) The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or any condition of this Agreement on the part of either party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

(h) The provisions of Sections 6, 7, 8, 10 and 11 of this Agreement shall survive any termination of this Agreement.

(i) The headings of the paragraphs herein are inserted for convenience and shall not affect any interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

The "Employee"                                  Aladdin Capital Holdings LLC

_____                         By: _____

-9-