## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALADDIN CAPITAL HOLDINGS LLC, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 3:11-CV-00655 (MRK) |
| | : | |
| v. | : | |
| | : | |
| HARUMI AOTO DONOYAN, | : | |
| | : | |
| Defendant. | : | MAY 26, 2011 |

## DEFENDANT'S BRIEF PURSUANT TO THIS COURT'S MAY 24, 2011 ORDER

Pursuant to this Court's order dated May 24, 2011, Defendant Harumi Aoto Donoyan ("Defendant" or "Ms. Donoyan") submits this brief in support of her position that Plaintiff's request for injunctive relief is mooted by the expiration of the relevant restrictive covenants.

## I.    PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS MOOT

### A.    In Connecticut, a request for injunctive relief on an expired restrictive covenant is moot.

The Plaintiff's request for injunctive relief is moot because the restrictive covenants at issue have expired. Defendant's noncompetition obligations set forth in Section 7(c) of the Amended and Restated Employment Agreement (Exhibit A to the Complaint) and in Section 11.14(a) of the Amended and Restated Limited Liability Company Agreement of Aladdin Capital Holdings LLC (Exhibit C to the Complaint) ("the LLC Agreement") (together with Section 7(c) of Exhibit A "noncompete agreement") expired on May 5, 2011. Similarly, the nonsolicitation obligations set forth in Sections 11.14(b)-(c) of the LLC Agreement ("nonsolicitation agreement") expired on May 18, 2011. See Pl's. Mem. in Supp. of Prelim. Inj. at p. 5, n. 2 and ex's. cited therein.

In Connecticut, a request for injunctive relief to enforce a restrictive covenant is moot

once the restrictive covenant has expired.  See Van Dyck Printing Co. v. DiNicola, 43 Conn. Supp. 191, 191 (Conn. Super. Ct. 1993) (Hodgson, J.), aff'd, 231 Conn. 272 (1994) (cited by Brian M. Mahlsberger, Covenants Not to Compete, 1484 (Seventh ed., vol. I 2010)).  In Van Dyck Printing Co., the plaintiff asked the Connecticut Superior Court to grant injunctive relief to enforce an *expired* noncompete agreement.  Id.  The Connecticut Superior Court declined to address the plaintiff's request because it found that the request for injunctive relief was moot because the term of the covenant had expired.  Id.  Importantly, the Connecticut Supreme Court explicitly affirmed the Superior Court's decision, stating that the lower court's decision was "properly resolved," "well reasoned," "thoughtful and comprehensive."  Van Dyck Printing Co., 231 Conn. at 273-74.

The Connecticut Supreme Court's endorsement of Judge Hodgson's decision in Van Dyck Printing Co. is consistent with the conservative interpretation Connecticut courts afford restrictive covenants.  In the context of restrictive covenants concerning employment, a court must not "write out a new contract" for the parties.  See Timenterial, Inc. v. Dagata, 29 Conn. Supp. 180, 185 (Conn. Super. Ct. 1971), citing Beit v. Beit, 15 Conn. Supp. 191, 198 (Conn. Super. Ct. 1948), aff'd, Beit v. Beit, 135 Conn. 195 (1948).  Noncompetition agreements must be construed narrowly.  See Saye v. Old Hill Partners, Inc., 478 F. Supp. 2d 248, 267 (D. Conn. 2007).  Indeed, it is well established that under Connecticut law restrictive covenants in the employment context "are subject to stricter review than other types of contracts."  Id., citing Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 253 (1919) ("in a restrictive covenant between employer and employe [sic] . . . there is small scope for the restraint of the right to labor and trade and a correspondingly small freedom of contract.").  Thus, Van Dyck Printing Co. is consistent with Connecticut law on restrictive covenants, which prohibits courts from writing

contracts for the parties. See Beit, 15 Conn. Supp. at 198 (stating that a court must not write a new contract for parties to a noncompete agreement).[1]

**B.    Courts in other jurisdictions have also found requests for injunctive relief on expired restrictive covenants to be moot.**

Several other jurisdictions agree that a request for injunctive relief to enforce a restrictive covenant is moot once the term of the covenant expires. See, e.g., A-Copy, Inc. v. Michaelson, 599 F.2d 450, 452-53 (1st Cir. 1978) (overruling trial court's grant of injunctive relief to plaintiff because restrictive covenant at issue had expired by the time the trial court issued injunction); and Hodak v. Madison Capital Mgmt., LLC, Civ. No. 5:07-5-JMH, 2008 U.S. Dist. LEXIS 7263, 5-6 (E.D. Ky. Jan. 30, 2008)[2] (request for injunctive relief to enforce restrictive covenant moot where covenant had expired); and Healthcare Mgmt. & Inv. Holdings, LLC v. Feldman, Nos. 1:03CV0323 & 1:04CV0883, 2006 U.S. Dist. LEXIS 66038, *33-34 (N.D. Ohio Sept. 15, 2006) (same); and Hogan Mgmt. Servs., P.C. v. Martino, 530 S.E. 2d 508, 510 (Ga. App. 2000) ("The duration of a covenant not to compete is not tolled during litigation. And when the duration of that covenant has expired, an action seeking injunctive relief pursuant to the covenant is moot"); see also Latuszewski v. VALIC Fin. Advisors, Inc., Nos. 04-1324, 04-1435, & 04-2776, 2005 U.S. App. LEXIS 11006, *5-7 (3d Cir. Pa. June 9, 2005) (finding that because noncompete agreement had expired, appeal contesting district court's denial of injunctive relief was moot); Hodges v. Schlinkert Sports Assocs., 89 F.3d 310, 312 (6th Cir. Mich. 1996) (same); Agrigenetics, Inc. v. Rose, 62 F.3d 268 (8th Cir. 1995) (dismissing appeal as moot where appellant sought injunctive relief in the form of a one year extension of expired restrictive

---

[1] Plaintiff's request for an extension of the expired restrictive covenants is tantamount to asking the Court to write a new contract for the parties. If the Plaintiff wished to include a tolling provision in the restrictive covenants, it should have done so. See, e.g., Gaylord Broadcasting Co., 746 F.2d at 253 n.1 (parties may contractually provide for the tolling of the noncompete period).

[2] All unpublished cases are attached hereto as Exhibit A.

covenant and remanding to trial court with directions to vacate its order denying preliminary injunctive relief on the merits and to enter a new order denying plaintiff's request for preliminary injunctive relief as moot); Curtis Indus. v. Livingston, 30 F.3d 96, 97-98 (8th Cir. Minn. 1994) (appeal contesting district court's denial of injunctive relief was moot where restrictive covenant had expired); Gaylord Broadcasting Co. v. Cosmos Broadcasting Corp., 746 F.2d 251, 252-54 (5th Cir. 1984) (same); Citadel Inv. Group, LLC v. Teza Techs. LLC, 398 Ill. App. 3d 724, 736 (Ill. App. Ct. 1st Dist. 2010), appeal denied, 236 Ill. 2d 551 (Ill. 2010) (same); C.M. Brown & Assocs. v. King, 680 S.W.2d 365, 365-366 (Mo. Ct. App. 1984) (same).

Here, similar to the restrictive covenants in Van Dyck Printing Co. and the above-cited cases, the restrictive covenants at issue have expired. Plaintiff's request for injunctive relief is therefore moot.[3]

**C.     Plaintiff's cited cases are distinguishable.**

In sharp contrast to the clear holding in Van Dyck Printing Co. that a request for injunctive relief to enforce an *expired* noncompete agreement is moot, Plaintiff cannot cite to any Connecticut state or district court case applying Connecticut law that stands for the proposition that an *expired* restrictive covenant may be extended as an equitable remedy by the Court.

All of Plaintiff's cited cases are distinguishable. For example, in United Rentals, Inc. v. Frey, Civ. No. 3:10CV1628 (HBF), 2011 U.S. Dist. LEXIS 16375 (D. Conn. Feb. 17, 2011), the restrictive covenant had *not* expired when the relief sought was granted. Similarly, in Edge Technology Svcs., Inc. v. Worley, CV-054008278, 2005 Conn. Super. Lexis 1804 (Conn. Super.

---

[3] Plaintiff is free to pursue any other remedies it may have. Any claim for damages Plaintiff may have is subject to arbitration. See Exhibit B to Complaint at p. 9 ¶ 16. Plaintiff's inability to seek damages in this case distinguishes it from many other cases asserting breaches of noncompete agreements, where the mootness of a motion for preliminary injunction does not warrant dismissal of the entire case, which proceeds on a claim for damages. See, e.g., Cintas Corp. v. Perry, 517 F.3d 459, 446, n.3 (7th Cir. 2008) (plaintiff seeks damages and so case is not moot with respect to violations of noncompete). Here, Plaintiff must arbitrate any claim for damages. Plaintiff's attempt to do an end-run around the arbitration provision in the separation agreement by seeking injunctive relief under expired noncompete and nonsolicitation agreements should not be countenanced.

Ct. July 5, 2005), the restrictive covenant at issue had not expired when the court issued its ruling.[4] Similarly, <u>Elizabeth Grady Face First Inc. v. Escavich</u>, 321 F. Supp. 2d 420 (D. Conn. 2004) is distinguishable because the court (a) applied Massachusetts law, and (b) again, the restrictive covenant had not expired when the court issued its ruling.  Likewise, <u>KX Industries, L.P. v. Saaski</u>, CV-960386806S, 1997 Conn. Super. Lexis 2444 (Conn. Super. Ct. August 29, 1997) is factually and procedurally distinguishable.  In <u>KX Industries,</u> the court initially granted an *ex parte* temporary injunction *during* the term of the restrictive covenant, not *after* it had expired.  <u>Id.</u>  Thereafter, the court found defendant in contempt of court because he had failed to comply with the terms of the ex parte injunction.  <u>Id.</u>

Plaintiff also cites several cases from other jurisdictions to support its argument, but all such cases are distinguishable and have no applicability to the matter at hand.  For instance, <u>Teksystems, Inc. v. Bolton</u>, Civ No. RDB-08-3099, 2010 U.S. Dist. Lexis 9651 (D. Md. Feb. 4, 2010), is distinguishable from <u>Van Dyck Printing Co.</u> on several grounds.  First, <u>Teksystems, Inc.</u> was decided under Maryland law.  <u>Id.</u> at *11.  Second, the plaintiff sought damages and a permanent injunction to enforce a noncompete agreement.  <u>Id.</u> at *21-23, 27.  Third, the case was decided on a motion for summary judgment.  <u>Id.</u> at *1.  Fourth, there was no arbitration agreement requiring the plaintiff to submit its damages claim to arbitration as there is here.  <u>See id.</u>  Consequently, <u>Teksystems, Inc.</u> is irrelevant to this matter.

The remaining cases cited by Plaintiff are also distinguishable and irrelevant.  <u>See</u> <u>Basicomputer Corp. v. Scott</u>, 973 F.2d 507 (6th Cir. 1992) (applied Ohio law and restrictive covenants had note yet expired); <u>CDW LLC v. NETech Corp.</u>, 722 F. Supp. 2d 1052 (D. Ind.

---

[4] Moreover, the cases do not discuss the courts' authority to extend the term of the noncompete agreements as an equitable remedy, and therefore it appears that the defendants in those cases did not challenge the courts' authority to do so.  The cases do not address the Supreme Court's endorsement of Judge Hodgson's decision in <u>Van Dyck Printing Co.</u>

2010) (applied Wisconsin law, noncompetes had not yet expired, and injunctive relief ordered against a company, not an individual); Presto-X Co. v. Ewing, 442 N.W.2d 85 (Iowa 1989) (applied Iowa law and restrictive covenant had not expired); SafeWorks, LLC v. Max Access, Inc., Civ. No. H-08-2860, 2009 U.S. Dist. Lexis 29268 (D. Tex. 2009) (applied Texas law); Guy Carpenter & Co. v. Provenzale, 334 F.3d 459 (5th Cir. 2003) (applied Texas law). Significantly, the court in SafeWorks, LLC, declined to extend the term of the restrictive covenant after such covenant had expired. 2009 U.S. Dist. LEXIS at *18.

Thus, Plaintiff's cited cases are inapposite and provide no authority for a district court in Connecticut applying Connecticut law to write a new contract for the parties by reviving expired noncompete and nonsolicitation agreements.

## II.   CONCLUSION

In sum, pursuant to Van Dyck Printing Co. and consistent with Connecticut law on restrictive covenants, a request for injunctive relief to enforce an *expired* restrictive covenant is moot. Because the noncompete and nonsolicitation agreements here have expired, Plaintiff's request for injunctive relief is moot. Accordingly, Plaintiff's motion for preliminary injunction and request for injunctive relief should be denied as moot.

**HARUMI AOTO DONOYAN,**

/s/ Patricia E. Reilly
Patricia E. Reilly (ct08352)
Matthew K. Curtin (ct427740)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, 3rd Floor
New Haven, Connecticut  06510
Tel.  203.974.8703
Fax  203.907.1914
preilly@littler.com
mcurtin@littler.com

# EXHIBIT A

LEXSEE



Warning
As of: May 26, 2011

## KEN HODAK, Plaintiff, v. MADISON CAPITAL MANAGEMENT, LLC, et al., Defendants.

### Civil Action No. 5:07-5-JMH

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY, CENTRAL DIVISION

### 2008 U.S. Dist. LEXIS 7263

### January 30, 2008, Decided
### January 30, 2008, Filed

**SUBSEQUENT HISTORY:** Clarified by, Motion denied by Hodak v. Madison Capital Mgmt., LLC, 2008 U.S. Dist. LEXIS 40438 (E.D. Ky., May 16, 2008)

**PRIOR HISTORY:** Hodak v. Madison Capital Mgmt., 2007 U.S. Dist. LEXIS 35248 (E.D. Ky., May 14, 2007)

**COUNSEL:** [*1] For Ken Hodak, Plaintiff: Beth A. Bowell, Erica Leigh Keenan, Robert L. Roark, LEAD ATTORNEYS, William Scott Hunt, Walther, Roark & Gay, P.L.C., Lexington, KY.

For Madison Capital Management, LLC, Madison Investment Partners, 24 LLC, UAR GP Services, LLC, United American Resources, LP, UAR GP Holdco, LLC, UAR MLP, LP, UAR GP, LLC, Defendants: Alexander J. Moeser, Sadhna G. True, Susan C. Sears, LEAD ATTORNEYS, Dinsmore & Shohl LLP - Lexington, Lexington, KY.

For UAR GP Services, LLC, Counter Claimant: Alexander J. Moeser, Sadhna G. True, LEAD ATTORNEYS, Dinsmore & Shohl LLP - Lexington, Lexington, KY.

For Ken Hodak, Counter Defendant: William Scott Hunt, Walther, Roark & Gay, P.L.C., Lexington, KY.

**JUDGES:** Joseph M. Hood, Senior U.S. District Judge.

**OPINION BY:** Joseph M. Hood

**OPINION**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Declaratory Judgment Claim for Lack of Subject Matter Jurisdiction [Record No. 43]. Plaintiff has responded [Record No. 47], objecting in part to Defendants' motion. Defendants have filed a reply [Record No. 52] in further support of their motion, and the motion is now ripe for consideration.

### I. BACKGROUND

Hodak was employed by UAR GP [*2] Services, LLC ("GP Services") as its CEO from May through September of 2006. [Record No. 1 at PP 18, 23.] As a condition of his employment, he was required to execute a Non-Competition, Nondisclosure and Confidentiality Agreement (the "Non-Competition Agreement"), which prohibited him from working for certain classes of companies in the coal industry for a period of one year following his separation from GP Services, renewable at

Page 1

GP Services' discretion for a second year. *[Id.* at 21; Record No. 1-3 at P 1.] Six months after coming to work for GP Services, Hodak's employment was terminated, allegedly "for cause." [Record No. 1 at P 23.]

Hodak filed suit in early 2007, and Count III of Hodak's Complaint seeks a declaration that a portion of the Non-Competition Agreement is unenforceable as overbroad. [Record No. 1 at PP 34-36.] Specifically, he avers that the provision that he could not work for certain types of coal companies for one year following termination of his employment with GP Services is an unreasonable restriction on his ability to work and therefore contrary to public policy. *[Id.]*

Shortly after the lawsuit was filed, Defendants granted a limited waiver of the Non-Competition [*3] Agreement so that Hodak could accept employment with National Coal Corporation. [1] Hodak did accept that employment, leaving the position after a six-month tenure. Defendants did not exercise their option to renew the Non-Competition Agreement for a second year, and the one-year term expired on September 29, 2007.

> 1   The Court notes that this assertion has been baldly made by Defendants, unsupported by an affidavit. Plaintiff has not controverted it, but the facts are not appropriately before the Court.

Count III of Plaintiff's Complaint, captioned "Declaratory Judgment Under KRS Chapter 418," reads as follows:

> Under KRS 418.045, any person interested under an instrument of writing, including a contract, may apply for and secure a declaration of his rights and duties.

> Because interpreting the validity of contracts and the rights and duties of the parties involved in *[sic]* another primary function of the declaratory judgment, Plaintiff requests that this Court declare the Non-Competition Agreement . . . invalid and unenforceable because it is overly broad and violates public policy. Additionally, Plaintiff requests that this Court declare that Defendants breached the Employment Agreement and[,] [*4] as a result[,] may not enforce the

Non-Competition Agreement. Moreover, Plaintiff requests that this Court award any/all monetary and/or equitable relief for such breach(es) including Plaintiff's reasonable attorneys' fees and costs.

*[Id.* at PP 35-36.]

## II. ANALYSIS

Defendants ask the Court to enter an order dismissing Count III of Plaintiff's Complaint for lack of subject matter jurisdiction. Defendants argue that Plaintiff's request for relief has become moot due to the expiration of the Non-Competition Agreement and, to the extent that the Court determines that Plaintiff's request for a declaration that Defendants breached the employment agreement is not moot, that said portion of Count III be dismissed as duplicative of relief sought elsewhere in the Complaint.

Article III, Section 2, of the United States Constitution limits this Court's jurisdiction to actual cases and controversies. This is to say that:

> "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." *Cleveland Branch, N.A.A. C.P. v. City of Parma,* 263 F.3d 513, 530 (6th Cir.2001) (citing *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). [*5] "A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.' "*Id.* (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). Mootness generally depends on "whether the relief sought would, if granted, make a difference to the legal interests of the parties...." *McPherson v. Michigan High School Athletic Ass'n, Inc.,* 119 F.3d 453, 458 (6th Cir.1997) (en banc) (internal quotation marks and citation omitted).

*United States v. City of Detroit,* 401 F.3d 448, 450-51 (6th Cir. 2005).

2008 U.S. Dist. LEXIS 7263, *5

Considering the expiration of the Non-Competition Agreement in September 2007, no forward-looking controversy exists with respect to those contractual provisions which are the basis of Count III, limiting Hodak's employment with other coal companies, because Hodak is now free to work for whomever he chooses. As Defendants argue and Plaintiff concedes, forward-looking enforcement of the relevant provision of the Non-Competition Agreement is no longer an actual controversy requiring the Court's attention. Any request for injunctive relief in Count III is now moot, and to the extent that Plaintiff has requested [*6] injunctive relief in Count III, his claim shall be dismissed.

That said, the Court is not persuaded that it is without jurisdiction as to the remainder of Count III. Whether the Non-Competition Agreement was invalid and unenforceable because it was overly broad and violated public policy or whether it was unenforceable in any event because Defendants breached the Employment Agreement with Plaintiff in the first place remain - at this juncture - live issues. 2 Further, the Court is not persuaded that the relief requested in Count III - a declaration that the Non-Competition Agreement is invalid and was, in any event, unenforceable due to Defendants' breach of contract - is duplicative of the relief requested in Count II. Count II avers that the Defendants failed to provide him thirty days prior notice of any performance deficiency, allowing him time to cure any deficiency, prior to terminating his employment "for cause." [*7] The fact that some of the relief requested in Count III depends from a decision on the issue of breach of contract presented in Count II does not subsume Count III into Count II. Accordingly, the Court will deny Defendants' motion to dismiss Count III in its entirety.

2 Notwithstanding its decision today, the Court wonders what, if any damages, will be available to Plaintiff on Count III, particularly considering that a limited waiver was apparently granted to Plaintiff by Defendants, allowing him to take a position that he desired during the term of the Non-Competition Agreement. That issue is not, however, properly before the Court today on Defendants' Motion to Dismiss as it requires the Court to consider facts outside of the pleadings which are not adequately supported here by affidavits or stipulations of fact.

## III. CONCLUSION

For all of the reasons stated above, Defendants' Motion to Dismiss will be granted in part and denied in part.

Accordingly, **IT IS ORDERED:**

(1) that Defendants' Motion to Dismiss Count III of the Plaintiff's Complaint [Record No. 43] shall be, and the same hereby is, **GRANTED IN PART AND DENIED IN PART;** and

(2) that portion of Count III which seeks injunctive relief [*8] shall be, and the same hereby is, **DISMISSED.**

This the 30th day of January, 2008.

Signed By:

*Joseph M. Hood*

**Senior U.S. District Judge**

LEXSEE



Cited
As of: May 26, 2011

**HEALTHCARE MANAGEMENT AND INVESTMENT HOLDINGS, LLC,
Plaintiff, vs. RICHARD FELDMAN, Defendant. RICHARD FELDMAN, Plaintiff,
vs. HEALTHCARE MANAGEMENT AND INVESTMENT HOLDINGS, LLC, et
al., Defendants.**

**CASE NO. 1:03CV0323, CASE NO. 1:04CV0883**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
OHIO, EASTERN DIVISION**

**2006 U.S. Dist. LEXIS 66038**

**September 15, 2006, Decided
September 15, 2006, Filed**

**COUNSEL:** [*1] For Healthcare Management &
Investment Holdings, L.L.C., Plaintiff: Paul R.
Rosenberger, Persky, Shapiro & Arnoff, Cleveland, OH;
Stewart D. Roll, Persky, Shapiro & Arnoff, Beachwood,
OH.

For Richard Feldman, Defendant: George Basara,
Buchanan Ingersoll Professional Corp., Pittsburgh, PA;
Jaime S. Tuite, James F. Glunt, Buchanan Ingersoll,
Pittsburgh, PA.

For Marina Goldman, Zyama Goldman, Defendants: Paul
R. Rosenberger, Persky, Shapiro & Arnoff, Cleveland,
OH; Stewart D. Roll, Persky, Shapiro & Arnoff,
Beachwood, OH.

For BHC Belmont Pines Hospital, Inc., Ardent Health
Services, LLC, 3rd Pty Defendants: Geoffrey S. Mearns,
Baker & Hostetler, Cleveland, OH.

For Richard Feldman, Counter-Claimant: Jaime S. Tuite,
James F. Glunt, Buchanan Ingersoll, Pittsburgh, PA.

For Healthcare Management & Investment Holdings,
L.L.C., Counter-Defendant: Paul R. Rosenberger, Persky,
Shapiro & Arnoff, Cleveland, OH; Stewart D. Roll,

Persky, Shapiro & Arnoff, Beachwood, OH.

**JUDGES:** Ann Aldrich, UNITED STATES DISTRICT
JUDGE.

**OPINION BY:** Ann Aldrich

**OPINION**

**MEMORANDUM OF OPINION**

This is a consolidated diversity case arising out of
alleged breaches of an employment agreement entered
[*2] into by the parties.

On January 21, 2003, Richard Feldman filed a
complaint in the Allegheny County Court of Common
Pleas in Pennsylvania against Healthcare Management
and Investment Holdings, LLC ("HMIH") and Zyama
Goldman, M.D. raising various breach of contract and
Pennsylvania Wage Payment and Collection Law
("WPCL") claims. On February 04, 2003, HMIH and
Goldman filed a petition for removal on the basis of
diversity jurisdiction pursuant to 28 U.S.C. §§ 1332,
1441, 1446. On April 07, 2004, this case was transferred

to the Northern District of Ohio and assigned case number 1:04cv883.

On February 18, 2003, HMIH filed a complaint in the Cuyahoga County Court of Common Pleas in Ohio against Feldman raising various breach of contract, breach of fiduciary duty, misappropriation of trade secrets, tortious interference with business relationships, and unfair competition claims. On February 20, 2003, Feldman filed a petition for removal on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, 1446.

These two actions have been consolidated [*3] under Lead Case Number: 1:03cv323.

On August 10, 2004, the parties, at the direction of the court, filed second amended cross complaints. (Docket Nos. 87, 89.) [1] On November 20, 2004, the parties filed cross motions for summary judgment. (Docket Nos. 110, 111.) On December 22 and 23, 2004, they filed briefs in opposition. (Docket Nos. 118, 119.) On January 07 and 13, 2005, they filed reply briefs. (Docket Nos. 120, 121.)

> 1   In his second amended complaint, Feldman added Defendant Marina Goldman. (Docket No. 89-1.)

All issues have been fully briefed and are ripe for adjudication. For the following reasons, the cross motions for summary judgment (Docket Nos. 110, 111) are each **GRANTED**, in part, and **DENIED**, in part.

## I. FACTUAL BACKGROUND

HMIH is a limited liability company engaged in the business of selling and providing psychiatric healthcare and related services. It is organized and existing under the laws of the State of Delaware, with a principle place of business in Shaker Heights, [*4] Ohio. Dr. Goldman is Chairman of the Board of Directors and Marina Goldman is Vice President of Administrative Services. Feldman was HMIH's Chief Executive Officer ("CEO") from May 04, 2002 to January 26, 2003. Thereafter, he was CEO for Belmont Pines Hospital, a psychiatric treatment facility located in Youngstown, Ohio. Presently, he lives in Costa Rica.

On May 04, 2002, Feldman and HMIH entered into an employment agreement (the "Agreement"). Under the

Agreement, Feldman was restricted from engaging in any business in competition with HMIH while employed there, absent HMIH's written consent. The Agreement provided that it could be terminated by HMIH by giving ten days notice to Feldman if he ever (1) willfully and materially breached the Agreement, (2) habitually and grossly neglected his duties, or (3) engaged in any conduct which materially damaged HMIH's reputation. In the event of such termination, Feldman would only be entitled to salary earned prior to the date of termination. Alternatively, the Agreement provided that Feldman could be terminated without cause with ninety days notice, in which case he would be entitled to severance pay of one year paid salary and benefits.

[*5] The Agreement also provided Feldman several benefits. It granted him a term of employment for one year, to be renewed automatically for subsequent one-year terms. It provided him with an annual salary of $ 200,000.00, term life insurance in an amount not less than $ 1,000,000.00, full reimbursement of his out-of-pocket medical expenses, an automobile for use while he was employed by HMIH, and short-term and long-term disability coverage. Also, paragraph five granted him a five percent equity share in HMIH's Ohio affiliate (the "Affiliate"), which had not yet been created at the time the Agreement was executed.

Approximately two months after the execution of the Agreement, in July of 2002, Feldman and HMIH entered into a non-competition agreement (the "Restrictive Covenant"). The Restrictive Covenant was captioned "First Amendment to Employment Agreement," and it replaced the Agreement's non-competition provision. The Restrictive Covenant prohibits Feldman, while employed with HMIH and for a period of two years thereafter, from engaging in any business "which may compete with the business conducted by Employer or any affiliate of Employer." (Docket No. 110-3, at P1.) The geographic [*6] scope of the Restrictive Covenant is limited to "the State of Ohio [and] any other state where Employer or any affiliate of Employer either transacts business or is in the business of establishing business during Employee's employment by Employer." Id. HMIH alleges that, as consideration for Feldman entering into the Restrictive Covenant, it executed a "Limited Liability Company Operating Agreement" (the "Operating Agreement"), which created the Affiliate on August 12, 2002.

HMIH alleges that it trained Feldman and taught him

substantial amounts of information regarding its services, business contacts, customers, and specific business practices. In addition, it alleges that Feldman was privy to a substantial amount of confidential, trade secret, and proprietary information, including information concerning its corporate structure, billing processes, health care contacts, and business strategies. It also alleges that, during his employment, Feldman was charged with opening numerous residential treatment centers throughout the state of Ohio.

On January 16, 2003, HMIH terminated Feldman's employment on ten days notice, invoking the provision of the Agreement dealing with material [*7] breach, habitual gross negligence, and damage to reputation. Feldman denies these allegations and alleges that he provided notice of termination on January 13, 2003, three days prior to HMIH's notice. He further alleges that HMIH did not provide him with all of the salary and employment benefits he was promised under the Agreement. Specifically, he alleges that HMIH did not employ him for a period of at least one year, did not provide him with term life insurance, did not reimburse him for all of his out-of-pocket medical and hospital expenses, did not provide him short-term and long-term disability coverage, did not purchase or lease an automobile for his use, did not pay him the minimum required salary of $ 200,000, and did not provide him with severance pay. He also alleges that his final paycheck underpaid him for services rendered.

Accordingly, HMIH raises three breach of contract claims, one breach of fiduciary duty claim, an unlawful misappropriation of trade secrets claim, two tortious interference with actual and prospective business relationships claims, and an unfair competition claim. It is seeking a declaratory judgment that Feldman breached the Agreement, an order permanently [*8] enjoining Feldman from further doing so, compensatory and punitive damages, and attorneys' fees and costs. In response, Feldman filed a counterclaim alleging that he is entitled to indemnification for all judgments, costs, and fees incurred in this pending litigation by virtue of his status as an officer of HMIH. In a separate complaint, he raises two breach of contract claims and three claims under the Pennsylvania WPCL. He is seeking compensatory and liquidated damages, and attorneys' fees and costs.

In its motion for summary judgment, HMIH raises three issues:

> (1) Whether Feldman is entitled to indemnification?
>
> (2) Whether Pennsylvania's WPCL applies in this case and if so, whether Feldman is entitled to severance pay and as against Marina Goldman?
>
> (3) Whether Feldman is entitled to severance pay under the Agreement?

In his motion for summary judgment, Feldman raises three issues:

> (1) Whether HMIH's Operating Agreement protects him from liability?
>
> (2) Whether the business judgment rule protects him from liability?
>
> (3) Whether HMIH is entitled to injunctive relief?

The Court will address each issue in turn.

## II. STANDARD OF REVIEW

Summary [*9] judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment has the initial burden to either (1) present affirmative evidence negating an element of the non-movant's claim or (2) demonstrate "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once that burden is met, the non-movant must set forth sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 342 (6th Cir. 1990). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

All reasonable factual inferences must be drawn in

favor of the non-movant. Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004) [*10] (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). However, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Indeed, "[a] mere scintilla of evidence is insufficient; rather there must be evidence on which the jury could reasonably find for the non-movant." Humenny, 390 F.3d at 904 (internal quotation omitted).

When evaluating cross-motions for summary judgment, the Court is obligated to analyze each motion on its own merits and view facts and inferences in the light most favorable to the non-movant. Westfield Ins. Co. v. Tech Dry Inc., 336 F.3d 503, 506 (6th Cir. 2003).

## III. LEGAL ANALYSIS

### A. HMIH's Cross Motion for Summary Judgment

#### 1. Indemnification - Counterclaim

In response to HMIH's second amended complaint, Feldman filed a counterclaim for indemnification under HMIH's Operating Agreement for any expenses, fees, and judgment incurred in this litigation. HMIH seeks summary judgment on the [*11] ground that Feldman is not entitled to indemnification because he is not being sued in his official corporate capacity.

Article IX, Section 2 of the Operating Agreement states in pertinent part:

> Every person who is a Member, Director or officer of the Company or a former Member, director or officer or a person who is serving or has served at the request of the Company as a member, officer, trustee, director or manager of another company is hereby indemnified against expenses, judgments, decrees, fines, penalties, or amounts paid in settlement in connection with the defense of any pending or threatened action suit or proceeding, criminal or civil, to which he, she or it is or may be made a party by reason of having been such Member,

> officer, trustee, director or Manager, provided he, she or it is determined by (a) Members who are not parties to or threatened with such action, suit, or proceeding ("Disinterested Members") holding a majority of the Voting Interests held by Disinterested Members; (b) a majority of the Members who are not parties to or threatened by such action, suit or proceedings; or (c) a Court of competent jurisdiction (i) not to have been negligent or guilty [*12] of misconduct in the performance of his, her or its duty to the Company; (ii) to have acted in good faith in what he, she or it reasonably believed to be in the best interest of the Company; and (iii) in any matter subject of a criminal action, suit, or proceeding, to have had no reasonable cause to believe that his, her or its conduct was unlawful.

See (Doc. No. 110-10.) The sole issue before the Court is whether Feldman is being sued "by reason of having been" an officer at HMIH.

Per the Operating Agreement's choice of law provision, Delaware law governs this issue. See (Doc. No. 110-10, Art. XII, § 1).

Under Delaware law, "if there is a nexus or causal connection between any of the underlying proceedings . . . and one's official corporate capacity, those proceedings are 'by reason of the fact' that one was a corporate officer, without regard to one's motivation for engaging in that conduct." Homestore, Inc. v. Tafeen, 888 A.2d 204, 215 (Del. 2005). Thus, the Court must determine whether there is a "nexus" or "causal connection" between the claims asserted against Feldman and his official corporate capacity at HMIH. To do so, the Court "must seek [*13] to discern the nature of the claims which [Feldman] is called upon to defend." Weaver v. ZeniMax Media, Inc., 2004 Del. Ch. LEXIS 10, *14 (Jan. 30, 2004).

Counts One, Two, and Three allege that Feldman breached his employment contract, which is separate and distinct from the Operating Agreement. The Delaware Supreme Court has held that "[w]hen a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction." Stifel Fin. Corp. v.

Cochran, 809 A.2d 555, 562 (Del. 2002); see also Weaver, 2004 Del. Ch. LEXIS at * 14-17. Thus, under Delaware law, corporate officers are not entitled to indemnification for alleged breaches of a separate employment contract. Id. Here, because Counts One, Two, and Three allege that Feldman breached a separate employment contract, he is not entitled to indemnification with respect to these three claims.

Count Four raises a breach of fiduciary duty claim. The parties do not dispute that there is a sufficient nexus between Count Four and Feldman's official corporate capacity. Thus, Feldman is entitled to seek indemnification [*14] with respect to this claim.

Finally, Counts Five, Six, Seven, and Eight raise misappropriation of trade secrets, tortious interference with business relationships, and unfair competition claims. Each claim arises, in part, out of allegations that Feldman disseminated confidential and/or propriety information after his employment with HMIH was terminated. The Delaware Court of Chancery has held that a sufficient nexus exists between such claims and one's official corporate capacity because the officer had "had access to proprietary information by reason of the fact that he was a director and officer." Brown v. LiveOps, Inc., 903 A.2d 324, 2006 Del. Ch. LEXIS 113, *19 (Del. Ch. Jun. 12, 2006). Here, a sufficient nexus exists between Counts Five, Six, Seven, and Eight and Feldman's official corporate capacity because he only had access to the alleged confidential and/or proprietary information by reason of the fact that he was CEO at HMIH. Thus, under Delaware law, Feldman is entitled to seek indemnification with respect to these four claims.

In sum, Feldman is not entitled to indemnification with respect to Counts One, Two, and Three, but he may seek indemnification with respect [*15] to Counts Four, Five, Six, Seven, and Eight. However, under the Operating Agreement, he will only be entitled to such indemnification if he is not found at trial (1) to be negligent or guilty of misconduct in the performance of his duties to HMIH or (2) to have acted in good faith in what he reasonably believed to be in the best interest of HMIH. See (Docket No. 110-10 Art. IX, § 2.) Thus, the motion for summary judgment with respect to the counterclaim is granted as to Counts One, Two, and Three; and denied as to Counts Four, Five, Six, Seven, and Eight.

**2. WPCL - Counts Two, Four, and Five**

**a. Choice of Law Provision**

HMIH argues that because the Agreement is expressly governed by Ohio law, the Pennsylvania WPCL is inapplicable to the instant case. Accordingly, HMIH seeks summary judgment on Counts Two, Four, and Five of Feldman's second amended complaint. Feldman counters that Pennsylvania law prohibits parties from contracting around the WPCL. Thus, according to him, because he worked primarily in Pennsylvania, the Pennsylvania WPCL applies notwithstanding the Agreement's contrary choice of law provision.

The WPLC provides Pennsylvania employees with a statutory [*16] mechanism for collecting unpaid wages and benefits and provides for criminal penalties for non-compliance. See 43 P.S. § 260.1 et seq. Specifically, it requires all employers to "pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer." See 43 P.S. § 260.3. Thus, under Pennsylvania law, "when a corporation fails to pay wages and benefits that it owes its employees, the corporation's top officers can be held personally liable for the non-payments." See Belcufine v. Aloe, 112 F.3d 633, 634 (3d Cir. 1997). The WPLC defines "employer" to include "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." See 43 P.S. § 260.2a. It further provides that "[n]o provision of this act shall in any way be contravened or set aside by a private agreement. See 43 P.S. § 260.7.

[*17] Feldman argues that this latter provision precludes enforcement of the Agreement's choice of law provision. This court agrees. Section 260.7 clearly prohibits parties from contracting away an employee's statutory right to wages due. The court recognizes that "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." Kruzits v. Okuma Mach. Tool, 40 F.3d 52, 55 (E.D. Pa. 1994) (citing Smith v. Commonwealth Nat'l. Bank, 384 Pa. Super. 65, 68, 557 A.2d 775 (Pa. Super. 1989)). However, that is not the case in the employment context when statutes are specifically designed to protect Pennsylvania employees. For example, in McIlvaine Trucking v. Workers' Comp. Appeal Bd., 570 Pa. 662, 810 A.2d 1280 (2002) the Pennsylvania Supreme Court voided a choice of law

provision as offending public policy in the workers' compensation context reasoning that the relevant state statute expressly applied to all in-state injuries. Id. at 672.

Here, like the workers' compensation statute, the Pennsylvania WPCL's underlying purpose is to protect Pennsylvania employees. See Killian v. McCulloch, 873 F. Supp. 938, 942 (E.D. Pa. 1995). [*18] The term "employer" is broadly construed to include those "employing *any person* in this Commonwealth." See 43 P.S. § 260.2a (emphasis added). Moreover, § 260.7 evinces the state legislature's intent in protecting Pennsylvania employees and their statutory right to wages due regardless of any contravening private agreement with their employers. Thus, the court is persuaded that if the Pennsylvania Supreme Court were to address this issue, it would follow its reasoning in McIlvaine and find that the instant choice of law provision is void as offending public policy with respect to the Pennsylvania WPCL claims.

HMIH's citation to Tucci v. CP Kelco Aps & Lehman Bros., Inc. 2002 U.S. Dist. LEXIS 19232 (E.D. Pa. Oct. 10, 2002) is unavailing. In Tucci, the court dismissed a Pennsylvania WPCL claim because (1) the defendant company was located in Delaware, (2) the plaintiff worked primarily in Delaware, and (3) the parties executed a Delaware choice of law provision. 2002 U.S. Dist. LEXIS 19232 at *7-8. The court emphasized, however, that because the plaintiff did not have an office in Pennsylvania and was not hired to perform work in Pennsylvania, [*19] he did not establish that his employment was based in Pennsylvania. Id. Here, Feldman lived and worked primarily in Pennsylvania, paid Pennsylvania taxes, was covered under Pennsylvania's workers' compensation statute, and for some time, his Pennsylvania home address served as HMIH's business address. Accordingly, Tucci is distinguishable.

In short, the Pennsylvania WPCL applies to the instant case notwithstanding the Agreement's contrary choice of law provision. The court further notes that prior to removal from the Western District of Pennsylvania, Judge Hardiman came to the same conclusion. See (Doc. No. 119-5) (adopting the magistrate judge's report and recommendation).

**b. Unpaid Severance - Count Four**

HIMH argues that because the Pennsylvania WPCL only provides a statutory right to wages earned, it does not cover Feldman's claim for severance pay because those wages were never earned. The court disagrees. The parties do not dispute that the Pennsylvania WPCL covers severance pay. Indeed, § 260.2a defines "fringe benefits or wage supplements" to include "separation" pay and "any other amount to be paid pursuant to an agreement to the employee."

Thus, the [*20] sole issue is whether Feldman is entitled to severance pay under the Agreement. Because of the Agreement's choice of law provision, the court will analyze Ohio law to interpret the contract. See (Doc. No. 110-3, at P17.)

Under Ohio law, "'[t]he purpose of contract construction is to effectuate the intent of the parties,' and that intent 'is presumed to reside in the language they chose to employ in the agreement.'" State ex. re. Petro v. R.J. Reynolds Tobacco Co., 104 Ohio St. 3d 559, 564, 2004 Ohio 7102, 820 N.E.2d 910 (2004) (quoting Kelly v. Medical Life Ins. Co., 31 Ohio St. 3d 130, 132, 31 Ohio B. 289, 509 N.E.2d 411 (1987)). Also, "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of the contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." Layne v. Progressive Preferred Ins. Co., 104 Ohio St. 3d 509, 511, 2004 Ohio 6597, 820 N.E.2d 867 (2004) (quoting Ed Schory & Sons v. Francis, 75 Ohio St. 3d 433, 440, 1996 Ohio 194, 662 N.E.2d 1074 (1996)).

Because neither party maintains that the Agreement is vague and ambiguous, [*21] the court is required to enforce its terms as written. See Ledyard v. Auto-Owners Mut. Ins. Co., 137 Ohio App. 3d 501, 505, 739 N.E.2d 1 (8th App. Dist 2000) (quoting Nationwide Mut. Ins. Co. v. Finkley, 112 Ohio App. 3d 712, 715, 679 N.E.2d 1189 (9th App. Dist. 1995)).

Paragraph 13 of the Agreement covers severance pay. There are two ways to terminate the Agreement under Paragraph 13. First, pursuant to Subsection A, the Agreement "may be terminated by Employer by giving ten (10) days notice to Employee if Employee willfully and materially breaches this Agreement, habitually and grossly neglects the duties to be performed under Paragraph 2, or engages in any conduct which materially damages the reputation of Employer." Second, pursuant

to Subsection B, the Agreement may be terminated "by either party, without cause, by giving ninety (90) days notice to the other party." If the employee is terminated pursuant to Subsection A, he is only entitled to "salary compensation earned prior to the date of termination as provided for in Paragraph 4 of this Agreement, computed pro rata up to and including the date of termination." See Paragraph 13(C). However, if he is terminated for [*22] any other reason, he is entitled to "a severance payment of one year paid salary and benefits." See Paragraph 13(D).

Here, it is undisputed that on January 13, 2003, Feldman provided advanced notice that the Agreement would not be renewed for another one-year term. By doing so, the Agreement was effectually terminated on that date, notwithstanding the fact that Feldman intended to work until May 04, 2003. See Paragraph 13(B) (indicating that mere notice works to terminate the Agreement.) Upon such termination, Feldman's entitlement to severance pay vested. It is true that three days later, HMIH sought to terminate the Agreement immediately on the grounds that Feldman willfully and materially breached the Agreement, habitually and grossly neglected his duties, and engaged in conduct which materially damaged its reputation. If these allegations are found to be true at trial, then Feldman is not entitled to severance pay. If, however, they are found to be false, then Feldman is entitled to severance pay and the Pennsylvania WPCL would provide an independent statutory mechanism for relief. [2]

2

HMIH's citation to Allende v. Winter Fruit Distributors, Inc., 709 F. Supp. 597 (E.D. Pa. 1989); Barsky v. Beasley Mezzanine Holdings, L.L.C., 2004 U.S. Dist. LEXIS 17166 (E.D. Pa. Aug. 30, 2004); and Scully v. US Wats, Inc., 1999 U.S. Dist. LEXIS 13007 (E.D. Pa. Jul. 27, 1999) is unavailing. In Allende and Barksy, the plaintiffs each sought unpaid wages that they *would have* received had their employment not been terminated. In Scully, the plaintiff sought an unpaid stock option, but the court concluded that since payment was not yet due and the dollar value was undetermined, no wages had been earned. Here, however, upon his notice of termination, Feldman's entitlement to severance pay vested, which constitutes wages earned and is

clearly covered under the Pennsylvania WPCL.

### [*23] c. Marina Goldman

Finally, HMIH argues that because there is no evidence that Marina Goldman had any decision-making or policy-making authority with respect to the payment of Feldman's wages, she cannot be held liable under Pennsylvania's WPCL and should be dismissed as a party.

The term "employer" under the Pennsylvania WPCL "has been interpreted as requiring, at a minimum, some indication that the defendant employer exercised a policy-making function in the company and/or an active role in the corporation's decision making process." Tyler v. O'Neill, 994 F. Supp. 603, 616 (E.D. Pa. 1998) (citations omitted). The fact that one is a corporate officer or had check-writing authority is relevant but insufficient, standing alone, to establish that the officer exercised decision-making or policy-making authority. Int'l Ass'n of Theatrical Stage Emples., Local Union No. 3 v. Mid-Atlantic Promotions, Inc., 2004 PA Super 276, 856 A.2d 102, 106 (Pa. Super. 2004). Rather, to sustain an action under the Pennsylvania WPCL, a plaintiff must show that the employer "was *actively involved* in corporate policy-making, such as corporate decision-making or corporate [*24] advisement on matters of pay or compensation." Id. (emphasis added.) Thus, the sole issue is whether there is sufficient evidence to create a genuine issue of material fact as to whether Marina Goldman had any such authority.

Here, Feldman has set forth evidence establishing that Marina Goldman was the Vice President of Administrative Services, one of seven members of the Board of Directors, and had check-signing authority. Moreover, Alla Carran, HMIH's former Human Resources consultant, provides some support for the assertion that Marina Goldman had decision-making authority. Indeed, according to Ms. Carran, Dr. and Mrs. Goldman informed her that "*they* would not be reimbursing [Feldman]," that "*they're* direction was to not reimburse," that "*they* were not planning to honor [the life insurance obligation]," and that "*they* said *they* were changing [Feldman's] employment agreement." See (Doc. No. 119-9 "Carran Depo.," at 13-20 (emphasis added)).

In construing these facts in a light most favorable to Feldman, the court concludes that he has set forth sufficient evidence to create a genuine issue of material

fact as to whether Marina Goldman had decision-making [*25] or policy-making authority at HMIH. The motion for summary judgment, with respect to her, is denied.

### 3. Breach of Contract Severance Claim - Count Three

With respect to Count Three of Feldman's second amended complaint, HMIH argues that because Feldman materially breached the Agreement by (1) violating the non-compete provision and (2) refusing to work a full one-year term, it is entitled, as a matter of law, to deny Feldman any claim to severance.

HMIH is correct that under Ohio law, a material breach of contract by one party generally discharges the non-breaching party from performance of the contract. See Nious v. Griffin Constr., Inc., 2004 Ohio 4103, P16 (10th App. Dist. 2004) (citations omitted). However, HMIH's aforementioned arguments are both factually incorrect. With regard to the first argument that it was justified to withhold severance because Feldman allegedly violated the non-compete provision, it is undisputed that HMIH's decision to terminate Feldman and withhold severance occurred *before* Feldman accepted employment with an alleged competitor. Thus, HMIH cannot now maintain that its decision to deny severance pay was *in response to* [*26] Feldman's alleged breach of the non-compete provision. With regard to the second argument that it was justified to withhold severance because Feldman breached the Agreement by refusing to work a full one-year term, it is undisputed that Feldman agreed to work until May 04, 2003. Paragraph Three of the Agreement is quite clear that "[t]he term of employment shall begin on the date of this Agreement." The Agreement was executed on May 04, 2002. See (Doc. No. 110-3, at 1.) Thus, the term of employment began on May 04, 2002, notwithstanding the fact that his actual duties did not begin until May 29, 2002. Feldman agreed to work until May 04, 2003 and thus, no breach occurred. Because both of HMIH's arguments are factually incorrect, the motion for summary judgment with respect to Count Three is denied. The court also notes that HMIH does not pursue either of these two arguments in its reply brief.

In conclusion, HMIH's cross motion for summary judgment is granted with respect to the counterclaim as against Counts One, Two, and Three; and denied with respect to all other issues.

### B. Feldman's Cross Motion for Summary Judgment

### 1. Operating Agreement

With respect [*27] to Counts One, Two, Three, and Four of HMIH's second amended complaint, Feldman argues that the Operating Agreement limits his liability because he was acting within the scope of his authority as CEO.

Article III, Section Fifteen of the Operating Agreement states in pertinent part:

> To the fullest extent permitted under the Act, the Delaware General Corporation Law or any other applicable law as currently or hereafter in effect, neither the Officers nor the Directors, nor any Affiliate of any Officer of Director shall be personally liable, responsible or accountable in damages or otherwise to the Company for any of its Members for or with respect to any action taken or failure to act on behalf of the Company within the scope of authority conferred on such Officer or Director by this Agreement or by law. In addition to, and not by way of limitation of, the preceding sentence, no Officer or Director shall be liable to the Company or its Members for monetary damages for breach of fiduciary duty as a Director or an Officer, except for liability (i) for any breach of the Director's or Officer's duty of loyalty to the Company or its Members or (ii) for acts or omissions not in good [*28] faith or which involve gross negligence, intentional misconduct or a knowing violation of law.

(Doc. No. 110-10.) Thus, liability is limited when a corporate officer is acting within the scope of his authority, except for (1) breaches of the duty of loyalty, (2) acts or omissions not in good faith, (3) acts or omissions which involve gross negligence, or (4) acts or omissions which involve intentional misconduct or a knowing violation of the law.

Per the Operating Agreement's choice of law provision, Delaware law governs this issue. See (Doc. No. 110-10, Art. XII, § 1). Under Delaware law, similar to Ohio law, clear and unambiguous language should be

given its ordinary and usual meaning. Rhone-Poulenc Basic Chems. Co. v. American Motorist Insur. Co., 616 A.2d 1192, 1195 (Del. 1992).

Here, the Operating Agreement's limitation of liability provision only serves to eliminate liability for actions taken within the scope of authority "conferred on such Officer or Director *by this Agreement or by law.*" (Doc. No. 110-10, Art. III, § 15 (emphasis added.)) However, with respect to Counts One, Two, and Three, HMIH is not suing Feldman for actions taken within [*29] the scope of his authority conferred on him by the Operating Agreement; it is suing him for actions taken within the scope of his authority conferred on him by a separate employment contract. This distinction is critical. As the Delaware Supreme Court stated:

> When a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction. To the extent that he binds himself to certain obligations under that contract, he owes a personal obligation to the corporation. When the corporation brings a claim and proves its entitlement to relief because the officer has breached his individual obligations, it is problematic to conclude that the suit has been rendered an "official capacity" suit subject to indemnification under § 145 and implementing bylaws. Such a conclusion would render the officer's duty to perform his side of the contract in many respects illusory.

Stifel, 809 A.2d at 562. Although the Stifel court was analyzing an indemnification provision, this court sees no reason why the same analysis would not apply equally to a limit of liability provision. Indeed, [*30] if Feldman is able to use the limit of liability provision to exculpate himself for violations of his separate employment contract, his duty to perform under that contract is illusory at best. Thus, the court concludes that HMIH's Operating Agreement does not serve to limit Feldman's liability with respect to Counts One, Two, and Three, because those claims allege violations of a separate employment contract.

Count Four, however, raises several breaches of the fiduciary duties of care, loyalty, and to refrain from self-dealing. Breaches the duty of loyalty and to refrain from self-dealing are expressly excepted from the Operating Agreement's limit of liability provision. See (Doc. No. 110-10 Art. III, § 15.) Thus, that provision does not serve to limit Feldman's liability with respect to those aspects of Count Four.

With respect to breaches of the duty of care, the limit of liability provision also excepts: "acts or omissions not in good faith or which involve gross negligence, intentional misconduct or a knowing violation of law." See (Docket No. 110-10 Art. III, § 15.) Here, HMIH has set forth sufficient evidence establishing that Feldman (1) failed to set up any organized [*31] structure for the company; (2) failed to procure the requisite license before entering into the Andover project, which had to be canceled, costing lots of money and professional embarrassment; (3) failed to prepare a budget or any financial statements; (4) organized an open house in Columbus and announced that patients were being accepted without even applying for the requisite license, causing professional embarrassment and placing HMIC on probation, (5) instructed employees not to inform the board of directors about problems that were taking place with projects; and (6) never opened a single facility during his tenure as CEO. See (Doc. No. 108 "Goldman Depo.," at A19-A20; Doc. No. 108 "Sykes Depo.," at A116-A118; A122.) According to Dr. Goldman, once the Andover project fell through, "nobody wanted to deal with us." Id.

The court concludes that when viewing this evidence in a light most favorable to the non-movant, HMIH, a rational trier of fact could conclude that Feldman engaged in conduct that constitutes gross negligence. Accordingly, the motion for summary judgment with respect to Count Four is denied.

## 2. Business Judgment Rule

Feldman also seeks summary judgment [*32] on Count Four on the ground that Delaware's business judgment rule protects him from liability.

The business judgment rule is a common-law recognition of the statutory authority to manage a corporation that is vested in the board of directors. Omnicare, Inc. v. NCS Healthcare, Inc., 818 A.2d 914, 927 (Del. 2003) (quoting MM Cos. v. Liquid Audio, Inc., 813 A.2d 1118, 1127 (Del. 2003)). It is a "presumption

that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Id. (Quoting Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d 1361, 1373 (Del. 1995)). "An application of the traditional business judgment rule places the burden on the 'party challenging [a] decision to establish facts rebutting the presumption.'" Id. at 927-28 (quoting Unitrin, 651 A.2d at 1373). The rule is intended to be highly deferential. Indeed, "[u]nless the procedural presumption of the business judgment rule is rebutted, a 'court will not substitute its judgment for that of the [officer] if the . . . decision [*33] can be attributed to any rational business purpose.'" Id. at 928 (quoting Unitrin, 651 A.2d at 1373).

To rebut the rule, the plaintiff has the initial burden of providing evidence that the defendant, in reaching the challenged decision, "breached any one of the triads of [his] fiduciary duty -- good faith, loyalty or care." Cede & Co. v. Technicolor, 634 A.2d 345, 361 (Del. 1993). For example, if an officer makes "an uninformed business judgment under circumstances constituting gross negligence, that decision would not be protected under the business judgment rule and may give rise to an actionable claim." Lewis v. Honeywell, Inc., 1987 Del. Ch. LEXIS 458, *10 (Del. Ch. Jul. 28, 1987).

Here, because an issue of material fact exists as to whether Feldman engaged in gross negligence, the business judgment rule does not protect him from liability. See Lewis, 1987 Del. Ch. LEXIS 458 at *10. The motion for summary judgment with respect to Count Four is denied.

### 3. Injunctive Relief

Finally, with respect to HMIH's request for injunctive relief, the court recognizes that the Restrictive Covenant's non-compete provision was [*34] set to expire on or about January 26, 2005. See (Doc. Nos. 110-4, 110-6.) Thus, to the extent that Counts One and Two seek injunctive relief to enforce compliance with this provision, that request is now moot. Thus, the motion for summary judgment with respect to Counts One and Two is granted, solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision.

In conclusion, Feldman's cross motion for summary judgment is granted with respect to Counts One and Two solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision and denied with respect to all other issues.

### IV. CONCLUSION

For the foregoing reasons, the cross motions for summary judgment are each **GRANTED**, in part, and **DENIED**, in part. Specifically, HMIH's cross motion for summary judgment is granted with respect to Feldman's counterclaim as against Counts One, Two, and Three and denied with respect to all other issues; and Feldman's cross motion for summary judgment is granted with respect to Counts One and Two solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision [*35] and denied with respect to all other issues.

IT IS SO ORDERED.

/s/ Ann Aldrich

UNITED STATES DISTRICT JUDGE

Dated: September 15, 2006

### ORDER

Pursuant to the memorandum of opinion filed in this case on this date, Healthcare Management and Investment Holdings, LLC's cross motion for summary judgment (Docket No. 110) and Richard Feldman's cross motion for summary judgment (Docket No. 111) is each **GRANTED**, in part, and **DENIED**, in part. The parties should file a joint status report by October 30, 2006, including new deadlines for adding parties and claims, discovery, and dispositive motions. The report should also include a new backup trial date.

**IT IS SO ORDERED.**

**Dated: September 15, 2006**

/s/ Ann Aldrich

**UNITED STATES DISTRICT JUDGE**

LEXSEE



Positive
As of: May 26, 2011

**GARY LATUSZEWSKI; JAMES ROGAN; REED BIGHAM, Appellants in No.
04-1324 and No. 04-2776 v. VALIC FINANCIAL ADVISORS, INC.; GARY
LATUSZEWSKI; JAMES ROGAN; REED BIGHAM v. VALIC FINANCIAL
ADVISORS, INC.; THE VARIABLE ANNUITY LIFE INSURANCE COMPANY,
Appellants in No. 04-1435**

**NOS. 04-1324, 04-1435, 04-2776**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**2005 U.S. App. LEXIS 11006**

**April 22, 2005, Argued
June 9, 2005, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Motion denied by Latuszewski v. Valic Fin. Advisors, Inc., 2007 U.S. Dist. LEXIS 85548 (W.D. Pa., Nov. 9, 2007)

**PRIOR HISTORY:** On Appeal From the United States District Court For the Western District of Pennsylvania. (D.C. Civil Action No. 03-cv-00540). District Judge: Hon. Gary L. Lancaster.

**COUNSEL:** Michael J. Betts (Argued), Paul J. Atencio, Pittsburgh, PA, Attorneys for Appellants in Nos. 04-1324 and 04-2776.

Mary J. Hackett, Joseph F. Rodkey, Jr., Christopher J. Soller, Reed Smith, Pittsburgh, PA; and Sean Connelly (Argued), Larry S. Pozner, Anthony L. Giacomini, Hoffman, Reilly, Pozner & Williamson, Denver, CO, Attorneys for Appellants in No. 04-1435.

**JUDGES:** BEFORE: ROTH, FUENTES and STAPLETON, Circuit Judges.

**OPINION BY:** STAPLETON

**OPINION**

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Because we write only for the parties who are familiar with the facts, we do not restate them below. This appeal arises from alleged breaches in employment contracts between Appellees/Cross-Appellants The Variable Annuity Life Insurance Company and VALIC Financial Advisors, Inc., (collectively "VALIC" or "Appellees") and three of its previous employees, Appellants/Cross-Appellees, Gary Latuszewski, [*2] James Rogan and Reed Bigham (collectively "Appellants"). After resigning their positions with VALIC in early 2003, Appellants filed suit in Pennsylvania state court. VALIC subsequently removed to federal court and filed a motion for a preliminary injunction to enforce non-compete and trade secrets provisions in the contracts. The District Court granted VALIC's motion as to the trade secrets provision but

denied it as to the non-compete clause. Appellants timely appealed and VALIC cross-appealed. Appellants subsequently filed a motion to compel arbitration and stay further proceedings. The District Court, noting the existence of the cross appeals before us, entered an order on May 24, 2004, denying the "motion to compel arbitration without prejudice and for a stay of all further proceedings pending the disposition of the cross appeals in the Court of Appeals." App. at 46. Appellants timely appealed this order. Jurisdiction was proper in District Court pursuant to 28 U.S.C. § 1332. Jurisdiction, to the extent we have it, is proper in this Court pursuant to 28 U.S.C. § 1292(a)(1). For the reasons that follow, we will dismiss the appeal from [*3] the District Court's order of May 24, 2004, for want of jurisdiction and the cross appeal as moot. With respect to the remaining appeal, we will reverse in part and affirm in part.

I.

In reviewing a District Court's decision to grant a preliminary injunction, we review the District Court's findings of fact for clear error, its conclusions of law *de novo*, and its ultimate decision to grant the injunction for abuse of discretion. *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 89 n. 1 (3d Cir. 2000). To successfully seek a preliminary injunction, a party must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

We conclude that the District Court's decision to grant a preliminary injunction to protect Appellees' trade secrets, to the extent it foreclosed Appellants from using trade secret information to solicit business and service clients, is based on a correct [*4] understanding of the applicable law and is supported by the record. In particular, we conclude that (a) the District Court properly held that the information described in the preliminary injunction constituted protectable trade secrets [1]; and (b) the record supports the Court's conclusion that Appellees' "potential losses will be difficult to quantify in light of the potential loss of goodwill and disruption of customer relations that [Appellants'] conduct threatens." App. at 41.

> 1  To prevail on a claim for misappropriation of trade secrets, the moving party must show: (1) the

existence of a trade secret; (2) which was communicated in confidence to the employee; (3) and used by the employee (or former employee) in breach of that confidence; (4) to the detriment of the plaintiff. *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003). The District Court thoroughly evaluated and properly determined that VALIC satisfied these elements.

We also conclude, however, that the record [*5] does not support the preliminary injunction to the extent that either paragraph (1) or (2) can be read to foreclose Appellants from servicing former clients of VALIC who have become Appellants' clients without being solicited by them using information currently supplied by those clients. Where a former client of Appellees without solicitation has asked Appellants to service its needs, that client can be expected to be willing to provide Appellants with the information they need to provide that service. Accordingly, the minimal risk that VALIC's trade secret information will be utilized in this context will not justify the burden imposed on Appellants and the clients' right of choice.

We will vacate the existing preliminary injunction and, the District Court, if it deems it appropriate, may enter a modified one consistent with this opinion.

II.

Turning to the question of whether the District Court properly declined to preliminarily enjoin Appellants from violating the non-compete clause, we find Appellees' cross appeal to be moot. The District Court is no longer in a position to grant meaningful injunctive relief based on the non-compete clause.

The non-compete clause bars Appellants [*6] from competing with VALIC for one year after the end of their employment. *See, e.g.*, JA966 (Contract Provision 4.h.2). Appellants resigned from VALIC in early 2003. Two years have now passed since their resignations. Thus, even if we concluded that the District Court erred in declining to enjoin Appellants from violating the non-compete clause, that Court could not grant the relief sought because Appellants are no longer precluded from competing.

It is true, as Appellees stress, that the non-compete clause, Paragraph 4.h, contains the following provision: "If an injunction is issued to prevent violation of

paragraph 4h, the injunction shall run one year from the date it is entered." This does not, however, authorize the entry of a one-year injunction at any point in time. An injunction is not "an injunction . . . issued to prevent a violation of paragraph 4h" unless the conduct it precludes comes within the scope of that paragraph -- in the current context, unless the precluded competitive activity occurs within a year of the end of Appellants' employment. This provision was obviously intended, in the event litigation was required, to give VALIC a full year of protection so long [*7] as it secured an injunction within a year after the end of employment. It does not give VALIC a full year of protection if it did not secure an injunction for several years after the cessation of employment. [2]

> 2  We have jurisdiction at this point to review only the denial of preliminary injunctive relief, and, as we have pointed out, the cross appeal is now moot. Accordingly, we hazard no prediction on how the Supreme Court of Pennsylvania would rule on the enforceability of a non-compete covenant in the situation here presented, i.e., where (a) the parties' initial contract for at will employment includes a reasonable covenant not to compete and (b) the parties thereafter agree to continue the at will employment on somewhat different terms no less favorable to the employee, including the same or a less restrictive covenant.

III.

The District Court's order of May 24, 2004, is an interlocutory order. Accordingly, we have no final order jurisdiction under 28 U.S.C. § 1291. Although [*8] 9

U.S.C. 16(a) provides that an appeal can be taken from an interlocutory order "refusing a stay of any action" pending arbitration or "denying a petition . . . to order arbitration to proceed," we find § 16(a) inapplicable to the May 24th order.

As we read the May 24th order, it does not address the merits of the arbitration issues and, accordingly, does not "deny" a stay or order directing arbitration within the meaning of § 16(a); rather, it defers decision on those matters until the case becomes active again in the District Court. Accordingly, we will leave the arbitration issues for resolution in the first instance by the District Court. [3]

> 3  Before addressing the merits of the waiver issue raised by the Appellees, the District Court will want to consider whether that issue is for the Court or the arbitrator. *See Palko v. Airborne Express, Inc.*, 372 F.3d 588, 596-97 (3d Cir. 2004); *Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 12-15 (1st Cir. 2005); *Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 328 F.3d 462 (8th Cir. 2003).

[*9] IV.

We will dismiss the appeal of the District Court's May 24, 2004, order for want of jurisdiction and the cross appeal from the District Court's denial of a preliminary injunction enforcing the non-compete clause will be dismissed as moot. We will vacate the preliminary injunction entered by the District Court and remand for further proceedings consistent with this opinion. Each party will bear its own costs.

LEXSEE

## UNITED RENTALS, INC. and UNITED RENTALS (NORTH AMERICA), INC. v. EVAN FREY

### CIV. NO. 3:10CV1628 (HBF)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

#### 2011 U.S. Dist. LEXIS 16375

**February 17, 2011, Decided**
**February 18, 2011, Filed**

**COUNSEL:** [*1] For United Rentals Inc, United Rentals (North America), Inc., Plaintiffs: Brian C. Roche, Gerald C. Pia , Jr., LEAD ATTORNEYS, Roche Pia LLC, Shelton, CT.

For Evan Frey, Defendant: Stuart M. Katz, LEAD ATTORNEY, Cohen & Wolf, P.C., Bridgeport, CT.

**JUDGES:** HOLLY B. FITZSIMMONS, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** HOLLY B. FITZSIMMONS

**OPINION**

RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff United Rentals, Inc. and United Rentals (North America), Inc., ("United") commenced this suit against its former employee, Evan Frey ("Frey"), on October 15, 2010, alleging willful breach of confidentiality and non-compete provisions contained in Frey's Employment Agreement ("Agreement"). It sets forth claims for breach of contract, violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), and tortious interference with economic advantage and existing business relationships. United seeks a preliminary injunction to preclude Frey from improperly competing with United, and from disclosing United's trade secrets and confidential information.

For the reasons that follow, United's Motion for

Preliminary Injunction [Doc. #10] is **GRANTED.**

I. Findings of Fact

Based on the credible testimony, the exhibits, and the entire [*2] record developed during the evidentiary hearing on February 9, 2011, the Court finds the following facts established for the purposes of the injunction proceedings. [1]

> 1    Todd Hayes, Midwest Trench District Manager for United Rentals, and defendant Evan Frey testified at the hearing. The facts are for the most part undisputed. Defendant does not dispute that he signed the Employment Agreement. He does not dispute engaging in conduct that violates the Agreement. Rather, defendant argues that the Employment Agreement is unreasonable and thus unenforceable.

United Rentals, Inc. is a Delaware corporation, with headquarters in Connecticut and offices nationwide, which rents and sells equipment and merchandise to the commercial and general public throughout the United States, including Indiana. [2]Compl. ¶2. Evan Frey was hired by United as an Outside Sales Representative in December 2007, operating out of United's Indianapolis Branch. Compl. ¶7. During his employment, Frey sold trench shoring equipment and conducted trench shoring safety training programs. Compl. ¶8. Prior to his employment with United, Frey had no experience selling trench shoring products. [Pl. Ex. 5]. He received all his sales [*3] and product training in the trench shoring business from United. United provided Frey with, among

other things, extensive sales training and materials, time management training, trench shoring product training, introductions to vendors and customers and access to customer lists, contact information for decision-makers, detailed bidding and sales information including United's Rate Card, on-the-job sales ride-along training, and password protected access to information and materials located on the United, RentalMan/WYNNE [3] and Salesforce.com [4] computer systems. [Pl. Ex. 4]. Frey was United's only Outside Sales Representative in the Indiana Branch and United entrusted him with all its customer relationships.

> 2    United rents and sells, among other things, trench shoring equipment such as aluminum trench shields, steel trench shields, manhole shields, bedding boxes, crossing plates, pipe plugs, slide rail and build-a-box systems. [Doc. #11 at 2].
>
> 3    RentalMan provided an Outside Sales Representative access to, among other things, trench shoring customer lists, contact information, address, names of decision makers, information on overall spending by day, week, month, access to the customers  [*4] Dunn & Bradstreet rating, account payable terms at United Rentals. This program is password protected.
>
> 4    Salesforce.com provided an Outside sales Representative access to, among other things, itineraries, projects and contact information, bidding. This program is password protected.

United's offer letter dated December 4, 2007, states in part, "This offer is contingent upon . . . your prompt signing and returning of this offer letter, employment agreement and other enclosed documents." [Doc. #11]. Shortly after accepting the Outside Sales Position with United, Frey signed the offer letter and a written Employment Agreement. [5][Pl. Ex. 6]. By affidavit and through his testimony, Frey stated that he was told "he could not begin work unless he signed" the Agreement, not given a reasonable amount of time to review the Agreement, and told that the Agreement was non-negotiable. [Frey Aff., Doc. # 22-2 at ¶¶6-9]. Frey testified that he did not try to negotiate any terms, did not seek time to confer with his attorney and did not speak to his supervisors about the Agreement. [6]The Agreement contains restrictive covenants preventing Frey from working for a competitor, soliciting United's customers [*5] and employees, or disclosing United's trade secrets

and confidential information. In addition to the Agreement, United provided Frey with the Employee Handbook and Policy and Procedure Bulletin, defining trade secrets and confidential information and counseling against unauthorized disclosure. [7][Pl. Ex. 8, 9].

> 5    Frey signed the offer letter on December 5, 2007. [Pl. Ex. 11]. The Agreement was entered into "as of" December 17, 2007, Frey's first day of employment. [Pl. Ex. 6].
>
> 6    At the hearing, Hayes testified that he discussed the non-compete with Frey during the interview process. Frey testified that he was told sometime between his interview with Hayes and the December 4 Offer Letter that there would be an Employment Agreement. At the hearing, Frey could not recall when he was provided with a copy of the Agreement or the date he signed the Agreement
>
> 7    The Policy and Procedure Bulletin dated April 13, 2009, entitled "Confidential Information," states its purpose is "[t]o protect Confidential Information against unauthorized disclosure." "Confidential Information shall mean all information which is valuable to the Company and not generally known to the public, and includes, but is not limited  [*6] to, the following: . . . (b) Business, pricing and management methods and information." [Pl. Ex. 8].

Frey resigned from his position with United on October 6, 2010, accepting employment with MacAllister Machinery Company, Inc. ("MacAllister"), in Indianapolis. MacAllister is a direct competitor of United in the trench shoring equipment industry. Compl. ¶21. MacAllister is located approximately five miles from United's Indianapolis Branch office. [Pl. Ex. 10]. Upon accepting employment, Frey immediately began calling on United's customers and suppliers, asking for their business and submitting bids on behalf of MacAllister. [Pl. Ex. 10, 13-14, 18-21, 23]. Frey testified that during his first week of employment, he provided MacAllister with a list of his "best" customers. He stated he was assigned those "best" customers, even though some were located in his colleague's sales territory. [Pl. Ex. 23]. Frey testified that since joining MacAllister, he has contacted United's customers, regardless of whether the customer is located within the "restricted area" under his employment agreement, or whether MacAllister previously did business with the customer. Frey testified that

information on [*7] customers, bidding, margins, pricing, installation, and inventory should not be disclosed to a competitor. Frey does not dispute that he is competing within the "Restricted Area" as defined in the Employment Agreement, soliciting United's customers, suppliers and United's employees and using United's "confidential information" and "trade secrets" as defined in the Employment Agreement. [Pl. Ex. 10, 13-14, 18-21, 23].

The Employment Agreement

At issue at the preliminary injunction phase are the non-compete and confidentiality provisions in the Employment Agreement.

Under Section One of the Agreement, Frey agreed to the following provision against divulging confidential information:

> 1. Trade Secrets: Confidentiality and Company Property. During and at all times after Employee's employment with the Company:
> (a) Employee will not disclose to any person or entity, without the Company's prior written consent, any Trade Secrets or other Confidential Information (as described below), whether prepared by Employee or others;
> (b) Employee will not use any Trade Secrets or other Confidential Information in order to solicit or call upon any person or entity;
> (c) Employee will not directly or indirectly [*8] use any Trade Secrets or other Confidential Information other than as directed by the Company in writing;
> (d) Employee will not, except in the furtherance of the business of the Company, remove any Trade Secrets or other Confidential Information from the premises of the Company without the prior written consent of the Company;
> (e) All products, correspondence, reports, records, charts, advertising materials, designs, plans, manuals, field guides, memoranda, lists and other property compiled or produced by Employee or delivered to Employee by or

on behalf of the Company or by its customers (including, but no limited to, customers obtained by the Employee). whether or not Confidential Information, shall be and remain the property of the Company and shall be subject at all times to its direction and control;

> (f) Upon termination of employment for any reason whatsoever, or upon request at any time, Employee will promptly deliver to the Company all originals and copies (whether in note, memo or other document form or on video, audio, computer tapes, discs or otherwise) of all Trade Secrets or other Confidential Information, and all property identified in Section 2(e) above, that is in Employee's [*9] possession, custody or control, whether prepared by Employee or others;

[Doc. #14 (Agreement) §§2(a)-(f)].

Frey agreed to the following trade secrets and confidentiality provisions.

> (g) "Trade Secrets" shall mean all information not generally known about the business of the Company, which is subject to reasonable efforts to maintain its secrecy or confidentiality, and from which the Company derives economic value from the fact that the information is not generally known to others who may obtain economic value from its disclosure or use, regardless of whether such information is specifically designated as a trade secret under any applicable law.
>
> (h) "Confidential Information" shall mean all information which is valuable to the Company and not generally known to the public, and includes, but is not limited to:
>
> > (i) business, strategic and marketing plans and forecasts, and the past results of such plans and forecasts;

Page 3

(ii) business, pricing and management methods;

(iii) employee handbooks, operations manuals and best practices memoranda;

(iv) finances, strategies, systems, research, surveys, plans, reports, recommendations and conclusions;

(v) names of, arrangements with, or other information [*10] relating to, the Company's customers, equipment suppliers, manufacturers, financiers, owners or operators, representatives and other persons who have business relationships with the Company or who are prospects for business relationships with the Company;

(vi) technical information, work product and know-how;

(vii) cost, operating, and other management information systems, and other software and programming;

(viii) the name of any company or business, any part of which is or at any time was a candidate for potential acquisition by the Company, together with all analyses and other information which the Company has generated, compiled or otherwise obtained with respect to such candidate, business or potential acquisition, or with respect to the potential effect of such acquisition on the Company's business, assets, financial results or

prospects; and

(ix) the Company's Trade Secrets (note that some of the information listed above may also be a Trade Secret).

[Doc. #14 (Agreement) §§2(g) & (h)].

Frey agreed to a non-compete covenant, for a period of twelve (12) months from his last day of employment with United, which prohibits him (1) from working for any entity in competition with United [*11] within a limited, specifically-defined "Restricted Area"; and (2) from soliciting, accepting the business of, or calling upon United's customers. Specifically, the Agreement provides:

(a) During Employee's employment by the Company and for a period of 12 months immediately following the termination of employment for any reason whatsoever, (whether for cause, by resignation or otherwise) Employee will not, directly or indirectly (whether through affiliates, relative or otherwise):

(i) in any Restricted Area, be employed, retained, or otherwise provide any consulting, brokerage, contracting sales, financial or other services or assistance to any person or entity who or which then competes with the Company to any extent. For purposes of this Agreement, the term "Restricted Area" shall mean the area within:

(A) a 50 mile radius from any and all Company locations for which Employee performed services, or had management or sales responsibilities, at any time during the 24 month period immediately preceding the termination of Employee's employment with the Company; and

(B) any geographic area for which Employee had management or sales responsibilities at any time during the 24 month period immediately [*12] preceding the termination of Employee's employment with the Company;

(ii) solicit the business of, or call upon, any person or entity, or affiliate of any such person or entity, who or which is or was a customer, supplier, manufacturer, finder, broker, or other person who had a business relationship with the Company or who was a prospect for a business relationship with the Company at any time during the period of Employee's employment, for the purpose of providing or obtaining any product or service reasonably deemed competitive with any product or service then offered by the Company;

(iii) approve, solicit or retain, or discuss the employment or retention (whether as an employee, consultant, or otherwise) of any person who was an employee of the Company at any time during the one-year period preceding the termination of Employee's employment by the Company;

(iv) solicit or encourage any person to leave the employ of the Company;

(v) call upon or assist in the acquisition of any company which was, during the term of this Agreement, either called upon by an employee of the Company or by a broker or other third party, for possible acquisition by the Company or for which an employee of the [*13] Company or other person made an acquisition analysis for the Company; or

(vi) own any interest in or be employed by or provide any services to any person or entity, which engages in any conduct, which is prohibited to Employee under this Section 3(a).

(b) Employee shall be deemed to be employed or retained in the Restricted Area if Employee has an office in the Restricted Area or if Employee performs any duties or renders any advice with respect to any facility or business in the Restricted Area.

[Doc. #14 (Agreement) §§3(a) & (b)].

Under §3(f) of the Agreement, Frey agreed to the entry of injunctive relief enjoining him from breaching the Employment Agreement.

## II. DISCUSSION[8]

8 The Court has subject matter jurisdiction based on diversity of citizenship. Agreement §5(a). Connecticut law applies. Id. 9(g). "The question of whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny." Baker's Aid v. Hussmann, 830 F.2d 13, 15 (2d Cir. 1987).

In order for the Court to grant a preliminary injunction, the party seeking the injunction must establish "(a) irreparable harm [*14] and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) ("For the last five decades, this circuit" has required this showing on a preliminary injunction) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 7 2 (2d Cir. 1979); Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000); see also Branson Ultrasonics Corp. v. Stratman, 921 F. Supp. 909 (D. Conn. 1996). 9"A movant need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." United Rentals v. Bastanzi, No. 3:05CV596(RNC), 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, n.6 (Dec. 22, 2005)

9 The Court rejects defendant's argument that the standard for a preliminary injunction requires that plaintiff prove three elements: "(1) irreparable harm; (2)likelihood of success on the merits,

[*15] or the existence of a sufficiently serious question on the merits; and (3) the balance of hardships tipping in its favor." [Doc. #35 at 2].

1. Likelihood of Success on the Merits

United's breach of contract claim alleges that Frey violated the non-compete and confidentiality obligations contained in the Agreement. Compl. Count One. "The elements of a breach of contract claim are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *4 (citing Chem-Tek, Inc. v. Gen. Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993) (citing O'Hara v. State, 218 Conn. 628, 590 A.2d 948 (1991))).

Frey argues that the Employment Agreement is unenforceable because the restrictive covenants are overly broad and unenforceable. Defendant asserts that the "restrictive covenant prevents Mr. Frey from working for a person or entity that rents or sells equipment or merchandise of any kind to the commercial or general public." [Doc. #35]. Before the Court reaches the question of whether the Agreement has been breached, it must consider whether the Agreement is enforceable. [10] Defendant bears the burden of proof on this claim. Merryfield Animal [*16] Hosp. v. Mackay, No. CV020464586S, 2002 Conn. Super. LEXIS 2628, 2002 WL 31000298, at *3 (Conn. Super. Ct. July 31, 2002) ("The defendant, who claims that the noncompete clause is unenforceable, has the burden of proof."); Scott v. General Iron & Welding Co., Inc., 171 Conn. 132, 138, 368 A.2d 111 (1976) (same).

10  At the hearing, Frey testified that he was not provided adequate time to consider the Employment Agreement or legal counsel before commencing his employment with United. Defendant bears the burden of proving duress. United Rentals, Inc. v. Bastanzi, No. 3:05CV596(RNC), 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *5 (Dec. 22, 2005). Aside from alleging these facts in his affidavit and in his testimony, Frey did not brief this claim in his opposition brief or post-hearing brief and defendant has not provided evidence of duress. Indeed, Frey admitted that he never raised any objection prior to signing the Agreement and did not request additional time to consult with an attorney before commencing his employment.

The Court rejects defendant's argument, instead giving the Agreement a reasonable interpretation in light of the facts and circumstances in this case. As set forth below, the Court believes that Section 3(a)and (b) restricts the scope of [*17] the Agreement to the former employee's (1) company location, 2) performance of services, and 3)"management or sales responsibilities" engaged in on behalf of United. The Agreement also states that, "The Courts enforcing this Agreement shall be entitled to modify the duration and scope of any restriction contained here in to the extent such restriction would otherwise be unenforceable, and such restriction as modified shall be enforced." Agreement §3(g).

Reasonableness of the Non-Compete

Under Connecticut law, "[a] covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable." New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 533, 559 A.2d 715 (1989). In determining whether a covenant is reasonable, the court considers: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 529, n. 2, 546 A.2d 216 (1988). This test [*18] is "disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." New Haven Tobacco Co., 18 Conn. App. at 534.

As to the first factor, the length of time the restriction is in effect, §3(a) of the Agreement contains a time limitation of 12 months. The defendant does not dispute that the temporal restriction of one year is reasonable. The Court finds that a one year prohibition is reasonable. See Robert S. Weiss, 208 Conn. at 531-32 (1988) (and cases cited therein); United Rentals, Inc. v. Bastanzi, No. 3:05CV596(RNC), 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (Dec. 22, 2005) (one year restriction found reasonable).

The geographic scope is also reasonable. The restricted area is "any geographic area for which [Frey] had management or sales responsibilities at any time during the 24 month period immediately preceding the termination of [Frey's] employment with [United's

Page 6

Indianapolis branch]." [11]Agreement §3(a)(i)(B). This area encompassed most of the state of Indiana. Pl. Ex. 10. An employer can protect its business in the area where it does business. See Robert S. Weiss & Associates v. Wiederlight, 208 Conn. 525, 533, 546 A.2d 216 (1988); [*19] Scott v. General Iron & Welding Co., Inc., 171 Conn. 132, 138, 368 A.2d 111 (1976) ("The general rule is that the application of a restrictive covenant will be confined to a geographical area which is reasonable in view of the particular situation."); Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (finding 75 mile radius of Gainesville, Florida branch "accurately captures the market serviced by the plaintiff and thus is precisely drawn to protect its goodwill."); see also Musto v. Opticare Eye Health Centers, Inc., No. CV9900155663S, 2000 Conn. Super. LEXIS 2298, 2000 WL 1337676, at *4 (Conn. Super. Ct. Aug. 9, 2000) (upholding geographic scope where record demonstrated that plaintiff does business in geographic area defined by restrictive covenant). "Given the nature of the plaintiff's customer-driven business, it is reasonable for it to be concerned that an employee with extensive relationships with its customers, such as the plaintiff, might be in a position to threaten its business if the employee works for a competitor." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (citing Elizabeth Grady Face First, Inc. v. Escavich, 321 F. Supp. 2d 420, 427 (D. Conn. 2004) (concluding "twenty-five mile radius covers a range of territory reasonably necessary for [*20] the protection of Elizabeth Grady's goodwill and its investment in its customers.")).

> 11  The parties agreed that this geographic area was larger then the "50 mile radius from any and all company locations for which [Frey] performed services, or had management or sales responsibilities . . . ." Agreement §3(a)(i)(A).

As for the third factor, defendant argues that the Agreement unfairly protects United because competition is not limited to the trench safety business conducted by United's Indianapolis branch. Defendant argues that the Agreement restricts Frey from employment in any business competitive with United nationally and internationally and restricts Frey from selling any product also sold by United. [Doc. #35 at 5-6]. As previously stated, the Court does not accord the agreement this broad reading. Interpretation of these contract provisions is guided by well established principles of contract law.

A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . . [T]he intent of the parties is to be ascertained by a fair [*21] and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 1137 (1997). (Internal quotation marks omitted.)

Pesino v. Atlantic Bank of New York, 244 Conn 85, 91-92, 709 A.2d 540 (1998). Specifically, Section 3 of the Agreement contains precise language limiting the contours of the non-compete. The "restricted area" is clearly confined to the location where Frey performed his services or sales responsibilities while employed at United "at any time during the 24 month period immediately preceding the termination of [Frey's] employment with the Company." [Agreement §3(a)(i)(B)]. Similarly, the solicitation prohibition [*22] is clearly confined to customers Frey solicited, called on, who had a business relationship with United or were a prospect for a business relationship "at any time during the period of [Frey's] employment" for "the purposes of providing or obtaining any product or service reasonably deemed competitive with any product or service then offered by the Company." [Agreement §3(a)(ii)].

Defendant focuses on the fourth factor, taking an expansive and hypothetical interpretation of the Agreement, arguing that the covenant is an unreasonable restraint on his opportunity to pursue his occupation. The record establishes that MacAllister approached Frey with

a job offer and that Frey made no attempt to search for a job in a field or location that would not violate the Agreement. Frey testified that MacAllister is a direct competitor of United in trench shoring business in the very same sales territory. By its very nature, a restrictive covenant affects a defendant's opportunity to pursue his occupation.

However, this one does not do so unreasonably. See Scott v. General Iron & Welding Co., 171 Conn. 132, 368 A.2d 111 (1976) (court enforced 5-year, statewide prohibition on competition against former manager of [*23] wielding and metal fabrication company). Here, there is no evidence that the covenant deprives Frey of the ability to earn a living. He may not compete with United's Indianapolis trench shoring business within the territory he previously serviced for twelve months.

> Although the scope of restrictions imposed by the restrictive covenant taken literally are extremely broad, the plaintiff actually is seeking only to enjoin the defendant from competing in its own industry . . . . It further requests that the defendant be prohibited from soliciting any person who, prior to defendant's termination with plaintiff was a client or candidate. This, the court deems reasonable and not unduly restrictive.

Grayling Assocs. v. Villota, No. CV040833521, 2004 Conn. Super. LEXIS 1859, 2004 WL 1784388, at *2 (Conn. Super. Ct. July 12, 2004) (citing Robert S. Weiss & Assocs. v. Wiederlight, 208 Conn. 525, 531-33, 546 A.2d 216 (1988)). Moreover, the Court declines to speculate, as defendant seemed to invite at the hearing, whether the Agreement would be enforceable if defendant were working in another field or location. Schoonmaker v. Cummings and Lockwood of Connecticut, P.C., 252 Conn 416, 458-59, 747 A.2d 1017 (2000) ("In considering the validity of noncompetition [*24] clauses in other contexts, this court repeatedly has observed that their validity is to be determined, not by the language in which they are couched, but by a factual inquiry into whether they are reasonably limited and fairly protect the interests of both parties.").

Finally, there is no evidence that enforcement of this covenant will harm the public interest.

Accordingly, the Court finds that there is an enforceable Agreement between the parties, satisfying the first element of a breach of contract claim. The next two elements plaintiff must establish on its breach of contract claim are: defendant's breach of contract and damages resulting from the breach. Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *4 (citing Chem-Tek, Inc. v. Gen. Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993) (citing O'Hara v. State, 218 Conn. 628, 590 A.2d 948 (1991)).

The evidence establishes that Frey breached the Employment Agreement with United. Martin v. Dupont Flooring Systems, Inc., No. 3:01CV2189 (SRU), 2004 U.S. Dist. LEXIS 5486, 2004 WL 726903, at *3 (D. Conn. Mar. 31, 2004) (Breach of contract is an "unjustified failure to perform all or any part of what is promised in a contract."). As already stated, MacAllister is a direct competitor of United's Indianapolis [*25] branch's trench shoring business. MacAllister's recruitment of Frey was deliberate. MacAllister valued the connections and experience Frey gained as a trench shoring sales person in the Indianapolis market through his employment with United. Frey does not dispute that he is competing within the "Restricted Area" as defined in the Employment Agreement, soliciting United's customers, suppliers and employees and using United's "confidential information" and "trade secrets" as defined in the Employment Agreement. [12][Pl. Ex. 10, 13-14, 18-21, 23]. Frey testified that he will continue to call on United's customers and vendors to solicit business for MacAllister.

> 12   Defendant initially testified that in his view there are not trade secrets or confidential information in the trench shoring business, which was contradicted by later testimony.

Finally, Frey's continued employment with MacAllister will continue to damage United's trench shoring business in the Indianapolis branch area. The evidence clearly shows that Frey knows the identity of United's trench shoring customers and suppliers, United's prices and pricing methods and United products and services. He knows details of United's business, [*26] learned from his time on the job since December 2007. Frey does not dispute that, while employed by United, he learned confidential information that should not be disclosed to a competitor. On this record, the Court finds that it Frey has and will continue to disclose confidential

information either intentionally or inadvertently in his position at MacAllister. What Frey knows about United is bound to influence what he does for MacAllister and, to the extent it does, United will be disadvantaged. See Weseley Software Dev. Corp. v. Burdette, 977 F. Supp. 137, 147 (D. Conn. 1997) (citations omitted)("the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure."). The Court finds that plaintiff has shown likelihood of success on its breach of contract claim.

## 2. Irreparable Harm

Enforcement of the Agreement is necessary to prevent irreparable harm. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Assocs., Inc. d/b/a Tor Books v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir. 1995) [*27] (internal quotations and citation omitted). As set forth above, Frey is violating the Agreement and continues to do so in his employment with MacAllister.

"In cases such as this, involving a person competing with his former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury." Innoviant Pharmacy, Inc. v. Morganstern, 390 F. Supp. 2d 179, 188 (N.D.N.Y. 2005). "A number of Connecticut courts and courts in this district have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *8 (citing cases). This is because "when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). In addition, a presumption of irreparable [*28] injury is appropriate and justified "when the plaintiff establishes that the defendant is in possession of his former employer's confidential information when he accepts employment with a competitor. This is because the employee is likely, even inadvertently, to disclose his former employer's

trade secrets such as pricing and profit structure or future prototypes during the course of his new employment." VBrick Systems, Inc. v. Stephens, 3:08-cv-1979 (CFD), 2009 U.S. Dist. LEXIS 45835, 2009 WL 1491489, at *8 (D. Conn. May 27, 2009) (citing Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 631 (E.D.N.Y. 1996). See also Pepsico, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995) ("a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.")).

In fact, Frey acknowledged in the Agreement that in the event of his breach of the non-compete provision, United is entitled to injunctive relief, because the breach would cause irreparable damage. See Agreement §3(f). "This acknowledgment, if not an admission, is at least evidence and a recognition of the reality that money damages are not sufficient to remedy [*29] the loss." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *8 (citing Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) (finding that such a provision "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision.")).

In this case, United has established that Frey possesses confidential information that would not otherwise be readily available to MacAllister and that Frey is soliciting and marketing to United's customers. It appears that MacAllister recruited Frey because of the knowledge and experience he gained while employed by United. Indeed, during the first week of his employment with MacAllister, Frey was asked to identify his "best" United customers and MacAllister assigned those customers to Frey. Frey proceeded to contact United's customers and at least one vendor to solicit their business for MacAllister. Frey candidly testified that information on customers, rate card, bidding, margins, pricing, installation, and inventory should not be disclosed to a competitor. This acknowledgment is especially troubling in light of the evidence that all the information Frey possessed regarding [*30] the trench shoring market in the Indianapolis sales territory was gained during his employment with United. [13] Frey is a salesman who had no prior experience in trench shoring before his employment with United. He became conversant in United's products, customers, vendors, training programs and sales approach. Given that the two companies compete in the trench shoring business in the restricted

area, and based on the consequent loss of business from existing customers and the acknowledgment by the defendant that remedies at law would be inadequate, the plaintiff has adduced sufficient evidence of irreparable harm to justify the issuance of an injunction.

13    Prior to his employment with United, Frey worked for R.L. Turner Corporation in business development; Smith & Nephew Orthopaedics as Associate Account Manager; and Otto's Parking Marking, as a Sales Representative and Scheduling Director. [Pl. Ex. 5].

## III. CONCLUSION

For the foregoing reasons, United Rental's Motion for Preliminary Injunction **[Doc. #10]** is **GRANTED**. The injunction shall be in effect for one year from the date of this ruling. See Agreement, Pl. Ex. 6, §3(a).

IT IS HEREBY ORDERED that the defendant, Evan Frey, is enjoined [*31] as follows and therefore shall not:

(A) directly or indirectly disclose or otherwise use any of plaintiff's Trade Secrets or Confidential Information, as defined and described in Section 2 of the Agreement between plaintiff and defendant for any purpose whatsoever.

(B) directly or indirectly (whether through affiliates, relatives or otherwise)

(i) in the Restricted Area 14 be employed, retained, or otherwise provide any consulting, brokerage, contracting, sales, financial or other services or assistance to any person or entity who or which then competes with United in the trench shoring business;

(ii) solicit the business of, or call upon, any person or entity who was a trench shoring Customer 15 of United's Indianapolis branch during Frey's employment there;

(iii) approve, solicit or retain, or discuss the employment or retention of any person who was an employee of United's Indianapolis branch at any time during the one-year period preceding the termination of Frey's employment;

(iv) solicit or encourage any person to leave the employ of United's Indianapolis branch;

(v) own any interest in or be employed by or provide any services to any person or entity which engages in any conduct which [*32] is prohibited to Frey under this Order.

14    The "restricted area" is any geographic area for which Frey had management or sales responsibilities at any time during the 24 month period immediately preceding the termination of Frey's employment with United's Indianapolis branch. Agreement §3(a)(i)(B).

15    For purposes of this Order, "United Customer" shall mean (A) a trench shoring customer, supplier or vendor who had a business relation with United's Indianapolis branch or who was a prospect for a business relationship with United's Indianapolis branch at any time during the period of Frey's employment, and/or (B) an affiliate of such person or entity.

For purposes of this Order, the defendant will be deemed to be employed or retained in the Restricted Area if he has an office in the Restricted Area or if he performs any duties or renders any advice with respect to any facility or business activities in the Restricted Area. This includes, but is not limited to, defendant's current employer, MacAllister Machinery Co., Inc.

2011 U.S. Dist. LEXIS 16375, *32

IT IS FURTHER ORDERED that no bond be required, as agreed to by the parties in Section 3(f) of the Agreement.

This is not a recommended ruling. The parties consented to proceed [*33] before a United States Magistrate Judge [Doc. #33] on February 9, 2011, with appeal to the Court of Appeals.

Dated at Bridgeport, this 17th day of February 2011.

/s/

HOLLY B. FITZSIMMONS

UNITED STATES MAGISTRATE JUDGE

LEXSEE



Cited
As of: May 26, 2011

**Edge Technology Services, Inc. v. Karen E. Worley et al.**

**CV054008278**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW
HAVEN, AT NEW HAVEN**

**2005 Conn. Super. LEXIS 1804**

**July 5, 2005, Decided
July 5, 2005, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED
AND MAY BE SUBJECT TO FURTHER APPELLATE
REVIEW. COUNSEL IS CAUTIONED TO MAKE AN
INDEPENDENT DETERMINATION OF THE STATUS
OF THIS CASE.

**JUDGES:** Carmen L. Lopez, J.

**OPINION BY:** Carmen L. Lopez

**OPINION**

*MEMORANDUM OF DECISION*

On March 9, 2005, the Plaintiff Edge Technology
Services, Inc. (Edge) filed a four-count complaint against
the Defendants, Karen E. Worley (Worley) and The
Systems Group, (Systems). In Count One, the plaintiff
alleges a Breach of Contract action as to the defendant
Worley. The second count alleges tortious interference
with Contractual and Business Relations as to the
defendant Systems. Counts three and four are filed
against all defendants and allege a civil conspiracy and a
violation of Connecticut Unfair Trade Practices Act,
respectively.

In addition to the filing of the complaint, the Plaintiff
filed an application for Ex-Parte Temporary Restraining
Order, Temporary Injunction and Order to Show Cause.
The plaintiffs seek an order from the court prohibiting
and restraining the defendants from utilizing or disclosing
any confidential or proprietary information of the
plaintiff's clients that was acquired by Worley during the
course of her employment [*2] at Edge.

In addition, the plaintiffs seek an order from the
court prohibiting Worley from performing or seeking to
perform any services performed by Worley while an
employee of Edge, including the placement of
Information Technology personnel, for any client of Edge
for whom Worley performed such services at any time
during the one-year period immediately prior to Worley's
voluntary termination of employment from Edge on
January 3, 2005.

Lastly, the plaintiffs seek an order prohibiting
Worley from offering employment to or employing
directly or indirectly any employee, consultant,
subcontractor or other agent of Edge who was employed
by Edge during the one-year period immediately prior to
Worley's termination of employment from Edge on
January 3, 2005.

The plaintiffs also seek an order prohibiting and
restraining Systems from directing or in any way
inducing any of the foregoing conduct.

Page 1

On March 10, 2005, the court (Pittman, J.) denied the application for an ex-parte restraining order and instead set the matter down for a show cause hearing on April 4, 2005. The parties were advised that the "court would not hear evidence on that date but will conduct a status/settlement conference [*3] and assign the matter for an evidentiary hearing, if necessary."

On April 26 and April 27, 2005, the court (Lopez, J.) held an evidentiary hearing on the application for a temporary injunction. The parties were given until May 18, 2005 to file post-trial briefs and until June 10, 2005 to file reply briefs. The court has received briefs from all of the parties.

## I. FACTS

### A. The Plaintiff, Edge Technology Services, Inc.

Edge is an information technology (IT) consulting firm that supplies "the Fortune 100 companies in Connecticut with IT help and solutions to their technology needs." [1] This service is provided by the placement of IT personnel for short and long-term project assignments in technical positions at the clients' businesses. Ralph Durante is the president and CEO of Edge. He has been in the IT business for thirty-one years. He established Edge in 2000. The company currently employs approximately one hundred and fifty individuals.

1  4/26/05 Tr. at 85.

Although, according to Durante, "there are [*4] over three hundred clients in the state of Connecticut that have a good size IT Department," [2] Edge focuses its efforts on the top ten businesses in the State. These include the Hartford Insurance, Cigna, Aetna, ESPN, and Northeast Utilities. [3] Once one of these corporations determines that it needs IT personnel, it hires a company, referred to as a vendor, to service these needs. Both the plaintiff and the defendant, Systems, are experienced vendors of these types of services. In addition, both Edge and Systems are within a special class of vendors identified by The Hartford Insurance as preferred/Tier I. Vendors.

2  Id.
3  Id.

The process used by corporations to meet their IT needs begins with the issuance of a notice to vendors describing the positions that must be filled as well as the skills and requirements which must be possessed by the person interested in the position. Vendors then submit the names and resumes of their candidates to the corporation for consideration. The corporation then [*5] makes a decision selecting an individual from among the candidates presented by the vendors. The factors that go into the decision-making about which candidate to select are "qualifications and price, primarily." [4]

4  Id. at 42.

The business of placing consultants in Fortune 100 companies to address their IT needs is one that relies heavily on relationships. Durante testified that he considers having relationships with executives, managers and other employees of a Fortune 100 company a significant asset to his business. Building and maintaining relationships is so important to the IT consulting business, that each year a significant amount of money is spent on entertaining Fortune 100 company executives, managers and other employees for "lunch, dinner, drinks, coffee." [5]

5  Id. at 131.

The testimony in this case regarding cultivating [*6] relationships underscores the meaning of the frequently used saying, "it is not what you know, but who you know." Kate Cervoni, Edge's current Vice President and Branch Manager, testified that building professional relationships with the clients in the industry is "extremely important. That's why we have expense accounts and those things. It is about relationships and in any sales it's you don't say no to people you like so it's extremely important to build those relationships." [6]

6  Id. at 148.

Ms. Cervoni's candid description of the ways that relationships are built in this business offers a glimpse of the extent to which a business will go to cultivate relationships "You--you get to know them. You be their friend during, you know, the nine to five week or later because we do dinners and golf with dinners and things like that. You get to know, you know, how old are your kids, I have kids, truthfully whether you like them or not you appear to be friends with all your clients." [7]

7  Id. at 149.

[*7] When Durante commenced building his IT consulting business, one of the first activities that he engaged in, was establishing his management team as well as setting up his sales force. In an effort to successfully complete this process, and keeping the importance of relationships in mind, he asked his secretary who had worked with Worley at Howard Systems to call her and ask her if she would meet with him. Worley agreed to the meeting. Durante asked Worley to "head up sales . . . to run sales, to run the company, help me out." [8]

8  *Id.* at 86.

Worley accepted the position as the branch manager of the "Hartford office which she did in Farmington, Connecticut and she handled all the sales, hired the recruiters, hired the ad man, whatever it took to grow the Hartford marketplace." [9] At the time of accepting the position, Durante presented Worley with a letter he had prepared outlining the terms of her employment with Edge. [10] The letter enclosed a document entitled Professional Practices Agreement. [11] This [*8] agreement, which is an employment contract with a non-compete clause, consists of six paragraphs. Worley and Durante executed the letter and the agreement on June 27, 2001.

9  Id.
10  Plaintiff's Exhibit 1.
11  Plaintiff's Exhibit 2. The agreement states in relevant parts as follows:

1. Any confidential or proprietary information of Edge Technology Services, or its subsidiaries or of any client of Edge which is acquired by me in the course of my employment, will not be used by me except in performance of my employment duties and will not be disclosed to any unauthorized person either during or after the course of my employment by Edge.

4. While employed by Edge and for a period of one-year subsequent to any termination, voluntary or involuntary, of my employment with Edge, I will not be employed by, act as a consultant to, or otherwise perform such services for remuneration, directly or indirectly for any client of Edge (including, for this purpose, any subsidiary or other affiliate of such client), for whom I was performing services at any time

during the one-year period immediately prior to any such termination.

5. While employed by Edge and for a period of two years after termination (voluntary or involuntary) of my employment with Edge, I will not offer employment to or employ directly or indirectly (as employees, contractors consultants, etc.) any employee, consultant, subcontractor, or other agent of Edge who was employed by Edge during the one-year period immediately prior to any such termination.

[*9] Edge employed Worley until December 20, 2004 when she presented Durante with a letter providing him with two weeks notice of her intention to resign from her position. Durante testified that when Worley told him of her intentions to leave, he reminded her that he expected her "to do the right thing," which meant that he expected her to honor the covenant not to compete. Edge maintains that a covenant not to compete is routine and customary in the IT consulting business and he had every expectation that Worley would honor her agreement with Edge.

B. *The Defendant, Karen Worley*

Karen Worley has been engaged in the business of placing IT personnel for a at least twenty years. She has been employed on a full-time basis in this business since she graduated college in 1984. [12] In 1989, she joined a company known as Howard Systems as a sales representative. She left Howard and accepted the position with Edge on June 27, 2001.

12  4/27/05 Tr. at 25.

According to the terms of her employment, [13] Worley was to [*10] be paid a base salary of one hundred thousand dollars ($ 100,000.00) a year. In addition she was to be paid a quarterly bonus of twenty thousand dollars ($ 20,000.00) based on an agreed-upon Management by Objectives (MBO) plan. The agreement also provided an opportunity for Worley to gain an equity position in the company upon meeting the MBO requirements. In addition, Worley was to receive an expense account of thirty thousand dollars a year ($ 30,000.00), [14] a monthly car allowance of three hundred twenty dollars ($ 320.00) as well as cell phone reimbursement.

13  Plaintiff's Exhibit 1.

14  4/26/05 Tr. at 93.

In consideration for this salary, Worley was to provide a number of services to Edge. First, Worley's services included the marketing and sales of IT services to Edge's clients. She testified that among her duties at Edge, she "called on clients to place consultants at the client sites." [15] As a sales person, Worley testified that she "looked for opportunities to place consultants and placed consultants. [*11] " [16] Worley did not provide any IT consulting services to any of Edge's clients, she concentrated her efforts on placing the consultants.

15  4/26/05 Tr. at 18.

16  Id. at 22, 23.

In addition to these duties, Worley was responsible for supervising the recruiters of IT personnel; that is, those individuals, who were employees of Edge and who were responsible for the solicitation and placement of IT personnel at Edge's clients. As Edge grew and added staff, Worley's duties at Edge changed. Other employees were added that relieved Worley of some of her responsibilities. [17]

17  Id. at 48.

At the time that Durante offered Worley employment with his company, Worley was also subject to a non-compete agreement with Howard. [18] Although this was considered by Durante as a restriction on her ability to obtain business for Edge, "she [*12] worked on other accounts. There were plenty of other places to go and that was my approach on it." [19] According to Worley, since she already had experienced being subject to a non-compete agreement at Howard, she did not want to subject herself to that type of restriction again.

18  Id. at 14.

19  Id. at 87.

Worley testified that she discussed her concerns with Durante prior to signing the agreement. She testified that she considered that the agreement." would be overly restrictive of client relationships that I had for thirteen plus years. Going forward I didn't think that it was a reasonable prohibition. What I would think would be reasonable is any clients, ESPN for example, or UI or I knew that would be introduced to me while I was there but certainly not clients that I was bringing with me that I

had long term relationships with and it was my understanding that Ralph and I agreed that . . . that was an understanding." [20] According to Worley, Durante told her that she didn't need to worry about [*13] the relationships that she was bringing to the table because those relationships would not be subject to the prohibition.

20  Id. at 53.

The evidence demonstrates that during her time at Edge, Worley worked very hard at building and sustaining her relationships with Edge's clients. There came a time, however, when she decided that she wanted to leave Edge and move on in her career. When she was offered a position with the Defendant, Systems Group, Inc., a competitor of Edge, she accepted the position. On December 20, 2004, she met with Durante to personally deliver a letter of resignation. [21] In the letter, she advised Durante that her resignation was effective immediately and that the letter was to be considered as two weeks notice. Her last official day at Edge was to be January 3, 2005.

21  Plaintiff's Exhibit 4.

During the two [*14] weeks prior to her departure from Edge, Worley did not report into the office. It is her position that she was not asked to come into the office during those two weeks. She testified that she provided a transition memo to the office. She also submitted receipts for entertaining Edge's clients during the holidays. According to testimony, the receipts did not detail the nature of the business that was conducted, nor did Worley include anyone from Edge staff to join her in the business entertainment.

Worley began to work for Systems the same week that her resignation became final at Edge. Her duties at Systems are essentially the same as those that she engaged in at Edge. Those include seeking to make placements of IT personnel at companies such as The Hartford and other clients of Edge. The evidence demonstrates that she has already made efforts to place individuals at the Hartford and at Cigna. She has in addition, made personal visits to the physical plants.

When Durante learned of this activity, he telephoned Worley to discuss the situation. She told him that she had been directed by Mr. Foster, The Systems Group CEO to call on those accounts. She testified that these are

relationships [*15] that she has had for the past fifteen years and that she intends to continue calling on these accounts. She maintains that notwithstanding the agreement that she signed, she had an understanding with Durante that allows her to contact relationships that she had established prior to becoming an employee of Edge.

## C. The Defendant, Systems Group.

Carl Foster is the owner and President of Systems Group. He has owned and operated this business since 1985. It currently has one hundred and fifty five employees. Foster testified that the Hartford has been his client since 1986 and his company has been a preferred vendor or a Tier I vendor since the relationship first started. In addition, Cigna has been a client of Systems since 1986 and has been the Systems "biggest client." [22] Foster also explained that his company has enjoyed a preferred vendor status with Cigna the entire time that it has been in business.

22    4/27/05 Tr. at 3.

Foster testified that when he offered the position to Worley, he discussed the [*16] Professional Practices Agreement with her. Based on his, as well as his counsel's review of the Agreement, he believed that Worley was not restricted from doing business at the Hartford or at Cigna. As a result, he has directed Worley to identify opportunities for consultant services with those clients.

## II.  STANDARD FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION

"In general, a court may, in its discretion, exercise its equitable power to order a temporary injunction pending final determination of the order, upon a proper showing by the movant that if the injunction is not granted he or she will suffer irreparable harm for which there is no adequate remedy at law . . . In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." *Moore v. Ganim*, 233 Conn. 557, 569, n.25, 660 A.2d 742 (1995).

It is well-established in Connecticut that a temporary injunction may issue provided that a party has established that he or she has "a reasonable degree of probability of success on the merits of its claim and the imminence of substantial irreparable injury for which there [*17] is no

adequate remedy at law. The court must also consider the harm to the respective parties and to any public interests that may be affected by the entry of or failure to enter injunctive relief." *Musto v. Opticare Eye Health Centers,* Superior Court, Complex Litigation Docket at Waterbury, Docket No. 155663 (August 9, 2000, Hodgson, J.), citing *Griffin Hospitals v. Commission on Hospital and Health Care,* 196 Conn. 451, 457, 493 A.2d 229 (1985), citing *Olcott v. Pendleton,* 128 Conn. 292, 295, 22 A.2d 633 (1941).

Irreparable injury and lack of an adequate remedy at law is considered to be automatically established where a party seeks to enforce a covenant not to compete. *Segarino v. SCI Connecticut Funeral Services, Inc.,* Superior Court Judicial District of New Britain, Docket No. 499737 (May 22, 2000, Aurigemma, J.), 27 Conn. L. Rptr. 281, quoting *Lampson Lumber Co. v. Caporale,* 140 Conn. 679, 685 102 A.2d 875 (1954).

## III.  STANDARD FOR REVIEW OF A COVENANT NOT TO COMPETE

When considering a covenant not to compete, a court looks at five factors. In the case of *Robert S. Weiss & Associates, Inc. v. Wiederlight,* 208 Conn. 525, 529, 546 A.2d 216 (1988) [*18] citing *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 368 A.2d 111 (1976), our Supreme Court stated that as follows:

> The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests.

## IV. ISSUES IN DISPUTE

Edge maintains that it is entitled to a temporary injunction because it has demonstrated probable success on the merits of its claim, and that irreparable harm will result unless injunctive relief is provided. In addition, Edge asserts that there is no adequate remedy at law and

that the equities favor the issuance of an injunction. Furthermore the purpose of the covenant not to compete is subverted and rendered ineffective, without the application of injunctive relief.

Worley, on the other hand, maintains that there are essentially three reasons that Edge will not succeed on the merits. [*19] First, Worley alleges that the agreement is ambiguous in that it does not expressly restrict her from sales activities. Secondly, Worley asserts that she and Durante had an oral agreement that the covenant not to compete would not restrict her from doing business with those clients with whom she had pre-existing relationships. Moreover, these clients utilize the services of many different vendors, not just Edge. To restrict her in this fashion, Worley argues, would be to dramatically affect her ability to earn a livelihood. Lastly, Worley maintains that Edge does not have a legitimate business interest to have the agreement enforced against her.

Edge argues that it will succeed on the merits in that the evidence has clearly shown that the parties have an enforceable covenant not to compete. Durante denies that he ever had an understanding with Worley regarding the enforcement of the Professional Practices Agreement other than what is stated in the language of the Agreement. Edge relies on the statement contained within the employment letter: "This letter and the enclosed Professional Practices Agreement contain terms and conditions under which you will be employed and supersedes all [*20] prior oral or written representations."

Regarding the claim that the language in the agreement is ambiguous in that it does not expressly use the term "sales" in the list of prohibited activities, Edge argues that it has successfully established that the parties intended it to apply to Worley's activities at Edge, which have clearly been shown to be sales, in that she was not otherwise employed by Edge.

Furthermore, Edge argues that Worley has already violated the covenant not to compete contained within the Professional Practices Agreement, causing it irreparable harm. Edge maintains that it is entitled to protect its goodwill in its customer relationships through a covenant not to compete contained within a Professional Practices Agreement.

In addition, Edge asserts that there is no remedy that

can adequately protect its business, as well as its good will, other than an injunction.

Although Durante admits that Worley had pre-existing relationships with several of Edge's current clients, he maintains that she significantly nurtured and developed those relationships while employed for him and while he was paying a significant sum of money in the form of salary and expense account. [*21] He maintains that he is entitled to protect the investment that he made into those relationships.

## V. CONCLUSIONS

It is clear from the evidence in this case, that the court has before it well-educated, intelligent and successful people. Steps were taken to ensure that if any dispute were to arise once the employment relationship was terminated, their rights were protected. However, now that the separation has in fact occurred, the parties find that the steps taken were insufficient to keep them from a legal dispute.

The court finds that the plaintiff has established that a temporary injunction should issue.

Having heard the testimony of the parties and examined the documentary evidence, it is found that the plaintiff has met the burden of demonstrating the probability that it will succeed on the merits. Furthermore, the nature of the undertaking demonstrates a reasonable basis for including the covenant not to compete in the agreement signed by both parties. There is no hint of coercion or a failure by the defendant to fully understand her obligations under the written agreement.

It is also found, based upon the evidence presented, that the agreement is not ambiguous in light of [*22] the nature of the duties that Worley was hired to perform for Edge, and that she in fact performed for Edge. The fact that there was discussion regarding the scope of the covenant not to compete, prior to executing the agreement, points to the reality that the parties intended the agreement to apply to a sales person and was not restricted to those individuals providing consulting services. Having previously been subject to a non-compete clause, Worley knew and understood the meaning of executing such an agreement, and the consequences of a signed agreement.

The testimony revealed that the type of covenant

which is before the court is routine in the IT industry. In fact, the defendant had such an agreement when she began working for the plaintiff and the plaintiff insisted that they adhere to the terms of that agreement. Based upon the evidence presented, there is no basis for the defendant's claim of promissory estoppel or that she relied to her detriment on an oral representation which was not incorporated into the written agreement.

Applying the criteria set forth in *Weiss*, the court finds that the Professional Practices Agreement is reasonable and enforceable as to Worley. [*23] The evidence established that there are at least three hundred companies in which Worley could carry on her profession of placing IT consultants. The agreement limits her from doing business, for one year following her separation from Edge. In addition, the agreement does not prohibit her from working in the field of placing IT consultants but rather only with those who are Edge's clients and with whom she worked while employed at Edge.

It is also found that the plaintiff has shown that it will suffer irreparable harm, if the agreement is not enforced while the action is pending. It is true that Worley, had pre-existing relationships with several of Edge's clients, notably The Hartford and Cigna. However, it is also true that while employed at Edge she cultivated and extensively developed her contacts with these clients, as well as made new and potentially lucrative contacts.

It is undisputed, for example, that it was while employed at Edge that she was introduced to ESPN for the first time. The evidence has established that soon after leaving Edge, she called on and met with the hiring manager at ESPN to have lunch. Although this does not establish that she has attempted to make [*24] placements there, it does demonstrate swift efforts to begin to open ground to do so.

In addition, it was during her time at Edge that the Hartford instituted a new hiring process, called the Beeline, to manage the process of placing consultants. Under this new system, the Hartford restricts contact between the vendors and their hiring managers. All contact must go though Beeline. The evidence established that Worley made significant contacts with Beeline during this time, so much so, that when Beeline was interested in hiring its own personnel, Worley

recommended an individual who was ultimately hired by Beeline.

Worley argues that Beeline is a neutral entity and therefore having good contacts with its employees does not give anyone an advantage. However, the evidence demonstrates that there are times that having good and close relationships can provide special privileges, such as a preview of future hiring needs. In addition, since it is Beeline that decides which resumes to pass along to the hiring managers, having good relationships can help make sure that your resumes are not discarded, but rather are given serious consideration.

## VI. ORDER

The Application of the Plaintiff [*25] for A Temporary Injunction is granted. The Defendant, Karen Worley is enjoined from:

(a) utilizing or disclosing to any unauthorized person any confidential or proprietary information of Edge's clients that was acquired by Worley during the course of her employment at Edge.

(b) for a period of one year from the date of this order, from performing or seeking to perform any services performed by Worley while employed at Edge, including without limitation the placement of IT personnel, for any client of Edge for whom Worley performed such services at any time during the one-year period immediately prior to Worley's termination of employment from Edge on January 3, 2005.

(c) for a period of two years from the date of this order, from offering or seeking to offer employment to or employing directly or indirectly (as employees, contractors, consultants, etc.) any employee, consultant, subcontractor, or other agent of Edge who was employed by Edge during the one-year period immediately prior to Worley's termination of employment from Edge on January 3, 2005.

The Defendant, Systems Group is hereby enjoined from directing or in anyway inducing Worley from engaging in the above listed prohibited [*26] conduct.

Lopez, J.

LEXSEE

KX Industries, L.P. v. Bruce Saaski

CV 960386806S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW
HAVEN, AT NEW HAVEN

1997 Conn. Super. LEXIS 2444

August 29, 1997, Decided
August 29, 1997, Filed

**NOTICE:**    [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:**     Accordingly, the court issues a temporary injunction enjoining Saaski from working for Water Safety, or any other of KXI's three competitors, until March 10, 1998.

**JUDGES:** Frank S. Meadow Judge Trial Referee

**OPINION BY:** Frank S. Meadow

**OPINION**

MEMORANDUM OF DECISION

The plaintiff, KX Industries, L.P. (KXI), seeks a temporary injunction against the defendant, Bruce Saaski, a former employee of KXI.

On May 10, 1996, KXI filed an eight-count verified complaint against Saaski [1] along with, inter alia, an application for an ex parte temporary injunction. KXI's application asserts the following representations: [2] Saaski was employed by KXI as KXI's Technical Support Manager until April 24, 1996. [3] In this capacity, Saaski obtained confidential and proprietary information belonging to KXI with respect to KXI's current and prospective customers, material sources, research and development of KXI's product and manufacture and

testing of KXI's product. [4] Saaski's employment agreement contained a covenant not to compete (restrictive [*2] covenant) which prohibited Saaski from using or disclosing such confidential and proprietary information without the prior written consent of KXI; from maintaining possession of any materials, and copies thereof, containing any confidential information after Saaski ceased employment with KXI; and, from working for, or rendering services to, any competitor in any line of work or activity in which Saaski was engaged during any part of his last two years of employment with KXI, for a period of one year from the date of Saaski's cessation of employment with KXI. [5]

> 1    Count one alleges breach of employment contract; count two alleges a violation of the Uniform Trade Secrets Act; count three alleges tortious conversion; count four alleges statutory conversion pursuant to General Statutes 52-564; count five alleges a violation of the Connecticut Unfair Trade Practices Act; count six alleges slander per se; count seven alleges tortious interference with business expectations; and count eight alleges misuse of computer system information pursuant to General Statutes 52-570b.
>
> 2    Additionally, KXI submitted three affidavits and a copy of the employment agreement in support of its application

[*3]

> 3    Saask began working tor KXI in early December 1993.
>
> 4    KXI manufactures and distributes solid carbon block water filters, which remove chlorine and

other contaminants from otherwise unpotable water.

5   The allegations in count one of the complaint parallel the representations made in the application. To wit, count one alleges that in consideration of his employment with KXI, Saaski executed a written employment agreement which required, inter alia, that Saaski protect KXI's confidential and proprietary information, return all of KXI's confidential and proprietary information upon termination of his employment, and not work for or provide services to a competitor of KXI for at least one year following cessation of his employment with KXI. Saaski breached his employment agreement by failing to return KXI's confidential and proprietary information upon termination of his employment; by failing to protect KXI's confidential and proprietary information; by disclosing KXI'S confidential and proprietary information; and, by working for, providing services to, or becoming, a competitor of KXI.

[*4]   On May 10, 1996, the court, DeMayo, J., issued an ex parte temporary injunction commanding and enjoining Saaski from: (a) disclosing, utilizing or disseminating KXI's trade secrets and other confidential information, as defined in his employment agreement, and any other trade secret, confidential or proprietary information of KXI; (b) working for or rendering services to any competitor of KXI, or acquiring or holding any financial interest in a competitor, until August 24, 1997; (c) retaining KXI's trade secrets and other confidential information and proprietary information and material, and any reproductions of the same, whether stored/or recorded on paper, electronic or computer media of any form (e.g., hard disk, diskette, cartridge) or in any other manner; and ordering Saaski (d) to return to KXI all such confidential and proprietary information and material within two business days of service of this order. DeMayo, J., further ordered that this "Ex Parte Temporary Injunction shall continue in effect until further order of this Court, pending a hearing on [KXI's] Application for Temporary Injunction and Order to show Cause . . ." (Emphasis in original.) DeMayo, J., ordered [*5] that Saaski appear on June 10, 1996, to show cause why the temporary injunction, as applied for, [6] should not issue.

6   The relief applied for in the temporary

injunction is substantially identical to the relief applied for, and granted, in the ex parte temporary injunction.

On June 10, 1996, counsel for KXI and Saaski appeared before the court, Booth, J. At that time, the parties represented that they were attempting to resolve this matter amicably and consented to Judge Booth's marking the matter "off unless it's reclaimed."

On April 4, 1997, KXI filed a motion for an order of contempt. KXI sought to have Saaski held in contempt of court for failing to comply with the terms of the ex parte injunction issued June 10, 1996 by DeMayo, J., based upon Saaski's employment with Water Safety. [7] Water Safety is a competitor of KXI. Thereafter, on August 13, 1997, the court, Meadow, J., found Saaski in contempt of court and ordered that Saaski cease working for Water Safety. [8] The court, Meadow, J., also [*6] ordered a hearing as provided on June 10, 1996, on the validity of the restrictive covenant contained in Saaski's employment agreement because there had never been a hearing on the merits of the ex parte temporary injunction issued by Judge DeMayo. [9]

7   KXI claims that it learned of Saaski's employment with Water Safety on March 10, 1997, during an unemployment compensation hearing.
8   The court, Meadow, J., heard three days of evidence on the motion for contempt.
9   On August 20, 1997, the court, Meadow, J., heard an additional day of testimony on the validity and enforceability of the restrictive covenant.

## DISCUSSION

### A. Consideration

As an initial matter, the court must determine whether the covenant not to compete agreement is supported by sufficient consideration. Saaski argues that prior to executing the employment agreement, he and KXI entered into a contract of employment for a term of two years. Saaski contends that KXI was already obligated to employ him pursuant to such prior contract, [*7] and therefore, the later employment agreement (not compete) is not supported by valid consideration. KXI vehemently denies that it entered into a prior written contract for a term of employment with Saaski. KXI

maintains that the contract existing between itself and Saaski is the employment agreement, (Exh. I) dated December 9, 1993.

The employment agreement provides that "I [Saaski] am about to commence or have recently commenced employment with KX Industries L.P . . . I acknowledge that I have been advised that the execution and delivery of this Agreement is a condition of my employment. Accordingly, in consideration of my employment and/or continued employment by the Company [KXI] as well as to induce the Company to afford me access to Confidential information . . . I agree as follows . . ."

Whether a contract is supported by sufficient consideration is a question of law based upon the evidence. *Town Bank & Trust Co. v. Benson*, 176 Conn. 304, 307-08, 407 A.2d 971 (1978). "Under the law of contract, a promise is generally not enforceable unless it is supported by consideration. E. Farnsworth, Contracts (1982) 2.9, p. 89; A. Corbin, Contracts (1963) 193, p. 188." [*8] *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). In employment contracts, "past consideration" does not make a promise enforceable. *Dick v. Dick*, 167 Conn. 210, 224, 355 A.2d 110 (1974). A promise to do that which one is already bound to do does not constitute valid consideration for a new agreement. *Thermoglaze, Inc. v. Morningside Gardens Co.*, 23 Conn. App. 741, 745-46, 583 A.2d 1331, cert. denied, 217 Conn. 811, 587 A.2d 153 (1991).

Saaski has not demonstrated that he and KXI ever reached an agreement or entered into a contract for a term of employment for two years. The present case is similar to *Van Dyck Printing Co. v. DiNicola*, 43 Conn. Supp. 191, 648 A.2d 898 (1993). In *Van Dyck Printing Co. v. DiNicola*, the court enforced a covenant not to compete that had been entered into approximately one month after the employee started working for the employer. *Id.* the court reasoned that the covenant not to compete was supported by sufficient consideration because "at the time the defendant began work, he and the plaintiff had not concluded an agreement concerning the terms of his employment. They had, rather, [*9] agreed on some items and left open some others . . . When the plaintiff presented the defendant with the proposed written contract, no completed contract was already in place." *Id.* 195-96; see also *Russo Associates, Inc. v. Cachina*, Superior Court, Judicial District of Fairfield, 1995 Conn.

Super. LEXIS 248, Docket No. 27 69 10 (March 1, 1995, Levin, J.) (When determining whether a restrictive covenant in the employment context is supported by sufficient consideration, the court must consider the temporal proximity between the employee's hiring and the signing of the employment agreement.) [10] Moreover, where a "preexisting contract of employment is terminable at will, no overt consideration is required to support an otherwise valid covenant not to compete." *Daniel V. Keane Agency, Inc. v. Butterworth*, Superior Court, judicial district of New Haven, 1995 Conn. Super. LEXIS 507, Docket No. 31 31 81 (February 22, 1995, Levin, J.).

> 10    In the present case, Saaski signed the employment agreement on December 9, 1993. Saaski began his employment at KXI in early December 1993.

[*10] Since Saaski has not demonstrated that he and KXI ever entered into a prior contract of employment for a term of two years, and since Saaski executed the employment agreement shortly after commencing his employment at KXI, the employment agreement is supported by sufficient consideration.

**B. The Temporary Injunction & The Restrictive Covenant**

"The principal purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." (Internal quotation marks omitted.) *Clinton v. Middlesex Mutual Assurance Co.*, 37 Conn. App. 269, 270, 655 A.2d 814 (1995). "The requirements for a temporary injunction are . . . establishing a legal right, which involves a determination of the probability of the plaintiff's succeeding on the merits and that there is no other adequate remedy at law; and . . . the imminence of a substantial and irreparable injury to the plaintiff, considered together with the effect of a temporary injunction on the plaintiff and the defendant." *Connecticut Assn. Clinical Laboratories v. Conn. Blue Cross, Inc.*, 31 Conn. Supp. 110, 113, 324 A.2d 288 (1973). Furthermore, in *Waterbury* [*11] *Teachers Assn. v. Freedom Of Information Commission*, 230 Conn. 441, 446, 645 A.2d 978 (1994), our Supreme Court impliedly acknowledged that the requirements for a temporary injunction are: (1) the plaintiff had no adequate legal remedy; (2) the plaintiff would suffer

irreparable injury absent an injunction; (3) the plaintiff was likely to prevail on the merits; and (4) the balance of the equities favored an injunction. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." *Advest, Inc. v. Wachtel*, 235 Conn. 559, 562-63, 668 A.2d 367 (1995). The trial court is afforded broad discretion in deciding whether to issue an injunction. *Bauer v. Waste Management of Connecticut, Inc.*, 239 Conn. 515, 534, 686 A.2d 481 (1996); *Nair v. Thaw*, 156 Conn. 445, 452, 242 A.2d 757 (1968) ("The issuance of an injunction and the scope and quantum of the injunctive relief rests in the sound discretion of the trier").

In the present proceeding, the parties have agreed that KXI has no adequate legal remedy and would suffer irreparable harm absent an injunction, thus, the first two requirements for a temporary injunction [*12] have been satisfied. [11] Pursuant to this court's order of August 13, 1997, the issue now before the court is the validity and enforceability of the restrictive covenant. As discussed *supra*, with respect to the requirements for a temporary injunction, this issue falls within the ambit of the third and fourth requirements for a temporary injunction, i.e., that if the restrictive covenant is found to be valid and enforceable, the plaintiff would be likely to prevail on the merits and the court would then proceed to balance the equities of issuing an injunction. The inquiry as to the validity and enforceability of the restrictive covenant itself requires a balancing of the equities between plaintiff and defendant. *Scott v. General Iron Welding Co.*, 171 Conn. 132, 137, 368 A.2d 111 (1976) (To be valid and enforceable, a restrictive covenant "should afford only a fair protection to the interest of the party in whose favor it is made and . . . the interests of the employee himself must also be protected . . ."); *Robert S. Weiss Associates, Inc. v. Wiederlight*, 208 Conn. 525, 529 n.2, 546 A.2d 216 (1988) (The factors to be considered in evaluating the enforceability of a restrictive [*13] covenant include, inter alia, "the fairness of the protection accorded to the employer . . . [and] the extent on the restraint on the employee's opportunity to pursue his occupation . . ."). Accordingly, if the covenant is found to be valid and enforceable, KXI will be likely to succeed on the merits and the equities will favor issuing the injunction. Conversely, if the court determines that the covenant is invalid and unenforceable, not only will KXI be unlikely to prevail on the merits, but the equities will also disfavor KXI. Thus, whether the third and fourth requirements for a temporary injunction are satisfied is

dependent on whether the covenant is valid and enforceable.

> [11]   The parties made this indication at the hearing before the court, Meadow, J., on August 20, 1997.

"In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place, . . . and [*14] must be reasonable - that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public . . . The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." (Citations and internal quotation marks omitted.) *Scott v. General Iron & Welding Co.*, *supra*, 171 Conn. 137. Thus, "the five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." (Citations omitted.) *Robert S. Weiss & Associates, Inc. v. Wiederlight*, *supra*, 208 Conn. 529 n.2. "The five prong test of Scott is disjunctive, rather than conjunctive; a finding [*15] of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." *New Haven Tobacco Co. v. Perrelli*, 18 Conn. App. 531, 534, 559 A.2d 715, cert. denied, 212 Conn. 809, 564 A.2d 1071 (1989).

The restrictive covenant in the present case provides: "Until the end of the Non-Competition Period (as herein defined), I will not, except with the prior written consent of an officer of KX Industries L.P.: (i) work for or render services to any Competitor (whether as an employee, consultant or otherwise) in any line of work or activity in which I was engaged at the company during any part of the two years immediately preceding the cessation of my employment with the Company or (ii) acquire or hold any

financial interest (whether as partner, stockholder or otherwise) in any competitor. The Non-Competition Period shall run until the date one year after I cease to be an employee of the Company (i.e., until the first anniversary of the date on which I cease to be an employee of the Company). However, if, prior to such first anniversary, I propose to work for or render services to a Competitor, I shall give at least ten days advance notice of my intentions to the [*16] Director of Personnel of KX Industries, L.P. If I fail to give such notice, the Non-Competition period shall not end until the date one year after KX Industries L.P. learns that I have entered into an employment or consulting relationship with or acquired a financial interest in a Competitor."

### 1. The Time & Geographical Restrictions

The "time and geographical restrictions are to be reviewed as intertwined considerations when a determination is made on the reasonableness of the limitations of an employee's post-termination activities. A restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might be reasonable for a longer time." *Van Dyck Printing Co. v. DiNicola, supra,* 43 Conn. Supp. 197.

### a. The Geographical Restriction

"The general rule is that the application of a restrictive covenant will be confined to a geographical area which is reasonable in view of the particular situation." *Scott v. General Iron & Welding Co., supra,* 171 Conn. 138. In the present case, the restrictive covenant states no specific geographic boundaries, rather, it prohibits Saaski from working for any competitor [*17] of KXI. The employment agreement defines a competitor as "any organization or person engaged in, or about to or planning to become engaged in, research, development, production, marketing, leasing or selling of a Competing Product." The employment agreement defines a competing product as "any product or process in existence or under development which is the same as, or similar to, or competes with, any product or process (i) which the Company manufactures, sells or licenses, or (ii) to which the Company has devoted a significant research or development effort and plans to manufacture, sell or license."

Because the definition of competing product is ambiguous regarding what is meant by "similar to" or

competes with," the court heard parol evidence on the issue. [12] Dr. Evan Koslow, Ph.D., the CEO of KXI, testified that KXI manufactures and distributes solid carbon block water filters nationally and internationally. Dr. Koslow further testified that KXI has only four competitors for whom Saaski would be prohibited from working pursuant to the employment agreement. These four competitors are Honeywell, Water Safety, Culligan and Multipure. These four companies are competitors of [*18] KXI because they all manufacture and distribute solid carbon block water filters that are nearly identical to the filters manufactured by KXI. Finally, Dr. Koslow testified that Saaski would not be prohibited from working for a myriad of other companies in the water purification industry. The court finds that the instant geographic restriction is reasonable under the circumstances. See *Robert S. Weiss & Associates v. Wiederlight, supra,* 208 Conn. 531-32 (A restrictive covenant that fixes the geographical scope of the covenant by prohibiting an employee from soliciting accounts of his former employer was reasonable under the circumstances).

> [12]   "As we have so often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law . . . The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such

evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud . . . These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud. (Citations omitted; internal quotation marks omitted.) Heyman Associates No. 1 v. Insurance Co. Of Penn., 231 Conn. 756, 778-81, 653 A.2d 122 (1995).

[*19] Furthermore, the present case is similar to *Aetna Retirement Services, Inc. v. Hug,* Superior Court, judicial district of Hartford-New Britain at New Britain, 1997 Conn. Super. LEXIS 1781, Docket No. 47 99 74 (June 18, 1997, Holzberg, J.). In *Aetna Retirement Services, Inc. v. Hug,* Aetna Retirement Services (ARS) applied for a temporary injunction prohibiting its former Head of Sales, Hug, from working for a competitor (The Equitable life Assurance Society of the United States) in violation of a restrictive covenant. The restrictive covenant therein provided that Hug could not "become associated, whether as a principal, partner, employee, consultant or shareholder . . . with any entity that is actively engaged in any geographic area in any business which is in substantial and direct competition with the business or businesses of [ARS] for which you provided substantial services during the two years prior to the termination of your employment . . ." Hug argued that the restrictive covenant as drafted was too broad, and unenforceable, because it would prohibit him from working for any company that sold financial products and services. The court held that the restrictive covenant only prohibited Hug [*20] from working for the direct and substantial competitors of ARS and could not be read so broadly as to bar Hug from employment at other financial services institutions. The court concluded that "the geographic scope [of the restrictive covenant] is reasonable in light of [ARS'] business throughout the

United States." *Id.*

The geographic restriction in the present case is reasonable because it too is narrowly limited to the four direct competitors of KXI. Also KXI is a national and international product.

b. The Time Restriction

Here, the restrictive covenant provides two interrelated time restrictions. First, the restrictive covenant provides that the non-competition period runs for one year from the date that Saaski ceases to work for KXI. A one year time restriction is reasonable. See *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. 525 (upholding a two year time limitation); *Scott v. General Iron & Welding Co., supra,* 171 Conn. 138 (upholding a five year restriction); *Torrington Creamery, Inc. v. Davenport,* 126 Conn. 515, 12 A.2d 780 (1940) (upholding a two year prohibition).

Second, the restrictive covenant provides that if [*21] within one year of ceasing work for KXI, Saaski proposes to work for, or renders services to, a competitor and Saaski fails to give the employer ten days advance notice of such proposal or work, the non-competition period shall not end until one year after the date on which KXI learns that Saaski has entered into an employment relationship with a competitor. Conceivably, Saaski could accept employment with a competitor within one year of leaving KXI, fail to notify KXI, then ten years later, KXI could learn of the employee's action and seek to enjoin Saaski from working for that competitor. While this second time restriction is potentially long, it is somewhat limited in that it only applies where Saaski begins work for a competitor of KXI within one year of leaving KXI. Furthermore, a lengthy time restriction may be reasonable under the circumstances when it is coupled with a narrow geographical restriction. *Van Dyck Printing Co. v. DiNicola, supra,* 43 Conn. Supp. 197. Here, although Saaski is subject to a potentially long time restriction, the time restriction is sharply curtailed in that it only applies if Saaski joins one of the four competitors of KXI within one year of [*22] leaving KXI. The time restriction of the restrictive covenant, when read in conjunction the narrow geographic restriction, is reasonable under the circumstances.

2. Protection to the Employer

"In order to be valid and binding, a covenant which

restricts the activities of an employee following termination of his employment . . . should afford only a fair protection to the interest of the party in whose favor it is made . . ." *Scott v. General Iron & Welding Co., supra*, 171 Conn. 137. "When the character of the business and the nature of employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights . . . Especially if the employment involves . . . [the employee's] contacts and associations with clients or customers it is appropriate to restrain the use, when service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge." *Robert [\*23] S. Weiss & Associates, Inc. v. Wiederlight, supra*, 208 Conn. 533. "When, as here, a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be disclosed either intentionally or inadvertently, by the employee in the course of his new employment, enforcement of a covenant not to compete is necessary to protect against such use and disclosure . . ." (Citation omitted.) *Aetna Retirement Services v. Hug, supra*, Superior Court, 1997 Conn. Super. LEXIS 1781, Docket No. 47 99 74.

In the present case, Saaski became familiar with KXI's particular expedited method of manufacturing standard and special order solid carbon block water filters. KXI understandably seeks to protect this information from its competitors. The restrictive covenant in this case provides a fair and reasonable degree of protection to KXI.

3. The Employee's Opportunity to Pursue His Occupation

"The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and prevented from supporting himself and [\*24] his family." *Scott v. General Iron & Welding Co., supra*, 171 Conn. 137.

The restrictive covenant herein does not preclude Saaski from earning a living because Saaski is only prohibited

from working for the four companies that manufacture solid carbon block water filters. Saaski is free to work for other companies in the water purification industry. Furthermore, after the expiration of the non-competition period, the defendant is free to join any one of the plaintiff's four competitors that extends him an offer of employment. See *Daniel V. Keane Agency, Inc. v. Butterworth, supra*, Superior Court, 1995 Conn. Super. LEXIS 507, Docket No. 31 31 81.

4. The Public Interest

"In order for such interference [with the public interest] to be reasonable, it must be determined that the employer is seeking to protect a legally recognized interest, and then, that the means used to achieve this end do not unreasonably deprive the public of essential goods and services." *New Haven Tobacco Co. v. Perrelli, supra*, 18 Conn. App. 536. "In determining whether a restrictive covenant unreasonably deprives the public of essential goods and services, the reasonableness of the scope and severity of the [\*25] covenant's effect on the public and the probability of the restriction's creating a monopoly in the area of trade must be examined." *Id.*

KXI has a legally protected interest in protecting itself from the competition of a former employee who became familiar with KXI's product manufacturing process while employed by the plaintiff. See *Daniel V. Keane Agency, Inc. v. Butterworth, supra*, Superior Court, 1995 Conn. Super. LEXIS 507, Docket No. 31 31 81. This restriction in this case does not create a monopoly or interfere with the public's ability to procure carbon block water filters. *Id.*

IV. CONCLUSION

The employment agreement (covenant not to compete) is supported by sufficient consideration. The restrictive covenant contained therein is reasonable under the circumstances and is therefore valid and enforceable. Accordingly, the court issues a temporary injunction enjoining Saaski from working for Water Safety, or any other of KXI's three competitors, until March 10, 1998. [13]

> 13   Because the court has determined that the restrictive covenant is valid and enforceable, the issues of whether, and to what extent, the court may "blue pencil" the restrictive covenant are moot.

1997 Conn. Super. LEXIS 2444, *25

[*26]  Dated at New Haven this 29th day of August 1997.

Judge Trial Referee

Frank S. Meadow

LEXSEE



Caution
As of: May 26, 2011

**TEKSYSTEMS, INC., Plaintiff, v. JONATHAN BOLTON, Defendant.**

**Civil Action No.: RDB-08-3099**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**2010 U.S. Dist. LEXIS 9651**

**February 4, 2010, Decided**

**COUNSEL:** [*1] For TEKsystems, Inc., Plaintiff: Paul J Kennedy, LEAD ATTORNEY, Jeffrey J Sun, Littler Mendelson PC, Washington, DC; Kimberly A Marinoff, PRO HAC VICE, Littler Mendelson PC, Washington, DC.

For Jonathan M. Bolton, Defendant: Carl S Silverman, LEAD ATTORNEY, Law Office of Carl S Silverman LLC, Baltimore, MD.

For Stephen Douglas Associates, Inc., Consol Defendant: Carl S Silverman, LEAD ATTORNEY, Law Office of Carl S Silverman LLC, Baltimore, MD; Greg H Rosenthal, Michael W Ullman, PRO HAC VICE, Ullman and Ullman PA, Boca Raton, FL.

**JUDGES:** Richard D. Bennett, United States District Judge.

**OPINION BY:** Richard D. Bennett

**OPINION**

**MEMORANDUM OPINION**

Plaintiff TEKsystems, Inc., has filed this lawsuit seeking an award of injunctive relief and damages against its former employee, Defendant Jonathan M. Bolton, for his alleged breach of restrictive covenants contained in the Employment Agreement. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Currently pending are the parties' cross motions for summary judgment. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated below, Plaintiff's Motion for Summary Judgment (Paper No. 21) is [*2] GRANTED and Defendant's Cross-Motion for Summary Judgment (Paper No. 27) is DENIED with respect to the issue of breach of contract. Defendant Bolton is enjoined from violating the non-compete provision in the Employment Agreement for a period of eighteen months from the date of the Order that follows. Finally, this Court's ruling with respect to Count II and the issue of damages is to await further briefing by the parties.

**BACKGROUND**

Plaintiff TEKsystems ("TEK" or "the Company"), a Maryland corporation, is a leading technical staffing and services company. Deposition of Kevin Phelps, taken May 14, 2009, ("Phelps Dep.") at 99. In May of 1999, around the time that he received his undergraduate degree, Defendant Jonathan M. Bolton ("Bolton") accepted an offer to work with TEK as a Technical Recruiter in the New York City region. Deposition of Jonathan M. Bolton, taken May 13, 2009, ("Bolton Dep.") at 11-15. On June 7, 1999, Bolton entered into an Employment Agreement (the "Agreement") with TEK, which contains certain restrictive covenant provisions. The Agreement provides, in pertinent part:

3. COVENANT NOT TO COMPETE: EMPLOYEE agrees that upon the termination of his/her employment, whether [*3] by TEKSYSTEMS or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not:

(1) Engage in the business of recruiting or providing on a temporary or permanent basis technical service personnel (including, but not limited to, such personnel as engineers, designers, drafters, computer programmers, database administrators, systems analysts or other similarly skilled individuals engaged in similar lines of work), industrial personnel (including, but not limited to, assemblers, warehousemen, shipping/receiving, technicians, or other similarly skilled individuals engaged in similar lines of work), or office support personnel (including, but not limited to, secretaries, data entry personnel, mailroom personnel, administrative assistants, word processors, desktop publishers or other similarly skilled individuals engaged in similar lines of work) within a radius of fifty (50) miles of the office in which EMPLOYEE worked at the time his/her employment terminated . . .

5. COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION: EMPLOYEE covenants and agrees that, except as required by the proper performance of his/her duties for TEKSYSTEMS, he/she shall [*4] not use, disclose or divulge any Confidential Information or Trade Secrets concerning any TEKSYSTEMS clients, customers, employees, technical personnel, industrial personnel or office support personnel (as described in Paragraph 3) to any other person, entity or company besides TEKSYSTEMS . . .

6. RETURN OF RECORDS: EMPLOYEE agrees, upon termination of his/her employment with TEKSYSTEMS

for any reason whatsoever, to return to TEKSYSTEMS all records (whether on paper, computer discs or in some other form), copies of records and papers pertaining to TEKSYSTEMS . . . .

Agreement PP 3, 5, 6.

During his nine-year tenure with TEK, Bolton was promoted on several occasions and he ultimately became the Director of Strategic Accounts, in which position he managed TEK's business with certain investment banking clients, including Bank of America (including the securities side of its business), Bear Stearns, JPMorgan Chase, Lehman Brothers, UBS, and Wachovia Securities. Bolton Dep., at 37-38. Bolton played a significant role in building TEK's IT-staffing business in the New York market and it is estimated that he oversaw 40 to 50 million dollars in business. Phelps Dep. at 60. Bolton was described [*5] by his primary supervisor, Kevin Phelps, as "the expert in [TEK's] organization and really the only expert that managed that segment of our business, specifically in the securities area . . . he literally was our brand in that area . . . ." *Id.* at 60, 103.

While he was employed at TEK, Bolton attended periodic training sessions and he had access to the Company's confidential and proprietary information. Bolton had loaded some of this information, in the form of client contact data, on his personal Blackberry. Bolton Dep., at 174-76. Upon his exit from TEK, Bolton returned his laptop computer and left with nothing but his keys, wallet, and his own personal Blackberry device. *Id.* at 177-78; Phelps Dep. at 126-27. Bolton notes that TEK never requested that he separate personal and business contacts on his Blackberry and he claims that he never used the information on his Blackberry in any way to conduct business for himself or his future employer. Bolton Affidavit at PP 19, 20.

On April 21, 2008, Bolton accepted an offer of employment from another IT-staffing company named Steven Douglas Associates ("SDA"). Bolton resigned from TEK on April 23, and his last day with the Company was May [*6] 2, 2008. Before his departure, Bolton provided TEK with a transition plan, which documented his knowledge about his accounts. *See* April 27, 2008 Transition Plan (Pl.'s Ex. D.) On his last day with TEK, Bolton was given a written acknowledgement to confirm his understanding of the Agreement, but he

never signed the acknowledgement form. Bolton Dep. at 134-35.

Bolton began working with SDA on May 5, 2008, and he was given the title of "Managing Director of New York City." *Id.* at 60, 267; Pl.'s Ex. E. Approximately one week after joining, Bolton established an office address for SDA in New York City. Bolton Dep. at 207. However, Bolton explained that the new office merely served as a post office drop and did not contain any personal work space. *Id.* at 204, 207, 267. Since his hire with SDA, Bolton has worked from his home in Wayne, New Jersey, which is located within 50 miles of his prior office with TEK. *Id.* at 186.

On June 16, 2008, TEK issued Bolton a cease and desist letter requesting that he provide written assurances that he would abide by the terms of his Agreement. Pl.'s Ex. G. However, Bolton never provided any response to the Company. Bolton Dep. at 250, 252. In September or October [*7] of 2008, Bolton established an office for SDA in Linwood, New Jersey, which is located more than 50 miles from his former TEK office at in New York City. *Id.* at 184-85. Although SDA advertised on its website that Bolton was the Company's contact person in the Linwood office, *see* Pl.'s Ex. H, Bolton stated that he never visited the office and that no SDA employees worked there. *Id.* at 182, 200.

Within the first year of his employment with SDA, Bolton made nine placements for employment, seven of which were made with Credit Suisse in New York. Bolton Affidavit, at P 34; Pl.'s Ex. E at 15-16. Bolton claims that he specifically targeted Credit Suisse for business because it had never been one of TEK's clients. Bolton Affidavit at P 13. In addition, he claims that he obtained all nine placements by networking through Internet sites such as CareerBuilder and LinkedIn and that he "neither targeted nor [did] work with any of TEK's clients, nor with any of the customers, applicants or personnel to be referred for TEK's clients or customers" while he was employed with TEK. *Id.* at PP 31, 32.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall [*8] be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). [*9] In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment--even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered [*10] in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil &*

*Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3, 221 U.S. App. D.C. 288 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

## ANALYSIS

### I. Choice of Law

In a diversity action, a court applies the choice of law rules of the state in which it sits to determine the applicable substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). Under Maryland law, the doctrine of *lex loci contractus* applies to contractual claims, meaning that the law [*11] of the place where the contract is made applies. *Allstate Insurance Co. v. Hart*, 327 Md. 526, 529, 611 A.2d 100 (1992). The Employment Agreement at issue in this case was executed in Maryland and the contract specifically provides that Maryland law shall govern the merits of any dispute arising under the contract. Agreement at P 9.

### II. Breach of Contract Claim

#### A. Covenant Not To Compete

In this case, it is undisputed that since he left TEK and began working for SDA, Bolton has worked out of his home in Wayne, New Jersey, a location that is within 50 miles of his former office with TEK. Bolton has accordingly conceded that he violated the non-compete clause in Section 3(1) of the Agreement. *See* Def.'s Cross-Motion at 14. Bolton nevertheless defends against the breach of contract claim by arguing that the restrictive covenant in Section 3(1) is unenforceable as overbroad and because it fails to protect a legitimate business interest, imposes an undue hardship on Bolton, and contravenes the public's interest.

Under Maryland law, covenants not to compete may be enforced "only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists [*12] of clients, or solicitation of customers." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835 (1973). In determining whether a restrictive covenant

in an employment contract is enforceable, courts assess "whether the particular restraint is reasonable on the specific facts." *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123, 225 A.2d 288 (1967). Such covenants will be enforced "if the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Id.* (internal quotes omitted); *see also Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 754 n.3 (D. Md. 2003) ("under Maryland law restraints in restrictive covenants must be viewed in the context of the hardship imposed on the employees and the necessity of the restraint to protect the employer's interests"). When the scope of a restrictive covenant is considered to be reasonable on its face, courts may, in determining enforceability, assess other facts and circumstances, such as:

> whether the person sought to be enjoined is an unskilled worker whose [*13] services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

*Budget Rent A Car of Wash., Inc. v. Raab*, 268 Md. 478, 482, 302 A.2d 11 (1973).

#### 1. Scope

The non-compete restriction in the Agreement prohibits Bolton, for a period of 18 months, from working within a 50-mile radius of his former TEK office in New York City. Defendant first challenges the scope of this covenant, claiming that it is overbroad in terms of its temporal and geographical coverage.

With respect to the covenant's geographic scope, the covenant is reasonably circumscribed. This Court has previously concluded that the 50-mile prohibition at issue is facially reasonable under Maryland law. *See TEKsystems, Inc. v. Derek Spotswood*, Case No. RDB

05-1532, Memorandum Opinion at 10, fn. 3 (D. Md. June 28, 2005). Moreover, covenants imposing a far broader, or even unlimited, geographic limitation have [*14] been upheld by courts. *See, e.g., National Instrument, LLC v. Braithwaite*, 2006 Md. Cir. Ct. LEXIS 12, at *17-18 (Md. Cir. Ct. 2006) (upholding covenant restricting employee from competing in North America); *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (upholding covenant despite the absence of any geographic limitation). It is significant that TEK operates on a nationwide and international level, and that the covenant not to compete only forbids Bolton from competing against the Company in the New York region. Bolton is not barred from working or even competing against TEK in any market outside of the immediate New York City area.

The covenant is not overbroad in terms of its 18-month duration. Courts applying Maryland law have repeatedly upheld competition and solicitation restrictions that cover two years. *See PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002); *Gill v. Computer Equipment Corp.*, 266 Md. 170, 181, 292 A.2d 54 (1972); *Tuttle v. Riggs-Warfield-Roloson*, 251 Md. 45, 49, 246 A.2d 588 (1968); *National Instrument*, 2006 Md. Cir. Ct. LEXIS 12, at *19. A two-year restriction has been upheld as "more than reasonable for it acknowledges that [*15] after a certain period of time the information with which [the employee] could depart, will become stale and significantly less disadvantageous to [the employer]." *National Instrument*, 2006 Md. Cir. Ct. LEXIS 12, at *19. Therefore, the 18-month restriction here was clearly compliant with the norms governing the temporal scope of restrictive covenants.

Bolton acknowledges that restrictive covenants of similar duration and area have been deemed reasonable by courts in the past. He nevertheless claims that the covenant not to compete in Section 3(1) of the Agreement is overbroad in terms of the activity it prohibits. He claims that a "restrictive covenant that prohibits any employee from engaging 'in *any* activity which *may* affect adversely the interests of the Company'" is overbroad. Def.'s Cross-Motion at 25-26 (emphasis in original). However, Bolton's argument is unpersuasive in light of the fact that courts in Maryland have sanctioned restrictive covenants that prohibit former employees from securing employment with competitors. *See, e.g., Intelus*, 7 F. Supp. 2d at 642 (enforcing

covenant with no geographical limitation that restricted employee from working for one of the company's [*16] direct competitors); *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 608 (enforcing covenant not to compete that prohibited former employee from working for employer's competitors). Bolton adds that a restrictive covenant "must be *specifically targeted* at preventing the employee from trading on the good will he or she created while serving an employer's customers." Def.'s Cross-Motion at 26 (emphasis in original). However, this Court declines to adopt such an inflexible mandate; in this case the geographic and temporal limitations contained in the Agreement's covenant not to compete properly constrain its scope to legally enforceable bounds.

**2. Other Factors Governing Enforceability**

Having approved the scope of the covenant not to compete, this Court considers the other factors relating to enforceability, namely, the need to protect TEK's business interests, the nature of Bolton's qualifications and skills, the amount of hardship imposed on Bolton, and the public interest.

i) Protection of TEK's Business Interests

Employers have a legitimate interest in protecting their clients and good will by "preventing an employee from using his contacts with clients to recruit those clients after his employment [*17] has ended." *Intelus*, 7 F. Supp. 2d at 639 (citing *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 335, 572 A.2d 510 (Md. 1990)). This protective interest is especially strong "for businesses in which the personal contacts between the employee and the customer are an important element determining the business's success." *Intelus*, 7 F. Supp. 2d at 639 (citing *Milward v. Gerstung Int'l Sport Educ., Inc.*, 268 Md. 483, 488-89, 302 A.2d 14 (Md. 1973)); *see also Holloway*, 319 Md. at 335 (noting that covenants not to compete are warranted "if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee").

The covenant not to compete in the Agreement serves to protect TEK's legitimate business interests. A company's success in the IT-staffing industry depends overwhelmingly upon the ability of its employees to make and maintain personal connections with clients. In addition, during his rise at TEK, Bolton was privy to the Company's client contacts and confidential information.

Therefore, Section 3(1) is necessary to prevent TEK's former employees from abusing their access [*18] to inside information and from unfairly competing against the Company.

### ii) Bolton's Unique and Specialized Skills

Courts are more willing to enforce restrictive covenants when the employee at issue possesses unique or specialized skills. Under Maryland law, a "unique or specialized skill held by an employee, by virtue of knowledge, ability, or reputation, is one that would make it difficult to find a substitute employee." *Ecology Servs., Inc. v. Clym Envt'l Servs., LLC,* 181 Md. App. 1, 19, 952 A.2d 999 (2008) (citing *Rosenstein v. Zentz,* 118 Md. 564, 570-71, 85 A. 675 (1912)).

The record reflects that Bolton was one of TEK's most important and successful operatives in the New York region. After starting as a recruiter he was quickly promoted to the positions of Account Manager and Account Director, with responsibilities for direct client interaction. Ultimately Bolton assumed a senior management position within the company as Director of Strategic Accounts. By the time of his departure from TEK, Bolton had established himself as the point person on several of TEK's investment banking accounts, which were a source of significant revenues for the Company. Bolton was described as the [*19] "subject matter expert" in TEK's Information Technology field and as the "most knowledgeable of the customers, their buying patterns, their idiosyncrasies . . . and ultimately, the candidate pool associated with that." Phelps Dep. at 136. In sum, it is clear that Bolton was one of TEK's rising stars and that he was instrumental in expanding the Company's New York business.

### iii) Hardship to Bolton

When assessing the validity of a restrictive covenant, courts also consider the amount of harm facing the employee as a factor weighing against enforcement. Such covenants are normally upheld unless they are found to "impose undue hardship on the employee." *Becker,* 268 Md. at 96. Bolton submits that "New York, as a financial hub, provides an unmatched base of potential clientele" and that it would not be possible for him, "based upon his experience, knowledge and abilities to make a financially adequate living if he were precluded from working within the New York area." Def.'s Cross-Motion at 34.

Bolton's arguments as to undue hardship are unpersuasive. As an initial matter, his claims are speculative because he never attempted to seek new employment opportunities outside of the New York City [*20] region. Moreover, while the covenant could create some inconveniences for Bolton, this Court does not find that such inconveniences rise to the level of undue hardship. *See PADCO Advisors,* 179 F. Supp. 2d at 608 (rejecting employee's claim that relocation of family and unemployment for sixth months resulted in undue hardship).

### iv) Public Interest

Finally, concerning the issue of public interest, it has been recognized that the public benefits from the enforcement of reasonable restrictive covenants. *See Ruhl,* 245 Md. at 123-24. Such measures facilitate and protect business growth, especially in technology-related and information-based fields. *See Intelus,* 7 F. Supp. 2d at 642. Therefore, "[a]s long as employers do not restrict employees from earning a living and do not limit fair competition, they must be given the opportunity to provide a service to their customers without risking a substantial loss of business and good will every time an employee decides to switch employment." *Id.*

### 3. Conclusion

Bolton breached the non-compete clause set forth in Section 3(1) of the Agreement by engaging in the IT-staffing business in the New York City region after his employment with TEK ended. This [*21] provision is enforceable under Maryland law, as its geographic and temporal limitations were reasonably circumscribed, and traditional fact-specific considerations weigh in favor of enforcement. Consequently, summary judgment is hereby entered in favor of TEK on its breach of contract claim. [1]

> 1   TEK also alleges that Bolton breached Section 5 of the Agreement, which contains a covenant not to divulge confidential information, and Section 6 of the Agreement, which requires Bolton to return to the Company all records relating to TEK. However, this Court need not reach these allegations, as it has already determined that Bolton breached the Agreement by failing to comply with the non-compete provision in Section 3(1) of the Agreement.

### III. Remedies

As a remedy for breach of contract, the Agreement allows, under certain circumstances, for the imposition of monetary and injunctive relief in Subsections 7(a) and (b), respectively. In Count II, TEK seeks an equitable accounting.

## A. Damages

The Agreement contains a liquidated damages provision in Subsection 7(b), which provides that "as a consequence of a violation of the covenants contained herein, EMPLOYEE shall pay to TEKSYSTEMS an amount equal [*22] to one hundred percent (100%) of the gross profit, or twenty-five percent (25%) of the gross sales, whatever amount is greater, resulting from business generated by EMPLOYEE . . . through soliciting or otherwise competing for accounts or personnel in violation of Paragraph 3 and Paragraph 5 herein." TEK contends that pursuant to this provision, it is entitled to receive an award of $ 200,000--a figure representing the gross profits that SDA derived as a result of the nine placements that Bolton obtained in the New York market in the year after his departure from TEK. Pl.'s Motion at 22.

To receive actual damages as a consequence of Bolton's breach, TEK must show that Bolton "solicit[ed] or otherwise compet[ed] for accounts or personnel" in violation of Paragraph 3, which prohibits former employees from soliciting or competing for any persons or entities which "at any time within two (2) years prior to the date of termination of EMPLOYEE'S employment, was a client or customer of [TEK]." Agreement at P 3(2). These provisions provide that the liquidated damages clause is only triggered if TEK can show that Bolton generated money by competing with its clients. If triggered, the amount of [*23] damages owed to TEK would equal the amount of profits or gross sales derived through Bolton's competitive actions.

TEK's first argument in support of its claim for damages clearly fails. TEK contends that Bolton's placements with Credit Suisse were impermissible because TEK had previously sought Credit Suisse's business. However, to prove that it suffered actual damages, TEK must show that Credit Suisse was an actual client and not merely a potential client. Instead, the record reflects that Credit Suisse could never have been TEK's client since it lacked preferred vendor status. Bolton Affidavit at PP 12, 13.

In addition, TEK has failed to substantiate its second argument in support of its claim for damages. During the discovery process, TEK designated Kevin Phelps as its corporate representative to testify on its behalf at a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). At his deposition on May 14, 2009, Phelps testified that he was not aware of any TEK clients that were solicited by Bolton after he left the company. See Phelps Dep. at 137, 151-52. However, in its Reply brief, filed on August 18, 2009, TEK claims that it had "recently analyzed its client database [*24] and learned that Bolton has in fact communicated with TEK client Dresdner Kleinwort ("Dresdner"), after his employment with TEK ended and made a placement for Dresdner on behalf of SDA." Pl.'s Reply at 7. In support of this statement, TEK submitted a declaration from Mike Greenstreet, the Director of Business Operations for TEK's New York City office, and a copy of a TEK business record showing that Bolton had made a placement with Dresdner in 2005. Pl.'s Exs. 1 and A. Greenstreet avers that at the time of Phelps' deposition, TEK had conducted a limited search of TEK's clients and had failed to discover the Company's connection with Dresdner. Greenstreet Decl. at PP 6-8. Greenstreet contended that the "Dresdner placement was not reasonably ascertainable." Id. at P 8.

The Greenstreet declaration and TEK's business record may not be properly considered for purposes of ruling on the parties' motions for summary judgment. Under Fourth Circuit law "as a general proposition, a party may not submit an affidavit or declaration at the summary judgment stage contradicting its earlier deposition testimony." Caraustar Indus., Inc. v. N. Ga. Converting, Inc., No. 04-187, 2006 U.S. Dist. LEXIS 91829, at *19 (W.D.N.C. Dec. 19, 2006) [*25] (citing Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990)). This rule has been repeatedly applied to bar evidence contradicting the prior Rule 30(b)(6) deposition testimony of a corporate designee. See, e.g., Rainey v. American Forest and Paper Association, Inc., 26 F. Supp. 2d 82, 94 (D.D.C. 1998) ("[u]nless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition); United States v. J.M. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996) (holding that if a party states that it has no knowledge as to a set of alleged facts at a Rule 30(b)(6) deposition, it is barred from arguing for a contrary position at trial). To justify TEK's eleventh

hour attempt to introduce evidence of the company's connection with Dresdner, Greenstreet baldly claims that his evidence "was not reasonably ascertainable." However, this justification is unavailing--a more thorough search could easily have been conducted in preparation for Phelp's 30(b)(6) deposition.

At the current juncture, TEK's claim for substantial damages appears to be somewhat speculative. 2 [*26] However, because the record is not sufficiently developed on the issue, this Court is not yet prepared to rule on damages. Within thirty days of the Order that follows, the parties should notify the Court whether it is felt necessary to litigate the question of damages. 3

> 2   Even if TEK is not entitled to substantial damages on its breach of contract claim, it would still be entitled to nominal damages. Under Maryland law, "[i]t is well settled that every injury to the rights of another imports damage, and if no other damage is established, the party injured is at least entitled to a verdict for nominal damages." *Cottman v. Maryland, Dep't of Natural Res.*, 51 Md. App. 380, 443 A.2d 638 (1982) (internal quotation marks and citations omitted); *see also Stueber v. Arrowhead Farm Estates Ltd. Partnership*, 69 Md. App. 775, 779, 519 A.2d 816 (1987) ("whenever there is a contract and breach of that contract the trial court must assess some damages, nominal or substantial as it shall find to be proper on the law and the evidence") (emphasis in original) (internal quotations omitted).
>
> 3   In the event that the parties do not believe that there is any necessity for litigating the question of damages, [*27] then this Court will merely enter a nominal damages figure.

**B. Injunction**

In addition to damages, TEK seeks a permanent injunction to compel Bolton to comply with the Agreement's non-compete provision. Subsection 7(a) of the Agreement provides that "in the event of the violation of any covenant contained herein . . . TEKSYSTEMS . . . shall be entitled to an injunction or other equitable relief in any court of competent jurisdiction . . . ."

This Court has issued injunctions in cases involving similar circumstances to enforce covenants not to compete. *See, e.g., Intelus*, 7 F. Supp. 2d at 643 (granting

motion for preliminary injunction to enforce restrictive covenants in employment agreement). In considering the propriety of injunctive relief under Maryland law, courts are mindful that:

> The standard for an injunction in Maryland is "relief 'prohibiting someone from doing some specified act' or commanding someone to undo some wrong or injury . . . generally, it is a preventive and protective remedy, *aimed at future acts*, and it is not intended to redress past wrongs." *Colandrea v. Wilde Lake Community Assoc.*, 361 Md. 371, 761 A.2d 899, 911 (Md. 2000) (citing *Carroll County Ethics Comm'n v. Lennon*, 119 Md. App. 49, 703 A.2d 1338, 1342-43 (1998) [*28] (emphasis in original). A permanent injunction may be ordered if there "has been a determination on the merits of the claim." *Maryland Com'n on Human Relations v. Downey Communications, Inc.*, 110 Md. App. 493, 678 A.2d 55, 67 (Md. 1996).

*PADCO Advisors*, 179 F. Supp. 2d at 612.

This Court concludes that entry of a permanent injunction is warranted in this case as a remedy for Bolton's breach of contract. Although it does not appear that TEK is entitled to any substantial damages under the Agreement, it is deserving of prospective relief to prevent any future injury that could otherwise result from Bolton's continued operations in the New York City region. This Court has previously observed that "if the non-compete period is not enforced through equitable extension, it could 'reward the breach of contract, encourage protracted litigation, and provide an incentive to dilatory tactics.'" *PADCO Advisors*, 179 F. Supp. 2d at 613 (quoting *Roanoke Engineering Sales Co. v. Rosenbaum*, 223 Va. 548, 555, 290 S.E.2d 882 (1982)). Several courts facing similar circumstances have ordered an extension of the restricted period as a means of equitable relief. *See, e.g., Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371-72 (8th Cir. 1991) [*29] (extending restrictive covenant term based largely upon defendant's breach of a covenant not to compete); *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir. 1971) (affirming grant of injunction that extended restricted period beyond the

termination date of the original covenant); *PADCO Advisors v. Omdahl*, 185 F. Supp. 2d 575, 578 (D. Md. 2002) (issuing an equitable extension of a non-compete covenant beyond the covenant's original expiration date).

Since the Agreement's covenant not to compete expired on December 5, 2009, the question arises as to what extent injunctive relief should be extended into the future. In *PADCO Advisors*, this Court determined that an employer should be given credit for the entire period of non-competition that was originally set in the contract. In that case, the covenant's period was extended for a period of time equal to the duration of the employee's incompliance.

In this case TEK is entitled to receive credit for the entire 18 month prohibition against competition that is contained in the Agreement. Bolton began working with SDA only three days after leaving TEK, and he established SDA's office address in New York City within [*30] the same month in May of 2008. Therefore, the record reflects that almost immediately after leaving TEK, Bolton had worked as a recruiter for SDA within 50 miles of New York City, and that he has continued to do so until the present time. Therefore, Bolton will be prospectively enjoined from engaging in activity prohibited by the covenant not to compete for a period of 18 months going forward.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Paper No. 21) is GRANTED and Defendant's Cross-Motion for Summary Judgment (Paper No. 27) is DENIED on the breach of contract claim. A permanent injunction shall be entered enforcing the non-compete provision of the Agreement for a period of 18 months starting from the date of this Memorandum Opinion and accompanying Order. This Court's ruling with respect to the issue of damages will await notification by the parties within the next thirty days and possible subsequent briefing. A separate Order follows.

Date: February 4, 2010

/s/

Richard D. Bennett

United States District Judge

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, IT IS this 4th day of February, 2010, HEREBY ORDERED that:

> 1. Plaintiff's Motion [*31] for Summary Judgment (Paper No. 21) is GRANTED and Defendant's Cross Motion for Summary Judgment (Paper No. 27) is DENIED with respect to the breach of contract claim in Count I;

> 2. Defendant Jonathan M. Bolton shall abide by the non-compete provision set forth in Section 3(1) of the Employment Agreement for a period of eighteen months starting from the date of this Order;

> 3. This Court's ruling on Count II and the issue of damages will await notification by the parties within thirty days;

> 4. Copies of this Order and the foregoing Memorandum Opinion shall be transmitted to counsel of record.

/s/

Richard D. Bennett

United States District Judge

LEXSEE



Cited
As of: May 26, 2011

**SAFEWORKS, LLC, Plaintiff, v. MAX ACCESS, INC., ALAN L. CHURCH, and
GABRIEL J. TORRES, Defendants.**

**CIVIL ACTION NO. H-08-2860**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION**

**2009 U.S. Dist. LEXIS 29268**

**April 8, 2009, Decided
April 8, 2009, Filed**

**COUNSEL:** [*1] For SafeWorks, LLC, Plaintiff: Robert
L Rickman, Fish & Richardson PC, Dallas, TX; Stephen
E Fox, Fish & Richardson, Dallas, TX.

For Max Access, Inc., Alan L Church, Gabriel J Torres,
Defendants: Gretchen Agena, Littler Mendelson PC,
Houston, TX.

**JUDGES:** Nancy F. Atlas, United States District Judge.

**OPINION BY:** Nancy F. Atlas

**OPINION**

**MEMORANDUM AND ORDER**

This case is before the Court on a Motion for Partial
Summary Judgment [Doc. # 12] filed by Defendants Alan
L. Church ("Church") and Gabriel J. Torres ("Torres")
(collectively "Defendants"). [1] Based on the Court's
review of the full record and the application of governing
legal authorities, the Court concludes that Defendants'
Motion for Partial Summary Judgment should be **granted
in part** and **denied in part**.

1   Plaintiff SafeWorks, LLC ("SafeWorks") filed
a Response [Doc. # 14], and Defendants filed a

Reply [Doc. # 15]. SafeWorks additionally filed a
Motion to Strike and Alternative Unopposed
Motion for Leave to File Sur-Reply [Doc. # 16].
The Court denies SafeWorks' Motion to Strike but
grants the Unopposed Motion for Leave to File
Sur-Reply. In deciding Defendants' Motion, the
Court will consider SafeWork's Sur-Reply [Doc. #
16, Exh. A].

**I. BACKGROUND**

The present dispute [*2] arises out of Defendants'
employment with and resignation from SafeWorks.
SafeWorks manufactures, sells, distributes, and services
scaffolding and related safety equipment for the
construction, industrial restoration, and maintenance
industries. From the late 1980s until 1997, Defendants
were employed by Spider in its Houston, Texas location.
2 In 1997, SafeWorks acquired the assets of Spider and
Spider became a division of SafeWorks. The Spider
division sells and rents equipment directly to end users
through equipment dealers.

2   Torres began working for Spider in October
1987 as service technician and later as the
Houston service manager. Church began working
for Spider in May 1989 as a sales representative.

On October 2, 1997, in connection with the acquisition, Defendants, along with the other Spider employees, [3] were required to execute a Confidentiality and Non-Solicitation Agreement (collectively, the "Agreement"). [4] Church and Torres each signed a copy of the Agreement but SafeWorks did not. The Agreement contains *inter alia* a non-disclosure provision and a non-solicitation provision.

> 3  *See* Deposition of Christopher P. Bates, Exh. E to Defendants' Motion [Doc. # 12], at 21; *see also* [*3] Deposition of SafeWorks, LLC, by and through Christopher Bates, Exh. B to Defendants' Reply [Doc. # 15], at 178.
> 4  *See* Torres Confidentiality and Non-Solicitation Agreement, Exh. A to Defendants' Motion [Doc. # 12] ("Torres Agreement"); Church Confidentiality and Non-Solicitation Agreement, Exh. B to Defendants' Motion [Doc. # 12] ("Church Agreement").

Defendants were employed by SafeWorks in the Spider division from 1997 until mid-2008. On May 30, 2008, Church resigned his employment with SafeWorks, and in June 2008, he began employment with Max Access, Inc. ("Max Access"). Max Access also engages in the sale and rental of scaffolding and related equipment. On June 28, 2008, Torres resigned his employment with SafeWorks, and on July 9, 2008, he began working for Max Access.

On August 15, 2008, SafeWorks filed suit against Church and Torres in 164th Judicial District of Harris County, Texas. On September 25, 2008, SafeWorks filed a Notice of Non-Suit in the state court proceeding and filed the case presently before the Court. SafeWorks alleges claims of misappropriation of trade secrets, breach of contract, and tortious interference with SafeWorks' existing and prospective contractual [*4] relationships. Defendants have moved for partial summary judgment with respect to SafeWorks' claims for breach of the non-solicitation provision of the Agreement.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's [*5] claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *DIRECTTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material [*6] fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). [*7] In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## III. ANALYSIS

Generally, under Texas law, covenants not to compete are restraints of trade and are unenforceable unless the covenant contains restraints that are reasonable. *See* TEX. BUS. & COM. CODE § 15.50(a). Under § 15.50(a) the Texas Business and Commerce Code ("TBCC"), a "covenant not to compete" is enforceable if:

> it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity [*8] to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

*Id.* [5] A non-solicitation provision in a contract is also a restraint on trade and must meet the requirements of § 15.50 to be enforceable. *See Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 438-39 (S.D. Tex. 2008) (Rosenthal, J.) (citing *Shoreline Gas, Inc. v. McGaughey*, 2008 Tex. App. LEXIS 2760, 2008 WL 1747624, at *10 (Tex.App.--Corpus Christi April 17, 2008, no pet.); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599-600 (Tex.App.--Amarillo 1995, no pet.)). The enforceability of a covenant not to compete involving a Texas employee is governed by Texas law. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990); *In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (declining to overrule *DeSantis* following the enactment of § 15.50 of the TBCC and *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006). "The enforceability of a covenant not to compete, including the question of whether a covenant not to compete is a reasonable restraint of trade, is a question of law for the court." *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994), [*9] *abrogated in part on unrelated grounds by Sheshunoff*, 209 S.W.3d 644.

> 5   A federal court sitting in diversity jurisdiction must apply the substantive law of the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

Defendants have moved for partial summary judgment on SafeWorks' claims for breach of the non-solicitation provision in the Agreement. Defendants argue that the non-solicitation provision is not enforceable under Texas law because it is not part of an otherwise enforceable agreement and the provision is not a reasonable restriction. Defendants seek judgment also that SafeWorks is not entitled to damages or injunctive relief. Finally, Defendants seek recovery of their costs and attorney's fees for defending this suit. The Court addresses each of these arguments in turn.

### A. Ancillary to or Part of an Otherwise Enforceable Agreement

Defendants argue that the non-solicitation provision of the Agreement fails to satisfy the requirements of § 15.50 of the TBCC because it is not "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." To determine whether a covenant not to compete is ancillary to an otherwise enforceable agreement, the [*10] Court must first identify the "otherwise enforceable agreement" between Defendants

and SafeWorks. *Ray Mart Inc. v. Stock Bldg. Supply of Tex. LP*, 302 F. App'x 232, 236 (5th Cir. 2008). In doing so, the Court must ignore the noncompete covenant and must "determine whether any binding promises remain that would constitute an enforceable agreement." *Id.* After identifying such an agreement, the Court must "determine whether the noncompete covenant is ancillary to this otherwise enforceable agreement." *Id.* (citing *Sheshunoff*, 209 S.W.3d at 649).

For the reasons discussed below in Sections III.B and III.C, the Court concludes that the restrictions imposed by the non-solicitation provision of the Agreement are not reasonable, that the non-solicitation provision must be reformed by the Court, and that SafeWorks is not entitled to injunctive relief under the reformed provision. Accordingly, the Court does not reach the issue of whether the non-solicitation provision of the Agreement is "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." For purposes of the present motion, the Court will assume *arguendo* that the non-solicitation provision of the Agreement [*11] meets the requirement of § 15.50 of the TBCC that it be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made."

**B. Is the Non-Solicitation Provision Reasonable**

Defendants argue that the non-solicitation provision of the Agreement is overbroad--that is, not reasonable--because it does not contain reasonable restrictions on the scope of permitted post-employment activities and the restrictions impose a greater restraint than is necessary to protect the goodwill or other interest of SafeWorks. [6] Accordingly, Defendants request summary judgment in their favor on SafeWorks' claims that Defendants breached the non-solicitation provision of the Agreement.

6   Defendants' Motion [Doc. # 12], at 9.

The non-solicitation provision of the Agreement provides that for a period of six months after the termination of employment, an employee will not:

> directly or indirectly solicit or entice any of the following to cease, terminate, or reduce any relationship with [SafeWorks] or to divert any business from [SafeWorks]: (a) any employee, consultant

or representative of [SafeWorks]; (b) any contractor or supplier of [SafeWorks]; (c) *any customer or client of [SafeWorks]*; [*12] or (d) any prospective customer or client from which Employee has solicited business while employed by [SafeWorks]. [7]

7   Torres Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 5 (emphasis added); Church Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 5 (emphasis added).

This non-solicitation provision is not limited to customers and clients with whom Church or Torres, respectively, did business during their employment. Covenants not to compete that extend to clients with whom an employee did not actually do business during his employment are overbroad and unenforceable. *See Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex.App.--Beaumont 2004, no pet.) ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable."); *see also Rimkus*, 255 F.R.D. at 435; *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, 263 S.W.3d 232, 250 (Tex.App.--Houston [1st Dist.] 2007, pet. granted). For this reason alone, the non-solicitation provisions are overbroad and are unenforceable unreasonable restraints of trade.

Furthermore, the Agreement's non-solicitation provision is not limited to a reasonable geographic scope. [*13] *See, e.g., Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793-94 (Tex.App.--Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant."). SafeWorks is a global company with twenty-four North American locations. [8] Both Church and Torres worked only in the Houston location and surrounding area. For example, since 2000, Church's assigned sales territory was limited to industrial sales in the southern half of Texas. [9] The non-solicitation provision, however, purports to apply globally to any client or customer of SafeWorks. The Court concludes that this restriction is not reasonably tailored geographically so as to be a reasonable limitation of trade. The Court, accordingly, concludes that the non-solicitation provision of the Agreement, as applied to

Page 4

each Defendant, is overbroad and an unenforceable unreasonable restraint of trade.

> 8   Deposition of Christopher P. Bates, Exh. E to Defendant's Motion [Doc. # 12], at 20.
> 9   Deposition of SafeWorks, LLC, by and through Christopher Bates, Exh. B to Defendants' Reply [Doc. # 15], [*14] at 52-54.

SafeWorks concedes the that "the non-solicitation provision [] [of the Agreement] could possibly be construed as overbroad under Texas law to the extent that [it] fail[s] to limit the non-solicitation of employees and customers of SafeWorks to those of which Church and Torres were aware or with which they had contact during their employment with SafeWorks." [10] SafeWorks, however, asks the Court to rule that the non-solicitation provision is enforceable "to the extent that [it] restrict[s] the solicitation of employees, consultants, representatives, contractors, suppliers, customers, and clients of SafeWorks to those of which Defendants were aware or had contact during their employment with SafeWorks." [11]

> 10   SafeWorks' Response [Doc. # 14], at 3.
> 11   *Id.* at 19.

Section 15.51(c) of the TBCC provides that if a covenant is found to be "not reasonable" the court should reform the covenant to the extent necessary to make the limitation(s) reasonable. TEX. BUS. & COM. CODE § 15.51(c); *see also Wright*, 137 S.W.3d at 298 ("Instead of invalidating covenants not to compete, Texas courts usually have reformed them by revising the unenforceable provisions to those that would be reasonable under [*15] the circumstances." (citing *Butler*, 51 S.W.3d at 794)). [12] In order to make the limitations of the non-solicitation provision of the Agreement reasonable in this case, the Court limits the provision's scope to customers and clients of SafeWorks to or from which either Church and Torres rendered services during his employment with SafeWorks. Additionally, the Court limits the geographic scope of the reformed non-solicitation provision to Houston and the surrounding counties in South Texas where Church and Torres actually worked or solicited customers and clients while employed by SafeWorks.

> 12   SafeWorks argues that while it may be barred from recovering damages for the breach of the non-solicitation provisions, its claims for damages

for breach of the non disclosure provisions remain viable because non-disclosure agreements may be enforceable even if a covenant not to compete is not. *See, e.g., Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 888 (Tex.App.--Dallas 2003, no pet.). Defendants have not moved for summary judgment on claims based on the non-disclosure provision and, therefore, the Court need not reach this issue.

If a court reforms a covenant not to compete in order to make [*16] it reasonable and enforceable, "the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be *limited to injunctive relief.*" TEX. BUS. & COM. CODE § 15.51(c) (emphasis added). Accordingly, the Court denies SafeWorks damages for breach of the non-solicitation provision by Church or Torres. Defendants are entitled to summary judgment on the issue of damages on SafeWorks' claims for breach of the non-solicitation provision. It remains for the Court to determine whether SafeWorks is entitled to injunctive relief for Defendants' breach, if any, of the non-solicitation provision as reformed by the Court.

## C. Injunctive Relief

Defendants argue that SafeWorks is not entitled to injunctive relief because the non-solicitation provision of the Agreement has expired by its terms, rendering the request for injunctive relief moot. SafeWorks responds by asking the Court to exercise its equitable discretion to enjoin Church and Torres on a going-forward basis from soliciting SafeWorks' customers and clients under the non-solicitation provision as reformed by the Court. Defendants reply that such equitable relief is inappropriate [*17] when a plaintiff fails to seek a preliminary injunction hearing prior to the expiration of the terms of a non-solicitation agreement.

The non-solicitation provision of the Agreement had a term of six months commencing upon the cessation of each Defendant's employment with SafeWorks. [13] SafeWorks acknowledges that the non-solicitation provision for each Defendant has lapsed by its terms because more than six months have passed since Church and Torres ceased employment with SafeWorks. [14] Church's six-month non-solicitation period expired on November 30, 2008, and Torres' non-solicitation period expired on December 28, 2008.

13  *See* Torres Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 5; Church Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 5.

14  *See* SafeWorks' Response [Doc. # 14], at 21.

SafeWorks cites the Court to *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459 (5th Cir. 2003), to support its argument that expiration of the proscribed non-solicitation period does not render a request for injunctive relief moot. Defendants cite the Court to two post-*Guy Carpenter* district court decisions declining to grant injunctive relief when the plaintiff delayed or failed to seek a preliminary [*18] injunction. *See Staples, Inc. v. Sandler*, 2008 U.S. Dist. LEXIS 68589, 2008 WL 4107656, at *5 (N.D. Tex. Aug. 29, 2008); *Rimkus*, 255 F.R.D. at 437-38.

The Court agrees that SafeWorks' request for injunctive relief is not rendered moot merely by expiration of the originally proscribed six-month period. *See Guy Carpenter*, 334 F.3d at 464. The Court retains the ability to exercise its equitable powers and extend the non-solicitation period for the court-reformed non-solicitation provision beyond the original contractual period. *See id.*

Under the circumstances presented, however, the Court declines to grant SafeWorks the requested extension. During the state suit that preceded this federal case, the court set a temporary injunction hearing for August 25, 2008, ten days after SafeWorks filed suit. 15 SafeWorks chose not to proceed with the hearing on that date. SafeWorks represented to the state court that it needed limited, expedited discovery, including depositions of the Defendants, before presenting its case for a temporary injunction. SafeWorks represented to the state court that it would be prepared for a temporary injunction hearing shortly after the depositions were completed. 16 SafeWorks completed the Defendants' [*19] depositions on September 4 and 5, 2008, but the company did not thereafter seek a hearing date for a temporary injunction. Rather, SafeWorks filed a notice of non-suit and, on September 25, 2008, commenced this federal action. Since filing the present suit, SafeWorks has not sought a hearing on the preliminary injunction request it included in its Original Complaint. At a January 5, 2009, initial pretrial hearing, counsel for SafeWorks represented to the Court that SafeWorks was considering filing a motion for a preliminary injunction hearing in March 2009, but as of the date of this Memorandum and Order, SafeWorks still has not done so.

15  *See* August 25, 2008, Hearing Transcript, Exh. C to Defendants' Reply [Doc. # 15].

16  *Id.* at 48.

Even more significantly, SafeWorks has not directed the Court to evidence suggesting a probable right to the injunctive relief it now requests. To obtain a preliminary injunction, an applicant must prove four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause [*20] the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). SafeWorks has not presented evidence demonstrating a substantial likelihood of success on the merits. SafeWorks primarily directs the Court to Church's deposition testimony that he conversed with existing customers of SafeWorks within the six-month period, 17 and Torres' deposition testimony that he placed orders for certain customers of SafeWorks during the six-month period. 18 Examination of the actual testimony, however, reveals that Church's conversations with existing customers of SafeWorks resulted from the customers calling him, *not* from his solicitation or any pursuit of these customers. 19 Similarly, Torres' testimony makes it apparent that he placed an order for an existing customer of SafeWorks when the customer called him, *not* from his solicitation of this customer. 20 The testimony cited by SafeWorks fails to raise a genuine fact issue that Church or Torres "directly or indirectly solicited" existing customers of SafeWorks in violation of the non-solicitation provisions.

17  Church's Deposition, Exh. D to SafeWorks' Response [Doc. [*21] # 14], at 100.

18  Torres' Deposition, Exh. E to SafeWorks' Response [Doc. # 14], at 53-54.

19  Church's Deposition, Exh. D to SafeWorks' Response [Doc. # 14], at 100. Black's Law Dictionary defines solicitation as "the act or an instance of requesting or seeking to obtain something; a request or petition." BLACK'S LAW DICTIONARY 1427 (8th ed. 2004).

20  Torres' Deposition, Exh. E to SafeWorks' Response [Doc. # 14], at 53-54.

Page 6

In addition, SafeWorks' delay in seeking a preliminary injunction weighs heavily against a finding of irreparable injury. *See Rimkus*, 255 F.R.D. at 438.

Based on the record before the Court, the Court declines to grant SafeWorks injunctive relief on its claims for breach of the non-solicitation provision by extending the term of the non-solicitation provision. The Court will not enjoin Church and Torres on a going-forward basis from soliciting SafeWorks' customers and clients under the non-solicitation provision as reformed by the Court.

Because Defendants cannot recover damages and because the Court declines to grant SafeWorks injunctive relief, the Court grants Defendants summary judgment on SafeWorks' claims for breach of the non-solicitation provision of the Agreement. [*22] The Court now turns to the issue of Defendants' recovery of attorney's fees.

### D. Attorney's Fees

Defendants argue that they are entitled under § 15.51(c) of the TBCC to recover their costs, including reasonable attorney's fees, incurred in defending SafeWorks' attempt to enforce an overbroad covenant. [21] More specifically, Defendants contend that SafeWorks knew at the time each Defendant executed his Agreement that the non-solicitation provisions contained limitations that were not reasonable and were greater than necessary to protect the goodwill and business interests of SafeWorks. Defendants alternatively argue that they are entitled to recover attorney's fees under the terms of the Agreement, which provides that "[s]hould litigation arise concerning this Agreement, the prevailing party shall be entitled to its attorneys' fees and court costs in addition to any other relief that may be awarded." [22]

21 SafeWorks argues that Defendants first raised their arguments for recovery of attorney's fees in their reply brief and, therefore, the Court should not consider Defendants' arguments. SafeWorks argues that despite the fact that Defendants' Motion states that Defendants seek to "recover [*23] their costs and attorneys' fees expended in this cause," Defendants' Motion [Doc. # 12], at 13, Defendants' Motion failed to make argument in support of recovery of attorney's fees under the theories advanced in Defendants' Reply [Doc. # 15]. While SafeWorks' points are not without merit, the Court declines to strike Defendants' attorney's fee arguments because SafeWorks has

had a full opportunity in its Sur-Reply [Doc. # 16, Exh. A] to address Defendants' arguments on the merits.

22 *See* Torres Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 6 (erroneously numbered P 5 on page 2 of the Agreement); Church Agreement, Exh. A to Defendants' Motion [Doc. # 12], P 6 (erroneously numbered P 5 on page 2 of the Agreement).

Section 15.51(c) of the TBCC provides in relevant part that:

> If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, [and if] the promisor establishes that the promisee **knew at the time of the execution of the agreement that the covenant did not contain limitations** as to time, geographical area, and scope of activity to be restrained **that were reasonable** and the limitations imposed a greater restraint [*24] than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, **the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.**

TEX BUS. & COM. CODE § 15.51(c) (emphasis added). Church and Torres, as promisors, have the burden to establish that SafeWorks, as the promisee, knew at the time the Agreements were executed that the non-solicitation provisions contained limitations that were not reasonable. Defendants have failed to meet this burden. Evidence of SafeWorks' knowledge of Church's and Torres' roles and responsibilities while they were employed at SafeWorks is insufficient to establish that SafeWorks *knew* the non-solicitation provisions of the Agreement contained unreasonable limitations. Under Texas law, similarly, even though the Texas Supreme Court had held seven years prior to the execution of the Agreement by either Defendant that application of another state's law to determine the enforceability [*25]

of a covenant not to compete is void as against Texas public policy, there is no evidence SafeWorks representatives actually *knew* that the relevant non-solicitation provisions were unreasonable under Texas law. Accordingly, the Court denies Defendants' claim for attorney's fees under § 15.51 at this time.

With respect to Defendants' claim for attorney's fees under the prevailing party provisions of the Agreement, the Court concludes that Defendants' request is premature. SafeWorks' claims for breach of the non-disclosure provision of the Agreement remain pending and are not the subject of the pending summary judgment motion. Designation of Defendants as a "prevailing party" of this entire litigation is not warranted at this time. The Court also does not reach the issue whether Defendants' claim for attorney's fees under the prevailing party provisions of the Agreement is preempted by § 15.52 of the TBCC.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the non-solicitation provision of the Agreement is overbroad and an unenforceable unreasonable restraint of trade. The Court concludes SafeWorks is not entitled to damages for any alleged breach of the non-solicitation [*26] provision and the Court declines to grant SafeWorks injunctive relief under the non-solicitation provision as reformed by the Court. Furthermore, the Court denies Defendants' claim for attorney's fees under § 15.51 of the Texas Business and Commerce Code. Finally, the Court denies without prejudice Defendants' claim for attorney's fees under the prevailing party provision of the Agreement because such a claim is premature. Accordingly, it is hereby

**ORDERED** that Defendants' Motion for Partial Summary Judgment [Doc. # 12] is **GRANTED in part** and **DENIED in part**.

SIGNED at Houston, Texas, this 8th day of **April, 2009**.

/s/ Nancy F. Atlas

Nancy F. Atlas

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2011, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system.

/s/ Patricia E. Reilly