## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ALADDIN CAPITAL HOLDINGS LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **No.  3:11-CV-00655 (MRK)** |
| | : | |
| **v.** | : | |
| | : | |
| **HARUMI AOTO DONOYAN,** | : | |
| | : | |
| **Defendant.** | : | **JUNE 2, 2011** |

## DEFENDANT'S REPLY IN FURTHER SUPPORT OF DISMISSAL OF REQUEST FOR INJUNCTIVE RELIEF AS MOOT

Defendant Harumi Aoto Donoyan ("Defendant" or "Ms. Donoyan") hereby submits this reply brief in further support of dismissal of Plaintiff's request for injunctive relief as moot.  For the reasons set forth herein and in Defendant's brief dated May 26, 2011, Plaintiff's request for injunctive relief should be dismissed as moot.  Nothing in Plaintiff's brief supports a contrary result.

### A.       Plaintiff's request for injunctive relief is moot.

The issue here is whether, under Connecticut law, a request for injunctive relief to extend an expired post-employment restrictive covenant is moot.  Under clearly established Connecticut law, the answer to that question is a resounding yes.  The requested relief is moot.  See Van Dyck Printing Co. v. DiNicola, 43 Conn. Supp. 191 (Conn. Super. Ct. 1993), aff'd, 231 Conn. 272 (1994).  Plaintiff, however, incorrectly frames the issue as whether a court has the equitable authority to extend a restrictive covenant.  Plaintiff's mischaracterization of the relevant question of law ignores the issue this Court actually asked the Parties to brief, and its position relies on cases that are inapposite to the issue presented in this case.

Plaintiff's reliance on Levitt Corp. v. Levitt, 593 F.2d 463 (2d Cir. 1979), as support for

its assertion that this Court has the equitable authority to extend an expired post-employment restrictive covenant is misplaced. Levitt Corp. is both procedurally and factually distinguishable. First, Levitt Corp. originated in the Eastern District of New York and applied New York law, not Connecticut law. See Levitt Corp. v. Levitt, No. 78C1531, 1978 U.S. Dist. LEXIS 15820 (E.D.N.Y. Aug. 29, 1978).[1] Second, Levitt Corp. is not remotely analogous to this case on its facts. Levitt Corp. is primarily a trademark infringement case, in which the plaintiffs brought suit alleging the defendants infringed upon plaintiffs' trademarks in violation of, *inter alia*, the Lanham Act and the common law of unfair competition. Levitt Corp., 593 F.2d at 466.

Specifically, the plaintiffs sought injunctive relief preventing the defendants from using the name "Levitt" in any manner whatsoever because the defendants were developing a competing residential housing venture in Orange County, Florida, utilizing plaintiffs' trademarks to market the venture.[2] 1978 U.S. Dist. LEXIS 15820 at *7. The plaintiffs sought such relief to enforce an agreement prohibiting the individual defendant William J. Levitt from using the name "Levitt" in connection with a business engaged in residential development or construction and from using the name "Levitt" in a way that would create confusion with the defendants' trademarks. Id. at *7-8.[3]

The district court granted injunctive relief to enjoin defendants' use of plaintiffs' trademarks. Id. at *18-19. As a corollary to this injunction, the court also enjoined defendants for a period of two years from issuing any press releases or advertising concerning the individual defendant William J. Levitt's connection with the Orange County development. Id. While this injunction exceeded the temporal restriction of a prior, similar restriction to which the parties had

---

[1] Attached hereto as Exhibit A.
[2] The plaintiffs had previously acquired the relevant trademarks when they acquired a controlling interest in the defendants' residential development business. 1978 U.S. Dist. LEXIS 15820 at *4.
[3] This agreement was not limited in duration. Id. at *6-7.

agreed, the court explained that the underlying purpose of the injunction was to counteract the violation of the restrictions on the use of the trademark "Levitt" and the resulting confusion from the use of the trademark "Levitt." Id. at *19.

The two-year prohibition was not an extension of an expired restrictive covenant nor did the court characterize it as such. See id. at *19. Importantly, the district court fashioned the terms of this injunction so that it was substantially different from the expired restrictive covenant. See id. at *6-7, 18-19. Simply put, the court's injunction was not an extension of an expired post-employment restrictive covenant but instead injunctive relief meant to remedy blatant trademark infringement.[4]

Plaintiff also cites to several other cases for the assertion that a trial court has broad equitable powers to address and prevent wrongful conduct. All such cases are distinguishable from the instant dispute because those cases did not involve extension of an expired post-employment restrictive covenant. See Bauer v. Waste Mgmt of Conn., Inc., 239 Conn. 515 (1996) (seeking injunctive relief to prevent violation of zoning regulations); Elm City Cheese Co., Inc. v. Federico, 251 Conn. 59, 94 (1999) (affirming injunctive relief enjoining defendant from misappropriating trade secrets despite absence of any restrictive covenant); Zaubler v. The West View Hills, 148 Conn. 540 (1961) (affirming injunction restraining defendants from interfering with the effective prosecution of an action pending in another court); Forschner Group Inc. v. Arrow Trading Co., 124 F.3d 402 (2d Cir. 1997) (affirming injunction preventing defendant from infringing upon plaintiff's trademark); Xplore Tech. Corp.v. Killion, CV105013459S, 2010 Conn. Super. LEXIS 2401 (Conn. Super. Ct. Oct. 8, 2010) (issuing injunction during term of post-employment restrictive covenant enjoining defendant from

---

[4] Moreover, while the district court does not call the injunction preliminary or permanent, the injunction seems to be "permanent" in nature as parts 1, 3, 4, and 5 of the ordered injunctive relief have no temporal restriction. Levitt Corp., 1978 U.S. Dist. LEXIS 15820 at *18-20.

competing with plaintiff for a period of one year from defendant's resignation).

Express Scripts, Inc. v. Sirowich, CV 020077109, 2002 Conn. Super. LEXIS 3444, *29 (Conn. Super. Ct. Oct. 24, 2002) (Alander, J.) is equally distinguishable. Plaintiff cites dicta in that case for the proposition that it is unsettled as to whether a Connecticut court has the authority to issue an injunction extending a post-employment restrictive covenant beyond the term set forth in the covenant. See Pl's Br. re the Ct's Authority to Issue Inj. Relief, pg. 8. The court made this passing observation in a case in which the restrictive covenant had not yet expired. Express Scripts, Inc., 2002 Conn. Super. LEXIS 3444 at *29. Rather than support Plaintiff's position, the observation actually undermines it because the court questioned whether it had authority to extend even a *nonexpired* restrictive covenant. In fact, Judge Alander did not extend the term of the noncompete agreement in that case. See Express Scripts, Inc., 2002 Conn. Super. LEXIS 3444 at *30-31.

Plaintiff's discussion of the "blue pencil" rule also supports the settled law in Connecticut that a request for injunctive relief on an expired restrictive covenant is moot. As Defendant stated in its May 26 brief, Connecticut courts take a conservative approach to modifying post-employment restrictive covenants, and Connecticut jurisprudence concerning the "blue pencil" rule speaks to Connecticut courts' conservative approach to modification of a post-employment restrictive covenant. Thus, Connecticut's limited use of the "blue pencil" rule supports dismissal of Plaintiff's request for injunctive relief as moot.[5]

---

[5] Specifically, under Connecticut law a court cannot use the "blue pencil" rule to modify a post-employment restrictive covenant unless the parties have indicated an intent to make its terms severable. See, e.g., Grayling Assocs., Inc. v. Villota, CV040833521, 2004 Conn. Super. LEXIS 1859, *4 (Conn. Super. Ct. July 12, 2004) (applying "blue pencil" doctrine where terms of covenant clearly indicated the parties intended it to be severable), citing Beit v. Beit, 135 Conn. 195, 205 (1948); cf. Braman Chem. Enters., Inc. v. Barnes, No. CV064020633S, 2006 Conn. Super. LEXIS 3753, *26 (Conn. Super. Ct. Dec. 12, 2006) (refusing to "blue-pencil" noncompete agreement where there was no express provision permitting the court to do so) (attached as Ex. A); and Timenterial, Inc. v. Dagata, 29 Conn. Supp. 180 (Conn. Super. Ct. 1971) (restrictive covenant not severable by its terms). Here, a discussion of the "blue pencil" rule and whether the restrictive covenants are unreasonable and

Plaintiff has cited no authority to contradict the clear holding of <u>Van Dyck Printing Co. v. DiNicola</u>, as endorsed by the Connecticut Supreme Court, that a request for injunctive relief to extend an expired restrictive covenant is moot.  <u>See Van Dyck Printing Co.</u>, 43 Conn. Supp. at 191, <u>aff'd</u>, 231 Conn. 272 (1994).  Accordingly, Plaintiff's request for injunctive relief should be denied as moot.

**B.   Plaintiff's request to certify a question to the Connecticut Supreme Court should be denied.**

It is within this Court's discretion to certify a question to the Connecticut Supreme Court where a question of Connecticut law is determinative of an issue in the pending litigation and there is no controlling precedent.  <u>See Lopez v. Smiley</u>, 375 F. Supp. 2d 19, 26 (D. Conn. 2005).  <u>See also</u> Conn. Gen. Stat. § 51-199b.  Certification "is best used for obtaining an authoritative state law ruling that affects the merits of a federal law suit, and should be used sparingly, if at all, merely to resolve a threshold issue . . . ."  <u>Lopez</u>, 375 F. Supp. 2d at 27, <u>quoting</u> <u>Bethphage Lutheran Service, Inc. v. Weicker</u>, 965 F.2d 1239, 1246-47 (2d Cir. 1992); <u>cf.</u> <u>Ballou v. Law Offices Howard Lee Schiff, P.C.</u>, 713 F. Supp. 2d 79, 80 (D. Conn. 2010) ("The Court is sensitive to the demands on the Connecticut Supreme Court and does not wish to burden it . . . .").

Here, there is no reason to certify any question to the Connecticut Supreme Court.  Certification would not affect the merits of this dispute; instead, certification here would simply "resolve a threshold issue," which the Second Circuit has stated is not an appropriate use for certification.  <u>Bethphage Lutheran Service, Inc., supra.</u>  Moreover, <u>Van Dyck Printing Co.</u>, 43 Conn. Supp. at 191, speaks directly to the disputed issue of law in this matter and there is no

---

overbroad need not be reached because the request for injunctive relief is moot.  However, Defendant reserves her right to challenge the breadth and reasonableness of the restrictive covenants.

conflicting Connecticut state authority or question of statutory interpretation that is best resolved by the Connecticut Supreme Court.[6]

Thus, Plaintiff's suggestion that the issue of mootness should be certified to the Connecticut Supreme Court is unavailing and should be denied. Rather, plaintiff's request for injunctive relief should be denied as moot.

## II.    CONCLUSION

For the foregoing reasons and the reasons set forth in Defendant's Brief Pursuant to this Court's May 24, 2011 Order, Plaintiff's request for injunctive relief should be denied as moot.

**HARUMI AOTO DONOYAN,**


/s/ Patricia Reilly
Patricia Reilly (ct08352)
Matthew K. Curtin (ct27765)
LITTLER MENDELSON, P.C.
265 Church Street, 3rd Floor
New Haven, Connecticut  06510
Tel.  203.974.8703
Fax  203.907.1914
preilly@littler.com
mcurtin@littler.com

---

[6] Cf. Ballou v. Law Offices Howard Lee Schiff, P.C., 713 F. Supp. 2d 79, 80 (D. Conn. 2010) (Kravitz, J.). In Ballou, this court suggested that the question at issue could be certified because (1) the dispute turned on an important matter of undecided state law; (2) there was no dispute concerning the underlying facts; (3) the resolution of the disputed issue of law would affect thousands of cases pending in and already decided by Connecticut courts; and, (4) the Court was confident that if the losing party were to appeal, the Second Circuit likely would have certified the issue to the Connecticut Supreme Court. However, the parties did not agree that it should be certified and the court therefore declined to certify it. See Ballou, 713 F. Supp. 2d at 80. Here, none of the considerations militating in favor of certification exist.

# EXHIBIT A

LEXSEE



Cited
As of: Jun 02, 2011

**Braman Chemical Enterprises, Inc. v. Valerie Barnes**

**CV064020633S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW
HAVEN, AT NEW HAVEN**

**2006 Conn. Super. LEXIS 3753**

**December 11, 2006, Decided
December 12, 2006, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED
AND MAY BE SUBJECT TO FURTHER APPELLATE
REVIEW. COUNSEL IS CAUTIONED TO MAKE AN
INDEPENDENT DETERMINATION OF THE STATUS
OF THIS CASE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employer,
a corporation that provided pest control services to
commercial and residential customers, filed an action
seeking to enforce a noncompete clause in defendant
former employee's employment agreement. Plaintiff also
filed an application for a temporary injunction to enjoin
defendant from competing with plaintiff within the
radius-based restricted area.

**OVERVIEW:** Defendant argued that the noncompete
clause was unenforceable because of lack of
consideration, but the court found that defendant
executed the noncompete agreement shortly before the
start of her employment with plaintiff and in
consideration of her hire. The court, however, agreed
with defendant that the geographical restriction contained
in the noncompete clause, a 50-mile radius restriction that
encompassed almost all of Connecticut, was
unreasonable. The court found that the geographical

restriction was designed less to protect plaintiff's
legitimate interests and more to preserve an enormous
area free of competition. The court found that the
geographical area was so large that it effectively
eliminated competition altogether and prevented
defendant from practicing her trade unless she relocated
to an area outside the restricted portion of the state,
actions that were not necessary for the fair protection of
plaintiff's legitimate business interests. Because the
geographical restriction was unenforceable as a matter of
law, the court concluded that plaintiff was unlikely to
prevail on the merits of its action.

**OUTCOME:** The court denied plaintiff's application for
a temporary injunction.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Employment Relationships
> Employment Contracts > Conditions & Terms >
Trade Secrets & Unfair Competition > Noncompetition
& Nondisclosure Agreements*
[HN1]Under Connecticut law, a covenant not to compete
is valid and enforceable if the restraint is reasonable. For
a noncompete clause to be valid and binding, it must be
partial and restricted in its operation in respect either to

time or place and must be reasonable--that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN2]The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. Time and geographic restrictions in a covenant not to compete are valid if they are reasonably limited and fairly protect the interests of both parties. This five-prong test applies both to noncompete provisions, which bar an ex-employee from engaging in the same kind of business as the former employer, and to anti-sales provisions, which bar an ex-employee from transacting business with his former employer's customers. Connecticut courts, however, have tended to apply greater scrutiny to non-competes that create general bars based on geographical considerations than to those which focus simply on doing business with the employer's customers.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN3]The general rule is that the application of a restrictive covenant will be confined to a geographical area which is reasonable in view of the particular situation. Geographic restrictions should be narrowly tailored to the employer's business situation. It is permissible for the employer to protect itself in a reasonably limited market area.

*Labor & Employment Law > Employment Relationships*

*> Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN4]While a noncompete agreement must be viewed in its entirety, a single unreasonable provision may be sufficient to invalidate the entire agreement.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN5]Under Connecticut law, the party challenging the enforceability of a noncompete agreement has the burden of proving that it is not enforceable. In addition, there is some case law to the effect that when a party seeks injunctive relief to enforce a noncompete against a person who has taken the party's customers and is rendering the same kind of services to them, the usual requirements of establishing irreparable harm and lack of an adequate remedy at law do not apply. In such a case, irreparable damage would inevitably result from a violation of the defendant's promises. While the plaintiff could maintain a claim for damages as to each violation that causes injury the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN6]The fact that an employer seeks to protect his interests in potential new customers in a reasonably limited market area as well as his existing customers at the time the employee leaves does not render a noncompete covenant unreasonable.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN7]In Samuel Stores, the Connecticut Supreme Court

held that a post-employment restriction must be no more than reasonably necessary for the fair protection of the employer's business and must not unreasonably restrict the rights of the employee.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN8]Especially if employment involves the employee's contacts and associations with clients or customers, it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance so acquired to injure or appropriate the business which the party was employed to maintain and enlarge.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN9]When evaluating the "public interest" aspect of a noncompete agreement, the court should consider (1) the scope and severity of the covenant's effect on the public interest, (2) the probability of the restriction creating or maintaining an unfair monopoly in the area of trade, and (3) the interest sought to be protected by the employer. In the absence of specific facts showing the way in which enforcement of a noncompete would interfere with the public's interest in open competition, there is no basis for a court to conclude that enforcing the noncompete would impair that interest.

**JUDGES:** Jonathan E. Silbert Judge.

**OPINION BY:** Jonathan E. Silbert

**OPINION**

*MEMORANDUM OF DECISION*

The plaintiff, Braman Chemical Enterprises, Inc. ("Braman"), a Massachusetts corporation with an office and principal place of business in Agawam, Massachusetts, provides pest control services to commercial and residential customers. It is authorized to, and does, conduct business in Connecticut. It has brought this action against a former employee, Valerie Barnes, seeking to enforce a non-compete clause in her

employment agreement. Barnes opposes the plaintiff's efforts to enjoin her from competing with the plaintiff in Connecticut, primarily on the basis of her contention that the geographical restriction contained within the employment agreement . . . a radius of 50 miles from the Hartford City Hall . . . is unreasonable.

Most of the facts in this case are undisputed and were submitted to the court in the form of a written stipulation, summarized as follows: Braman has approximately 600 to 700 Connecticut commercial customers located [*2] in all of the State's cities and in many of its larger towns. Except for Fairfield County, in which it does little business, Braman services commercial and/or residential customers in at least 90 percent of Connecticut municipalities, although it does not have customers in all of the municipalities within the 50 mile radius from the Hartford City Hall. In 2005, Braman's total sales were approximately $ 4.6 million, of which commercial sales in Connecticut amounted to approximately $ 1.4 million. Its commercial sales in New Haven County amounted to approximately $ 125,000.

The defendant resides in Hamden, Connecticut. On November 5, 1990, Braman hired her to perform pest-control services for its commercial and residential customers in Connecticut. Before the start of her employment, and in consideration of her hire, Barnes executed a document dated October 24, 1990 and titled "Restriction Against Other Employment After Termination of Work With Braman Chemical Enterprises, Inc." This "non-compete" provides, in relevant part, as follows:

Valerie Barnes agrees that he/she will not directly or indirectly, either as

principal, or agent, or servant, for the period of 6 months [*3] after any termination of employment, enter or engage in any branch of the pest control business within 50 miles of the City Hall in the city of Hartford, Connecticut . . .

Prior to her employment with Braman, Barnes had no experience in the pest-control business, and Braman trained Barnes for her Operator's License. During the course of her employment with Braman, Barnes obtained her Supervisor's License on her own time and at her own expense. Braman paid license renewal fees on two or

three occasions, allowing the defendant to retain her Supervisor's License.

Commencing in late 1990 and continuing until April 26, 2006, Barnes worked as an exterminator for Braman, driving a company truck from customer to customer and directly rendering extermination services. Many of the customers she serviced were restaurants and other businesses that received services on a prescribed schedule, such as once or twice per month. At the beginning of her employment, Barnes' territory stretched from Greenwich to New London, and included most of southwest and southeast Connecticut. Hartford was not part of her territory. Over the years, Braman hired more exterminators to work in Connecticut, and [*4] Barnes' territory contracted to cover the area including the Connecticut shoreline from New Haven to Guilford, and north from New Haven to Meriden.

Toward the end of her employment with Braman, Barnes serviced approximately 65 (roughly ten percent) of Braman's regular Connecticut customers. She had little responsibility for sales or solicitation calls. During most of her tenure at Braman, and continuing to this day, Braman has had two full-time sales representatives in Connecticut, one of whom works in the territory that Barnes serviced. Developing new commercial customers for Braman involves personal visits to each prospect's place of business, and it sometimes involves repeated visits to the same prospect. Although Barnes did some sales work for which she received commissions, a significant majority of the customers on Barnes' route at Braman were developed by Braman's sales representatives, not by Barnes or other exterminators. In 2002, Barnes was offered and accepted a sales position, but after several months, her replacement quit, and Barnes returned to being an exterminator.

On January 5, 2006, Barnes formed a Connecticut limited liability company called "Bug One, LLC," with [*5] an office address at her home, 58 Laura Road, Hamden, Connecticut. The office address is approximately 37 miles from City Hall in Hartford, and therefore within the geographic scope of the "non-compete area". Indeed, with the exception of part of Fairfield County, most of the cities and towns in Connecticut are within the non-compete area.

Effective April 26, 2006, Barnes left her employment at Braman. Within one week following her resignation date, she commenced operating "Bug One" from her Office Address. Within three weeks of her resignation date, twenty-four of the customers that Barnes had serviced as an employee of Braman had cancelled their service contracts with Braman and entered into service contracts with Bug One. Barnes, through Bug One, is now providing them with pest-control services that are substantially identical to those she had provided while an employee of Braman. For the one year period that began on April 1, 2005 and ended on March 31, 2006, she had billed these entities $ 29,393.62 for her services. [1] It is undisputed that each of the twenty-four customers is located within New Haven County and within the non-compete area. Braman now has approximately 69 remaining [*6] commercial customers in New Haven County.

1 For the six-month period contemplated by this Non-Compete agreement, the defendant therefore billed approximately $ 14,700.

In 1996, roughly six years after Barnes had commenced her employment, the owner and general manager of Braman held a meeting with the employees during which the company gave the employees, including Barnes, a new non-compete agreement to sign. Barnes reviewed that agreement and decided not to sign it. Neither she nor Braman, however, made any effort to terminate her employment as a result of that decision.

Barnes was always paid as an hourly employee. During the beginning of her employment, she worked many overtime hours, some of which were mandatory. As Braman hired more exterminators in the territory in which Barnes worked, and as her territory contracted, she was given less opportunity to earn overtime pay because more people were sharing the available work. She did not receive a raise in 2005, even though she had received annual increases [*7] in her hourly pay prior to that year.

Braman filed the instant Application for Ex Parte Temporary Restraining Order, Temporary Injunction After Hearing, and Order to Show Cause on May 24, 2006. The Court, Pittman, J., denied the plaintiff's request for ex parte relief, but issued a show cause order for June 27, 2006. The parties agreed that the material facts were not in dispute, and they eventually selected a date on which to present the case to the court on the basis of the stipulation of facts outlined above, oral argument and written memoranda of law. The court heard argument on September 18, 2006, and the final brief was filed on October 31, 2006.

The parties agree that [HN1]under Connecticut law, a covenant not to compete is valid and enforceable "if the restraint is reasonable." *New Haven Tobacco Co. v. Perrelli,* 18 Conn.App. 531, 534, 559 A.2d 715 (1989). For a non-compete clause to be valid and binding, it must be "partial and restricted in its operation in respect either to time or place . . . and must be reasonable--that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation [*8] as to interfere with the interests of the public. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976).

[HN2]"The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *Robert S. Weiss & Associates, Inc. v. Wiederlight,* 208 Conn. 525, 529 n.2, 546 A.2d 216 (1988). "[T]ime and geographic restrictions in a covenant not to compete are valid if they are reasonably limited and fairly protect the interests of both parties." *Id.,* 208 Conn. at 530.

This five-prong test applies both to non-compete provisions, which bar [*9] an ex-employee from engaging in the same kind of business as the former employer, and to anti-sales provisions, which bar an ex-employee from transacting business with his former employer's customers. *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra; New Haven Tobacco Co. v. Perrelli, supra,* 18 Conn.App. at 535, n.2. Our courts, however, have tended to apply greater scrutiny to non-competes that create general bars based on geographical considerations than to those which focus simply on doing business with the employer's customers.

[HN3]"The general rule is that the application of a restrictive covenant will be confined to a geographical area which is reasonable in view of the particular situation." *Scott v. General Iron, supra,* 171 Conn. at 138. Geographic restrictions should be "narrowly tailored to

the plaintiff's business situation." *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. at 531 (although a 10-mile radius restriction was upheld, areas were carved out where the employee was free to practice his trade.) In that case, the court said that it was permissible for the employer [*10] to protect itself in a "reasonably limited market area." *Id.,* at 533.

Although in *Van Dyck Printing Co. v. DiNicola,* 43 Conn.Sup. 191, 648 A.2d 898 (1993), the court stated that the reasonableness of time and geographic restrictions in a covenant not to compete are intertwined and that broad geographic restrictions may be reasonable if the duration of the covenant is short, and longer periods may be reasonable if the geographic area is small, our Appellate Court has instructed us that "the five pronged test is disjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." *New Haven Tobacco Co., Inv. v. Perrelli,* 18 Conn.App. 531, 534, 559 A.2d 715, 717 (1989). This court concludes that the meaning of prior case law on this subject is that [HN4]while the non-compete must be viewed in its entirety, a single unreasonable provision may be sufficient to invalidate the entire agreement.

[HN5]Under our law, the party challenging the enforceability of a non-compete has the burden of proving that it is not enforceable, *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 139, 368 A.2d 111 (1976). [*11] In addition, there is some case law to the effect that when a party seeks injunctive relief to enforce a non-compete against a person who has taken the party's customers and is rendering the same kind of services to them, the usual requirements of establishing irreparable harm and lack of an adequate remedy at law do not apply. *Mattis v. Lally,* 138 Conn. 51, 56, 82 A.2d 155 (1951). In such a case, "irreparable damage would inevitably result from a violation of the defendant's promises." *Id.* "[W]hile the plaintiff could maintain a claim for damages as to each violation that causes injury the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent." *Kim's Hair Studio. LLC v. Rogers,* 2005 Conn. Super. LEXIS 1805, 2005 WL 1971259 (Conn.Super.) The plaintiff here essentially argues that it wants to earn its money by exterminating vermin, "not to live on the income from a damages award." *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d

Cir. 1970). Thus, [*12] if plaintiff were to establish that the competition from the defendant was likely to shut down its business, the court would be likely to conclude that irreparable harm had been established. The plaintiff has not made such a showing. Moreover, in light of the court's conclusion, infra, that the unenforceability of the geographical restriction is fatal to the validity of the non-compete, irreparable harm turns out not to be a material factor in deciding whether the plaintiff is entitled to the issuance of a temporary injunction.

The defendant attacks the non-compete on several grounds. First, she has argued that the non-compete is unenforceable because of lack of consideration. This claim is without merit. Barnes has acknowledged in the written stipulation of facts that she executed the non-compete shortly before the start of her employment with Braman and in consideration of her hire. It is true that she was requested to sign another non-compete agreement in 1996 and refused to do so, but the defendant has offered no basis upon which the court could conclude that by offering a different non-compete that was rejected, the plaintiff in some way diminished the validity of the original [*13] agreement.

Barnes does not vigorously contest the plaintiff's claim that the six-month time frame contained in the non-compete is reasonable. As of her Resignation Date, she was servicing approximately 65 of Braman's 600 to 700 regular Connecticut customers. Braman has only two sales representatives in Connecticut, and it argues persuasively that six months is a reasonable time frame to allow its sales people to take on the additional task, above and beyond their regular duties, of securing those customers and the attendant goodwill following her departure from the company, as well as making arrangements to service those customers.

In fact, Connecticut courts have fairly frequently enforced non-compete periods of a year or more. See, e.g., *Van Dyck Printing Company v. DiNicola*, 43 Conn.Sup. 191, 648 A.2d 898 (1993), affirmed per curiam 231 Conn. 272, 648 A.2d 877 (1994) (one year); *Robert S. Weiss & Assoc. v. Wiederlight*, 208 Conn. 525, 546 A.2d 216 (1988) (two years); *Hart Nininger & Campbell Assoc. v. Rogers*, 16 Conn.App. 619, 548 A.2d 758 (1988) (two years); *Scott v. General Iron & Welding Co.*, 171 Conn. 132, 368 A.2d 111 (1976) [*14] (five years); *Torrington Creamery, Inc. v. Davenport*, 126 Conn. 515, 12 A.2d 780 (1940) (two years). An employer

may pursue "the legitimate goal of allowing a period during which he could restaff his sales force to serve the customers formerly serviced by the defendant without losing the accounts to the appropriation by the defendant of the accumulated goodwill and familiarity built up by the plaintiff as his employer." *Van Dyck*, *supra*, 43 Conn.Sup. at 198.

The principal bone of contention in this case thus not the time restriction but rather the reasonableness of the non-compete's geographical restriction, a circle described by a fifty-mile radius drawn from the Hartford City Hall. Braman argues that the area is reasonably tailored to meet its legitimate business needs, pointing out that while the non-compete area covers most of Connecticut, it has customers in at least 90% of Connecticut's municipalities, and the non-compete area is substantially congruent with the area in which the plaintiff actually does business. [HN6]"The fact that an employer seeks to protect his interests in potential new customers in a reasonably limited market area as well [*15] as his existing customers at the time the employee leaves does not render the covenant unreasonable." *Robert S. Weiss & Assoc. v. Wiederlight*, *supra*, 208 Conn. at 533.

To bolster its argument that the non-compete area is reasonable, Braman points out that it does not include all of Fairfield County, a part of the state in which the company does relatively little business. It suggests that because the agreement permits Barnes to pursue her livelihood during the non-compete period in a part of the state in which she previously had plied her trade, it is not unduly restrictive. In taking this position, however, it overlooks several important issues of fact and law.

First, the size of the geographical restriction makes it clear that Braman is focusing its attention not just on protecting its interest in those existing customers who were actually serviced by Barnes, or even those who might in some way have become acquainted with her professionally in the course of her tenure at Braman, but rather on excluding all competition from her within the very large entire territory in which it conducts much of its business. The defendant contends that because this is a geographic [*16] restriction that seeks far more than a "fair protection" of the plaintiff's interests, it is an unreasonable restraint of trade, regardless of its duration. She cites numerous cases in which large geographical restrictions were held to be invalid. See, e.g., *Nesko Corp. v. Fontaine*, 19 Conn.Sup. 160, 110 A.2d 631

Page 6

(1954) (35-mile restriction, including a population of more than 1.5 million people, held invalid); *Trans-Clean Corp. v. Terrell*, 1998 Ct.Sup. 3765, 1998 Conn. Super. LEXIS 717 (Conn. Super. 1998) (court noted that the 60-mile radius from the employer's home office in Stratford encompassed approximately 75% of the state); *Timenterial, Inc. v. Dagata*, 29 Conn.Sup. 180, 277 A.2d 512 (1971) (50-mile radius restriction held invalid).

The restriction sought by the plaintiff in this case is in fact a circle with a diameter of 100 miles. The total area covered is a whopping 7850 square miles (using A=r<2>). In contrast, the total area of the State of Connecticut, according to its official government website, is only 5018 squares miles, and while this non-compete does not quite cover all of the state, it does include portions of Massachusetts, New York and Rhode [*17] Island.

An examination of the cases which have upheld radius-based restrictions reveals that many of them involve non-competes in connection with the sale of business. *Leo's Partners, LLC v. Ferrari*, 2005 Conn. Super. LEXIS 3595, 2005 WL 3667346 (Conn.Super. 2005) (20-mile restriction in connection with the sale of a family restaurant); *Kim's Hair Studio, LLC v. Rogers*, 2005 Conn. Super. LEXIS 1805, 2005 WL 1971259 (Conn.Super. 2005) (10-mile restriction in connection with the sale of a beauty salon); and *Sagarino v. SCI Connecticut Funeral Services, Inc.*, 2000 Conn. Super. LEXIS 1384, 2000 WL 765260 (Conn.Super. 2000) (30-mile restriction in connection with the sale of a family-owned funeral home). Indeed, the courts have less willing to uphold such restrictions against departing employees than they have in cases involving the sale of a business. See, *Samuel Stores, Inv. v. Abrams*, 94 Conn. 248, 108 A. 541 (1919). One case decided by the undersigned, which did concern a departing employee, involved only a 15-mile radius restriction. *Access America, LLC v. Mazzotta*, 2005 Conn. Super. LEXIS 2597, 2005 WL 2650093 (Conn.Super. 2005). In that case, the plaintiff real estate broker successfully argued that preventing the [*18] departing agent from selling real estate within the broker's limited market area was a fair protection of its business.

The 50-mile radius in this case is substantially more than is necessary to provide a "fair protection" of the plaintiff's business. Well over two million prospective Connecticut customers live within the 7850 square mile area covered by the non-compete. As the defendant points out, only around 700 of these are presently the plaintiff's customers, and it is likely that only a small percentage of these are even aware of the defendant's existence. There is nothing about her prior employment that has given Barnes any particular advantage over Braman in soliciting the more than two million potential customers spread out over those 7850 square miles.

A "fair protection" of Braman's interests might have been a six-month restriction on the defendant's soliciting any of the customers she serviced, or perhaps even any of Braman's existing customers. Non-competes limited to a plaintiff's existing customers have generally been upheld. E.g. *May v. Young*, 125 Conn. 1, 5, 2 A.2d 385 (1938) (restriction upheld because it involved only the clients of the plaintiff, [*19] "leaving open to the defendant all other opportunities for employment"); *Roessler v. Burwell*, 119 Conn. 289, 176 A 126 (1934) (non-compete held reasonable because defendant was "in no way restricted from entering into the same business anywhere he chose, nor in taking any proper means to build up such a business and secure customers, so long as he did not attempt to take away from the plaintiff his own customers"); *Hilb, Rogal & Ham Company of Hartford v. Pawlich*, 1995 Conn. Super. LEXIS 506, 1995 WL 91431 (Conn.Super. 1995), (limited to plaintiff's customers or "prospective customers"); *New Haven Tobacco Co., Inc. v. Perrelli*, 18 Conn.App. 531, 559 A.2d 715 (1989); *Edge Technology Services, Inc. v. Worley*, 2005 Conn. Super. LEXIS 1804, 2005 WL 1971109 (Conn.Super. 2005).

[HN7]In *Samuel Stores, supra*, our Supreme Court held that a post-employment restriction must be no more than "reasonably necessary for the 'fair protection' of the employer's business, and must not unreasonably restrict the rights of the employee. The non-compete in *Samuel Stores*, which prohibited a former salesman from competing with the plaintiff anywhere where the plaintiff had a branch [*20] store, was invalidated because its primary goal was to stifle competition and it was "not reasonably necessary for the fair protection of the plaintiff's business." *Id.*, at 248. See also, *Gartner Group, Inc., v. Mewes*, 1992 Conn. Super. LEXIS 38, 1992 WL 4766 (1992) (non-compete unreasonable because it prohibited solicitation of customers who were not "readily identifiable."); *Trans-Clean Corp. v. Terell, supra*; *Timenterial, Inc. v. Dagata, supra*; *Beit v. Beit*, 15 Conn.Sup. 191 (1947); *Haims, Buzzeo & Co. v. Wikstrom*

, Docket No. CV02-0120077, 2003 Conn. Super. LEXIS 2539 (Stamford/Norwalk Judicial District, 2003).

Other cases further suggest that the plaintiff has overreached in seeking enforcement of so vast a geographic restriction on the defendant's employment. For example, the restriction in *Mattis v. Lally*, 138 Conn. 51, 82 A.2d 155 (1951), was a one-mile radius from the plaintiff's business, and that non-compete was ancillary to the sale of a business. In *Torrington Creamery v. Davenport*, 126 Conn. 515, 12 A.2d 780 (Conn. 1984), the plaintiff sought and received enforcement of the non-compete in only two of ten towns [*21] where the employee had "special knowledge" of the employer's customers. In *Scott v. General Iron & Welding Co, Inc.*, 171 Conn. 132, 368 A.2d 111 (Conn. 1976), the wide area covered by the non-compete was upheld because of the employee's detailed knowledge of the company's customers and procedures, but the agreement did not prohibit the employee from working for competing companies; rather, it only prohibited his ownership and management of competing companies.

Braman also argues that it trained Barnes to work in this industry, and it was its sales staff, not Barnes, who recruited most of the customers in the non-compete area. It contends that it has thus made a considerable investment in both Barnes and the client base that it seeks to retain and grow, and that it is entitled to protect that investment. [HN8]"Especially if the employment involves . . . [the employee's] contacts and associations with clients or customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance so acquired to injure or appropriate the business which the party was employed to maintain and enlarge." *Robert S. Weiss & Assoc. v. Wiederlight, supra*, 208 Conn. at 533. [*22] (Citation and internal quotation marks omitted).

That argument makes sense as far as it goes, and if the plaintiff had been seeking only to protect the customer base it had nurtured though its investment in Barnes, this case would be quite different. Braman, however, seeks not a fair return on that investment, but rather something closer to a windfall by keeping the defendant out of all parts of the state where the plaintiff does business and where the defendant would have any interest in doing business.

Moreover, the "investment" made in Barnes is quite different from, for example, the "considerable investment" cited in *Edge Technology Services, Inc. v. Worley*, 2005 Conn. Super. LEXIS 1804, 2005 WL 1971109 (Conn.Super.). The employee in that case earned a $ 100,000 salary, had the opportunity for quarterly $ 20,000 bonuses, a $ 30,000 expense account, a car allowance and reimbursement for his cell phone. Barnes, in contrast, was an hourly wage employee in whom some training and licensing fees were the company's only real investment.

Barnes also contends that the non-compete in this case does nothing to protect the public interest. [HN9]When evaluating the "public interest" aspect of a non-compete, [*23] the court should consider "(1) the scope and severity of the covenant's effect on the public interest, (2) the probability of the restriction creating or maintaining an unfair monopoly in the area of trade, and (3) the interest sought to be protected by the employer." *New Haven Tobacco Co. v. Perrelli*, 11 Conn.App. 636, 640, 641, 528 A.2d 865 (1987). In the absence of specific facts showing the way in which enforcement of a non-compete would interfere with the public's interest in open competition, there is no basis for a court to conclude that enforcing the non-compete would impair that interest. *Wiederlight, supra*, 208 Conn. at 533, 534. On the other hand, there has been no evidence that this agreement advances the public interest, and thus, in this case, there is nothing in the stipulated facts to suggest that enforcement of the non-compete could possibly have any discernible effect on the public interest.

As previously discussed, however, it is the fact that the geographical restriction as written is designed less to protect the plaintiff's legitimate interests and more to preserve an enormous area free of competition that seals the fate of [*24] this non-compete. The court concludes that because of the geographical restriction, the non-compete may not be enforced against this defendant.

The plaintiff has suggested that should the court rule that any of the restrictions contained in the non-compete are excessive, it should enforce the agreement in a manner that would be fair, reducing, if necessary, the scope and/or nature of the offending restriction. The court concludes that it is not the court's task to reform the non-compete so that its application is rendered more fair. The plaintiff chose to require its employees to sign an agreement, which it drafted, in an effort to protect its interests. In light of the case law already discussed, it could have easily done so in a way that in all likelihood

2006 Conn. Super. LEXIS 3753, *24

would have passed judicial muster. For example, it could have sought simply to prevent a departing employee from soliciting business from those customers served by that employee for a six-month period, or even, perhaps, limited the restriction to the specific towns and cities in which those customers were located. Either of these approaches would have prevented the defendant from doing what she has done. It could also, as the plaintiff [*25] had done in *Gartner Group, Inc., v. Mewes Group, supra,* have included a clause in a broader non-compete that specifically permitted such "blue-penciling" by the court. The agreement in that case included the following provision:

If any provision or clause of this Agreement, or portion thereof, shall be held by

      any court or other tribunal of competent jurisdiction to be illegal, valid (sic), or unenforceable in such jurisdiction, the remainder of such provision shall not thereby affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of the Agreement, or any portion thereof, to be illegal, void, or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce the duration, area, or matter of such provision, and in its reduced form, such provision shall then be enforceable and shall be enforced.

See, also, *Century 21 Access America v. Nereida Lisboa,* Superior Court, judicial district of Ansonia/Milford at Milford, Docket No. CV03-081901, 2003 Conn. Super. LEXIS 2085 (July 23, 2003, Ronan, J.) (35 Conn. L. Rptr. [*26] 272).

This agreement contained no such provision. Instead, the plaintiff chose to overreach by expanding the restriction to a geographical area so large that it effectively eliminates competition altogether and prevents the plaintiff from practicing her profession unless she relocates to an area outside the restricted portion of the state, or outside of the state entirely, actions which are not necessary for the fair protection of the plaintiff's legitimate business interests. To accept the suggestion that the court should enforce a narrowed version of the non-compete, with the nature and scope of the narrowing to be undertaken by the court, would be to encourage employers to cast their nets as widely as possible, secure in the knowledge that while some employees might effectively be deterred from competing by such an agreement, the burden would be on those who chose to compete to convince the court to reform the contractual agreement. The plaintiff has provided the court with no persuasive authority suggesting that, other than under the circumstances in *Gartner Group, Inc.,* this a task which courts should undertake. There is no such provision in this agreement, however, and the [*27] court concludes that the approach it should take is that this non-compete is either enforceable on its own terms, or it is not.

Because the court has concluded that the geographical restriction contained in the non-compete is not enforceable as a matter of law, it also concludes that the plaintiff is unlikely to prevail on the merits of its action. For that reason, the court need not address the defendant's argument on the irreparable harm issue in order to reach a determination that the plaintiff is not entitled to the issuance of a temporary injunction.

For all of the above reasons, the Application for a Temporary Injunction is denied.

Jonathan E. Silbert Judge

LEXSEE



Positive
As of: May 27, 2011

**Levitt Corporation, et al. v. Levitt, et al.**

**No. 78 C 1531**

**United States District Court for the Eastern District of New York**

**1978 U.S. Dist. LEXIS 15820; 201 U.S.P.Q. (BNA) 164**

**Aug. 29, 1978**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the seller of a trademark, sought injunctive relief, punitive damages, a temporary restraining order, and attorney fees from defendant, the buyer of the trademark. The buyer claimed that the seller infringed on its trademark rights, breached an agreement between the parties, used a false designation of origin, committed unfair competition, and committed dilution of the mark.

**OVERVIEW:** The seller was a well known and successful housing developer. He operated under his surname and had named communities under his surname. The assignor sold his business as well as the right to his name to the buyer. The sale agreement stated that, when a period of time expired, the seller could enter back into the housing development business, with certain restrictions. After the designated time expired, the seller began building a new development under his surname. The seller argued that he should have the right to use his own name and that his surname was unprotectable because it had become generic name for a certain type of community. The court found that the seller's surname was not a generic term. The court found that there would be a substantial likelihood of confusion by the seller using his name in connection with the new development. Although a person had a fundamental right to use his family name in connection with business enterprises, such right did not apply when it was voluntarily parted with and was identified with a business that was sold in connection with the name. The buyer had chosen to limit its recovery to liquidated damages by the terms of the agreement.

**OUTCOME:** The court granted a modified version of the injunctive relief requested by the buyer and denied the buyer's request for treble damages, punitive damages, and attorneys fees. The court awarded the buyer liquidated damages as stated in the parties' contract.

**LexisNexis(R) Headnotes**

*Trademark Law > Subject Matter > Names > Generic Names > General Overview*
[HN1]A mark is not generic simply because it has some significance for the public. To be generic, the principal significance of a mark must indicate the nature or class of an article, rather than its origin.

*Trademark Law > Subject Matter > Names > Personal Names*
[HN2]The right of a person to use his family name does not apply when it has been voluntarily parted with, particularly, when the name has been extended to a corporation identified with the business and the corporation has then been sold, together with the name and its good will. Under such circumstances, doctrines of both trademark and contract, grounded in principles of honesty and good faith, limit the seller's right to his own family name.

*Contracts Law > Remedies > Foreseeable Damages > General Overview*
*Contracts Law > Remedies > Liquidated Damages*
[HN3]Liquidated damages, are in lieu of, not in addition to, other compensatory damages.

Case 3:11-cv-00655-MRK   Document 38   Filed 06/02/11   Page 18 of 23

1978 U.S. Dist. LEXIS 15820, *; 201 U.S.P.Q. (BNA) 164

COUNSEL:   [*1]   David I. Goldblatt, and Proskauer, Rose, Goetz & Mendelsohn, both of New York, N.Y., for Levitt Corporation.

Siegrun D. Kane, and Kane, Dalsimer, Kane, Sullivan, & Kurucz, both of New York, N.Y., for LSI United Corp.

Curtis E. Clayton, New York, N.Y., for defendants.

OPINION BY: PRATT

OPINION

Pratt, District Judge.

By complaint filed july 18, 1978, plaintiffs commenced this action against defendants. use of the names "Levitt," "Levitt & Sons," "Levittown," and "Strathmore" in connection with the construction, promotion, development, advertisement, and sale of residential dwellings. Plaintiffs seek injunctive damage, and punitive relief, and by proposed order to show cause requested a temporary restraining order and early return date on a motion for a preliminary injunction After hearing counsel for both sides, the court signed the order to show cause and granted a temporary restraining order preventing defendants from distributing or authorizing the distribution of or publishing, or authorizing the publication of any advertisement, press release, or other promotional material, using the names or marks "Levitt," "Levittown," and/or "Strathmore" either alone or in conjunction with [*2] other words, in connection with the promotion, development advertisement and/or sale of land and/or residential dwellings. Defendants were specifically relieved of any requirement to recall any advertisements, press releases, or other promotional materials distributed or published prior to the date of the order, July 18, 1978.

Upon the return of the preliminary injunction motion, and on consent of counsel for all parties, the court, pursuant to FRCP 65(a)(2), ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the application for preliminary injunction. In addition, the court directed that the trial be bifurcated so that evidence with respect to compensatory damages, if needed, could be heard separately from and after the injunction issues and related questions of liability.

A hearing was held on July 26, 1978 at which testimony and documentary evidence were presented. Tereafter, the court on August 11, 1978 issued an interim memorandum and order stating

that the defendants have infringed rights of the plaintiffs and that the latter are entitled to some relief. A full decision on liability will be issued shortly. The exact

nature [*3]  and extent of relief cannot be determined without further argument and, perhaps, further evidence.

Simultaneously, the court extended the temporary restraining order previously granted so that the TRO may operate as a preliminary injunction, to continue until further interim relief, or final relief in this action can be determined. A conference between counsel and the court was held on Friday, August 25, 1978, at which problems of injunctive relief, damages, and attorneys' fees were discussed.

This memorandum and order is intended to set forth in greater detail the court's findings and conclusions on the questions of liability, injunctive relief, damages and attorneys fees.

Defendant William J. Levitt is the founder of an extensive organization well known for its construction of residential housing, originally on Long Island, and later elsewhere in this country and the world.  His organization built at least two communities: Levittown, New York, and Levittown, Pennsylvania, which officially bear his name.

Prior to January 10, 1968, the Levitt operations were concentrated in a corporation called "Levitt & Sons, Inc." which was then engaged in land development and residential [*4]  construction both in the United States and elsewhere.  Defendant William J. Levitt was its controlling shareholder.  Pursuant to an agreement with ITT Corporation, Levitt & Sons, Inc.  (New York) was merged into ITT Levitt, Inc.  which was wholly owned by ITT Corporation.  As part of the agreement William J. Levitt received ITT common stock having a market value in excess of $60,000,000 for which he relinquished and transferred to ITT Levitt, Inc. his controlling interest in Levitt & Sons, Inc. (New York).  ITT Levitt, Inc. succeeded to all rights, title, and interest to the assets of Levitt & Sons, Inc. (New York), together with all good will, trademarks, tradenames, service marks, and service names associated with the business of that corporation. In addition, William J. Levitt was employed by ITT Levitt, Inc. for a five year period at a guaranteed minimum annual compensation of $175,000.

ITT Levitt, Inc. changed its name to Levitt & Sons, Inc. and continued the business of Levitt & Sons, Inc. (New York) by acquiring and developing land with residential communities.

By judgment entered September 24, 1971, the United States District Court for the District of Connecticut in [*5]  U.S. v. ITT, Civil Action #13,320, directed ITT to divest itself of its interest in Levitt & Sons, Inc. (Delaware).  To carry out that order, Victor Palmieri and Company was appointed trustee by the court, and ITT,

Case 3:11-cv-00655-MRK   Document 38   Filed 06/02/11   Page 19 of 23

1978 U.S. Dist. LEXIS 15820, *; 201 U.S.P.Q. (BNA) 164

on January 16, 1975, transferred all of its stockholdings in Levitt & Sons, Inc. (Delaware) to Palmieri.

In the meantime, William J. Levitt's employment agreement with ITT was modified by agreement dated January 31, 1972. Thereafter, it was superseded and terminated by an agreement dated November 3, 1975. Under the 1975 agreement, William J. Levitt agreed with Levitt & Sons, Inc. (Delaware) that to and including June 30, 1977 he would not "engage in any business consisting of or involving (i) the construction, sale and/or leasing of single family and/or multi-family residential housing units, or (ii) the development of unimproved land and/or sale of improved land for use in residential construction * * *." In addition, paragraph 5 of the 1975 agreement specifically restricted William J. Levitt's right to use his family name "Levitt" in connection with the business of residential development and construction. That paragraph 5 provided:

Mr. Levitt acknowledges and [*6] agrees that he does not have, either now or at any time in the future, (i) the right to use, or to authorize anyone else to use, the name "Levitt" alone or in conjunction with any other names or words, as the corporate, firm or business title, trade name or trademark of any business in any part of the United States or elsewhere in the world engaged in any of the activities described in Paragraph 3 hereof [i.e. residential development and construction] or in the construction of office buildings or other non-residential properties or(ii) the right to associate himself in any capacity, as owner (except ownership of shares of a publicly held corporation, which ownership does not involve control or managerial or operational responsibilities), partner, officer, director, employee or otherwise, in any business engaged in any of the activities described in Paragraph 3 hereof which uses the name "Levitt" in any of the manners described in clause (i) of this sentence. Notwithstanding the foregoing, after June 30, 1977, Mr. Levitt shall have the right to use his own name, privately or publicly (including, without limitation, in stationery, publicity releases and advertising), as a corporate [*7] officer or director in any corporation or other business enterprise engaged in any such business activities (but which does not use the name "Levitt" in any of the manners described in clause (i) of the foregoing sentence), provided that his use of such name shall not be in such manner as would be likely to create confusion with LVS's corporate title, trade names or trademarks.

In substance, therefore, William J. Levitt agreed with plaintiffs' predecessor that after June 30, 1977 he would be able to engage in the business of residential development and construction and would be able to use his own name "privately or publicly (including, without limitation, in stationery, publicity releases and advertising) as a corporate officer or director in any corporation or other business enterprise," but with two important restrictions: (1) the business enterprise might not use the name "Levitt" alone or in conjunction with any other names or words, as the corporate, firm or business title, brand name or trademark of a business engaged in residential development or construction, and (2) his use of the name "Levitt" shall not "be likely to create confusion with Levitt & Sons, Inc.'s corporate [*8] title, trade names or trademarks."

Plaintiffs contend that defendants' use of the name "Levitt" in their recent activities has violated both the restrictions on a trade name or trademark and the restriction against likelihood of confusion.

In July 1976, Levitt & Sons, Inc. (Delaware) transferred certain of its assets, including all of the trademarks, trade names, service marks, and service names, and the good will of the business associated therewith, to plaintiff Levitt Corporation. Under the assignment there were transferred to plaintiff Levitt Corporation the names "Levitt & Sons" registered in the U.S. Patent Office on May 17, 1960, "Strathmore" registered in the U.S. Patent Office on February 22, 1972, and the name "Levitt" registered in the U.S. Patent Office on October 23, 1973. Plaintiffs also claim that the common law trademark "Levittown" was transferred to plaintiff Levitt Corporation. In November 1977, Levitt & Sons, Inc. (Delaware) changed its name to LSI United Corp., one of the plaintiffs in this action.

Both parties agree that after June 30, 1977, William J. Levitt was not prohibited from engaging in the business of residential development and construction. [*9] For approximately nine years he abided by his restrictive covenant to refrain from that activity and this case presents no issue challenging his compliance. Instead, the present action requires a determination of to what extent William J. Levitt may use his own name in connection with the residential development and construction activities in which he may admittedly now engage.

Defendant William J. Levitt, through defendant International Community Corporation, has now embarked on a 10,000 unit residential housing development in Florida. As indicated below, the project has received extensive publicity, and has been advertised as "Levittown Florida". Plaintiff seeks to enjoin this and any other construction activities by defendant William J. Levitt which employ the names "Levitt" "Levitt & Sons" "Strathmore" or "Levittown" claiming that their use infringes not only the contractual, but also the trademark and trade name rights of plaintiff Levitt Corporation. More specifically, plaintiffs claim that defendants' use of the "Levitt" mark and its variants infringes Levitt Corporation's trademark rights, breaches the 1975 agreement, constitutes a false designation of origin, and unfair [*10] competition, as

well as a dilution of those marks and names entitling Levitt Corporation to injunctive relief. In addition, plaintiffs urge that William J. Levitt has demonstrated wanton and deliberate conduct creating a substantial likelihood of confusion which warrants not only broad equitable relief, but substantial monetary damages.

In response, defendants urge that William J. Levitt has the right to use his own name, that the name "Levittown" is a geographical name to which no one could acquire trade name rights, that no confusion has been created by Levitt's advertising of the Florida project, and that plaintiffs' lack of clean hands precluded them from equitable relief.

A preliminary question is whether the name "Levittown" may be deemed a trade name or trademark. Two geographic communities in the United States bear the official names "Levittown," one on Long Island in New York State, and the other near Philadelphia, in Pennsylvania. Plaintiffs argue that the term "Levittown" connotes a single family, residential community built under the "Levitt" trademark Defendants urge that "Levittown" means any large single family, residential housing development of quality construction [*11] and low cost, and that the term has thereby become generic. Certainly, if generic, the mark could not be protected. See Abercrombie & Fitch v. Hunting World, Inc., 537 F2d 4, 9, 189 USPQ 759, 764 (CA2 1976). However, [HN1]a mark is not generic simply because it has some significance for the public. To be generic, the principal significance of a mark must indicate the nature or class of an article, rather than its origin. Helene Curtis Industries v. Church & Dwight, Inc., 560 F2d 1325, 1332, 195 USPQ 218, 222 (CA7 1977); Feathercombs v. Solo Products Corp., 306 F2d 251, 134 USPQ 209 (CA2 1962).

There is no evidence before the court which would support defendants' contention that "Levittown"has become a generic mark exempting it from legal protection. It has been used to identify the origin. not the type of homes constructed in a development. In the present controversy, the designation of defendants' proposed 10,000 home development as "Levittown Florida" is challenged precisely because it identifies the homes as being built by defendant William J. Levitt in violation of the trademark which he transferred to plaintiffs' predecessor.

Defendants' contention that geographic names [*12] such as "Levittown" cannot be the subject of a trademark is interesting but unpersuasive. Whether the product is viewed as homes in a residential community, or indeed, as the community itself, geographical origin is not a useful concept because a modern, large scale home developer creates the geographical location along with the houses, streets, and other community facilities. To exempt "Levittown Florida" from trademark restriction on

the ground it designates a place of origin would permit defendants to bootstrap themselves out of the carefully phrased restrictions imposed by consent on William J. Levitt.

The central question for determination is whether William J. Levitt's use of his own name, and of the names "Levittown" and "Levitt"in connection with the Florida housing project is likely to create confusion with the corporate title of Levitt & Sons, Inc. (Delaware) and with plaintiffs' trade names or trademarks "Levitt""Levitt & Sons" and "Levittown."The "likelihood of confusion" test applies whether plaintiffs' claim be viewed under the Lanham Act, or under the specific language of the 1975 agreement.

Plaintiffs have shown not only a likelihood of confusion, but have presented [*13] extensive evidence to establish actual confusion. Initially, they point out plaintiffs' building activities in Florida where Levitt Corporation currently has in various stages of development seven different residential projects, all of which are presently being or in the future will be advertised and promoted for sale as "Levitt" projects. In 1979, 500 home sales are expected to gross 25 million dollars; in 1980, plaintiffs anticipate a 40 million dollar return from the sale of between 700 to 1,000 homes. According to the testimony of Edward Eichler, president of Levitt Corporation, the name "Levitt" has a special value in Florida, to which many people from northeastern United States retire, knowing well the Levitt name and history. In part, it was plaintiffs' desire to capitalize on that name which led them to actively pursue their current projects in Florida.

Given plaintiffs' existing activity in Florida under the name "Levitt," it was inevitable that substantial confusion would be generated by William J. Levitt's entry on a large scale into the central Florida real estate market with a proposed development called "Levittown Florida." Numerous instances of actual confusion [*14] caused by defendants' activities have been set forth in the record. There have been telephone inquiries, letters, even reservation deposits sent to plaintiffs, all on the obvious assumption that it was plaintiffs, not defendants, who were constructing "Levittown Florida."

Defendants' press releases and other press coverage of the development not only refer to the project as "Levittown" but liberally sprinkle the term "Levitt" through their references to the community and the houses to be built there. "Levitt"is used not only with reference to defendant William J. Levitt personally, but also in a manner which identifies a construction firm, such as when referring to "Levitt's Engineering and Planning Department."

Based on all the evidence, the court finds and concludes that there is not only a substantial likelihood of

confusion between the manner in which defendants have used William J. Levitt's name in connection with the Florida development, but that there has, in fact, been actual and substantial confusion.  Injunctive relief to the extent described below is therefore warranted.

Before discussing that relief, however, we must first consider defendants' claim that as a matter [*15]  of policy, William J. Levitt has the fundamental right to use his family name in connection with his business enterprises.  Such a [HN2]right does not apply, however, when, as here, it has been voluntarily parted with, particularly, when the name has been extended to a corporation identified with the business and the corporation has then been sold, together with the name and its good will.  Under such circumstances, doctrines of both trademark and contract, grounded in principles of honesty and good faith, limit the seller's right to his own family name.  The LePage Co. v. Russia Cement Co., 51 Fed. 941 (CA1 1892); Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 US 554 (1908); Guth v. Guth Chocolate Co., 224 Fed. 932 (CA4 1915) cert. den. 239 US 640 (1915); Hazel Bishop Inc. v. Perfemme, Inc., 314 F2d 399, 137 USPQ4 (CA2 1963).

There is no merit to defendants' argument that plaintiffs should not obtain equitable relief because they come into court with unclean hands.  In essence, defendants argue that William J. Levitt is the "real" Levitt and that plaintiffs defraud the public when they seek to pass off their products as "Levitt" developments.  The issue, however, is not the product [*16]  itself, but the extent to which William J. Levitt has sold his right to use his own name in connection with residential construction.  Plaintiffs' advertising does no more than exploit within a proper commercial framework the very rights which William J. Levitt sold to plaintiffs' predecessor. Unclean hands, therefore, has no place in this dispute.

In short, although William J. Levitt, by his agreement of 1975, retained the right after June 30, 1977 to use his own name privately or publicly in stationery, publicity releases, and advertising as a corporate officer, director in any business enterprise engaged in residential construction, his right was limited in two respects: (1) he could not use the name "Levitt" as a business title, trade name, or trademark, and (2) he could not use his name in such a manner as would be likely to create confusion with the corporate title "Levitt & Sons, Inc." or with the trade names and trademarks previously sold.  On the evidence presented in this case, defendants have used the name "Levitt" as a firm title, the name "Levittown" as a trademark, and the names "William J. Levitt," "Levitt" and "Levittown" in a manner which is likely to create confusion [*17]  with plaintiffs' rights in the names "Levitt," "Levitt & Sons" and "Levittown."

The question of appropriate relief remains to be considered.  Plaintiffs want a sweeping injunction banning defendants from any use of the name "Levitt" whatsoever.  They seek to go beyond the language of Paragraph 5 of the 1975 agreement, claiming that the present violation of that agreement by defendants, when coupled with a prior claimed violation which was settled by agreement of the parties, generated such a likelihood of future confusion as to require such drastic relief.  Defendants argue that unless William J. Levitt is permitted to make his name public in connection with the Florida development and, possibly with other developments, his contractual right to reenter the construction business after June 30, 1977 would be rendered meaningless.  According to defendants, not only governmental regulations, but practical necessity requires that a builder disclose his background and experience in order to successfully attract customers.  Such disclosure here necessarily connects William J. Levitt with the spectacular success of his prior company "Levitt & Sons," yet it is precisely the good will of [*18]  that company, as related to its trademarks and trade names, which plaintiffs claim as their sole right.

In view of the confusion already generated by defendants' publicity campaign focused upon William J. Levitt, his past accomplishments, and the development of "Levittown Florida," it is necessary that strong and substantial restrictions and requirements be imposed in order to protect plaintiffs in their rights.  To that end, an injunction shall issue:

(1) Directing defendants to cease all use of the term "Levittown" in connection with the development, advertising and marketing of their project in Orange County, Florida.  To the extent that defendants may request or compel the removal of the name "Levittown" from presently existing maps, streets, subdivision applications, municipal approvals, and any other advertising or governmental applications, forms, brochures, prospectuses, or other documentation, defendants are directed to do so forthwith.

(2) Directing defendants for a period of two years to refrain from issuing any press releases or advertising, or generating any publicity concerning William J. Levitt's connection with the Orange County development.  Although this restriction [*19]  exceeds that agreed to by William J. Levitt in 1975, it is needed in order to counteract the impairment of plaintiffs' rights caused by his actions to date.

(3) Directing defendants to refrain permanently in connection with any future residential developments from issuing press releases, brochures, advertising, or publicity concerning William J. Levitt's prior connection with or relationship to past projects which were, in fact,

1978 U.S. Dist. LEXIS 15820, *; 201 U.S.P.Q. (BNA) 164

developed by Levitt & Sons, Inc. (New York) or its related corporations. This restriction is necessary to avoid the likelihood of confusion inherent in publicity which associates William J. Levitt with the corporate history.

(4) Directing defendants, if plaintiffs so elect, to issue a press release in form to be proposed by plaintiffs and approved by the court, addressed to William J. Levitt's relationship to the parties to this suit, the questions presented and the result thereof.Such corrective advertising might help to restore plaintiffs' position, but the court recognizes the difficulties and risks involved in such a public statement and therefore leaves the drafting and decision as to its advisability to the plaintiffs' option.

(5) Directing [*20] defendants to cease and refrain from using the name "Strathmore" as any part, location, or street in the Orange County, Florida project, or in any other project now or hereafter built by defendants. There is no substantial dispute over plaintiffs' right to the name "Strathmore," registered in the U.S. Patent Office on February 2, 1972, in connection with the construction of residential communities.  In conferences with the court, defendants' counsel agreed to discontinue entirely any use of the name "Strathmore".

The court recognizes that in order to comply with various governmental requirements, including but not limited to the requirements of the New York State Attorney General, for disclosure in connection with prospectuses upon sales in New York of land located elsewhere, defendants may have to file information concerning William J. Levitt's background and experience in residential construction.  Similar information may, as a practical matter, be required if defendants are to obtain suitable financial backing for their development activities.  This injunction is not intended to preclude truthful disclosure to any governmental or financial body or agency of such information.  [*21]  It is not clear on the present record, however, whether any governmental regulations require disclosure to prospective purchasers of such information concerning defendant William J. Levitt's prior connection with Levitt & Sons and other "Levitt" building projects.  If such disclosure to purchasers by way of prospectuses or other advertising should be required, then the parties will have to apply to the court for further refinement of the principles embodied in this decision.  For present purposes the court has assumed that such disclosure is not and will not be required.  Should that assumption prove to be erroneous, then an equitable balance must be struck between plaintiffs' rights to the "Levitt" names and defendants' contractual right to engage in the business of residential construction.  Since no direct conflict between these rights yet appears, the court has made no attempt to strike that balance.

Plaintiffs have also sought compensatory damages in addition to the liquidated damages of $520.54 per day called for by the 1976 settlement agreement.  Plaintiffs contend that the liquidated damages provision was intended to establish a minimum or floor from which compensatory [*22] damages could be calculated, and they point out the express provision of the agreement that the liquidated damages were to be in addition to other relief to which plaintiff might be entitled.  The court cannot agree.  When speaking of "damages," the contract refers merely to "liquidated damages," a concept frequently invoked by contracting parties to establish damages for breach when compensatory damages, as here, might be difficult to compute.   By their nature, however, [HN3]liquidated damages, are in lieu of, not in addition to, other compensatory damages. Stone, Sand & Gravel Co. v. United States, 234 US 270, 279, 34 SCt 865, 867 (1913); Trans World Airlines v. Travelers Indemnity Company, 262 F2d 321, 326-7 (CA8 1959); Byron Jackson Co. v. United States, 35 F.Supp 665, 667 (SD Cal 1940); Sulyok v. Penzintezeti Kozpont Budapest, 279 App Div 528, 111 NYS2d 75, 80; Estate of Richter v. Novo Corporation, 43 AD2d 1, 349 NYS2d 101, 103. Indeed, if the contract were to be read as plaintiffs urge, the liquidated damages provision might well be deemed a "penalty" and, therefore, unenforceable under New York law.   The court construes this contract to limit plaintiffs' damages to the liquidated [*23] amount agreed to by the parties, $520.54 per day to be calculated from February 15, 1978, the date of defendants' first press release about a "new Levittown in the United States" to and including July 18, 1978, the date of the court's temporary restraining order.

Plaintiffs' requests for treble damages, punitive damages, and attorney's fees are denied.  Although in exceptional circumstances such a request may be granted in an action to enforce rights under the Lanham Act, plaintiffs' predecessor here, presumably knowing of such opportunities, agreed instead to a liquidated damages provision, and as indicated above, plaintiffs' damages are limited by that provision.  Moreover, the court does not find the circumstances giving rise to the 1976 settlement agreement to be the flagrant conduct that plaintiffs urge. There, a relatively innocuous breach, perhaps even a good faith error, was promptly and effectively cured by agreement of the parties.  Under all the circumstances, such extraordinary relief as treble damages, punitive damages, or attorney's fees does not appear appropriate. Future violations by defendants, however, might well call for such measures, as well as for whatever [*24] enforcement and new equitable remedies may be available to the plaintiffs.

Settle on notice a final judgment for the injunctive relief and damages authorized above.

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2011, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's electronic filing system.

/s/ Patricia Reilly
Patricia Reilly CT08352